**Keith S. Dubanevich**, OSB No. 975200
**Keil M. Mueller**, OSB No. 085535
**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
209 S.W. Oak Street, Suite 500
Portland, OR  97204
Telephone:     (503) 227-1600
Facsimile:     (503) 227-6840
Email: kdubanevich@stollberne.com
         kmueller@stollberne.com

*Liaison Counsel for the putative class*

**Daniel L. Berger**, *to be admitted pro hac vice*
**Caitlin M. Moyna**, *to be admitted pro hac vice*
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:     (646) 722 8500
Facsimile:     (646) 722 8501
Email: dberger@gelaw.com
         cmoyna@gelaw.com

*Lead Counsel for the putative class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IN RE: PORTLAND GENERAL ELECTRIC COMPANY SECURITIES LITIGATION | Case No. 3:20-cv-01583-SI [Lead] <br><br> **CLASS ACTION** <br><br> **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

I.      SUMMARY OF THE ACTION ........................................................................1

II.     THE PARTIES .............................................................................................6

III.    JURISDICTION AND VENUE ....................................................................8

IV.     CONFIDENTIAL WITNESSES ...................................................................9

V.      FACTS .........................................................................................................10

        A.      Background of PGE ...........................................................................10

        B.      Background of Energy Trading Within the Power Industry ..............13

        C.      PGE's Increasing Profits and Pressure to Beat Prior Quarters .........16

                1.      Pre-Class Period Earnings and Reactions ................................16

                2.      Q4 2019 and FY 2019 Earnings and Reactions ......................17

                3.      Q1 2020 Earnings and Reactions ............................................18

                4.      Q2 2020 Earnings and Reactions ............................................19

        D.      PGE's Risky Energy Trades Conducted for Non-Retail Purposes ....22

        E.      The Truth Is Revealed .......................................................................26

VI.     DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......30

VII.    ALLEGATIONS OF SCIENTER .................................................................41

        A.      Maria Pope .........................................................................................41

        B.      James Lobdell .....................................................................................44

        C.      Imputed Knowledge of Facts Critical to the Company's Energy
                Trading Operations .............................................................................46

VIII.   ADDITIONAL LOSS CAUSATION ALLEGATIONS ..............................46

IX.     PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET ..............47

X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS
        CAUTION DOCTRINE ...............................................................................49

XI.     CLASS ALLEGATIONS .............................................................................49

        A.      Definition of Class .............................................................................49

        B.      The Class Satisfies the Requirements of Rule 23 ..............................50

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ..........................51

COUNT I Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated
        Thereunder  (Against all the Defendants) ........................................................51

COUNT II Violation of Section 20(a) of The Exchange Act  (Against the Individual
        Defendants) .....................................................................................................55

i

XIII.   PRAYER FOR RELIEF ................................................................................................56

XIV.   JURY DEMAND .........................................................................................................57

Court-appointed Lead Plaintiff, the Public Employees' Retirement System of Mississippi, for itself and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. This federal Securities Class Action asserts claims under the Exchange Act of 1934 (the Exchange Act). This consolidated amended complaint asserts securities fraud claims under Sections 10(b) (and Rule 10b-5 promulgated thereunder) and control person liability claims 20(a) of the Exchange Act. This action is brought on behalf of all investors who purchased the common stock of Portland General Electric Company ("PGE" or the "Company") during the Class Period (February 13, 2020 through August 24, 2020). These claims are asserted against the Defendants: (1) Portland General Electric Company; (2) CEO Maria Pope; and (3) CFO James Lobdell (collectively, "Defendants").

## I.    SUMMARY OF THE ACTION

1.    PGE has provided energy to the residents of Portland and Salem, Oregon, and their environs, for more than 130 years. According to PGE's website, it services nearly 900,000 retail customers across Oregon, including both residential and commercial customers. PGE's recent history finds its roots in the Enron Corporation, which owned PGE from 1997 until 2006, at which point PGE was divested as part of Enron's bankruptcy. Specifically, in April 2006, Enron conducted an offering of 27 million shares of PGE common stock, which were distributed to Enron's creditors, making the Company an independent, stand-alone, publicly-traded company for the first time since Enron had acquired it in 1997. PGE has remained independent and publicly-traded since 2006.

2.    Following the Enron collapse in 2001, and since the offering in 2006, PGE sought to maintain a conservative risk profile. Enron's risky trading practices generally involved

derivative instruments whose underlying assets were energy products – oil, gas or electricity. PGE, in contrast, eschewed these volatile and risky trading practices and touted its conservatism in its public filings and statements.  It maintained this risk-averse environment and profile for at least a decade leading up to the Class Period.  Investors and analysts likewise characterized PGE as a low risk investment.

3.     PGE had flourished during the two years leading up to the Class Period.  With the exception of one quarter, PGE reported an increase in diluted earnings per share ("EPS"), as compared to the prior year, in each reporting period from the fourth quarter of 2018 through the second quarter of 2020.  However, as a regulated public utility company, PGE found it increasingly difficult to sustain this growth that investors had come to expect. Thus, PGE's employees faced pressure from executive management, including PGE's CEO Maria Pope, to generate revenues and profits through alternative avenues.  Despite its low-risk profile, PGE turned to risky, speculative trades in energy derivatives to enhance its bottom line and maintain its streak of increasing profits.

4.     At most power companies, some trading within the energy market itself is normal, and PGE was no exception.  The power industry typically experiences unusually volatile pricing. This is a result of fluctuating demand, paired with fluctuating supply, both of which are difficult to predict, made even more complicated by the fact that energy cannot simply be stored and used for a later time when demand is higher.  To moderate the risks associated with high price volatility, power companies regularly engage in futures trading to hedge against these uncertainties and avoid large losses when demand spikes or supply dwindles.  Similar to most power companies, PGE maintained an active trading desk to conduct these price-hedging based

trades for "retail purposes."   Investors expect power companies to engage in this form of energy trading and, indeed, PGE disclosed that it practiced this type of energy trading.

5.      What is not usual is for an energy company to trade within the power or energy markets for the sole purpose of generating revenues and profits.  The inherent risks associated with these trades make them unappealing to investors and to energy companies alike.  Indeed, speculative trades within the energy industry led to Enron's collapse in 2006.  Even if some of these trades prove profitable, they are not likely to be repeated, and investors cannot rely upon them for a steady stream of revenue.  Thus, throughout the Class Period, PGE specifically and repeatedly assured investors in each of its Class Period SEC filings: "PGE does not engage in trading activities for non-retail purposes."

6.      Despite these assurances, PGE in fact engaged in high-risk trading activities for non-retail purposes during the Class Period.  Beginning in at least at the early part of 2020, PGE's energy traders engaged in risky trades designed not to hedge against price fluctuations but rather to generate profits for the Company.  However, rather than disclose to its investors that it had abandoned its risk-averse profile in pursuit of short-term profits through speculative trading activities, PGE continued to assure investors that its trading activities were conducted solely to mitigate risk.  Thus, investors did not know that PGE had increased the Company's exposure to the volatile energy market.

7.      Accordingly, investors were surprised when, after the market closed on August 24, 2020, PGE announced that it was taking a $127 million loss caused by the trades made by its energy trading desk, based on wrong way bets in the energy trading market.  Although PGE had been able to get away with speculative trades in prior quarters, which resulted in increased profits for PGE overall, this conduct caught up with the Company in the Summer of 2020, when changes

in the wholesale energy markets exposed these "ill conceived" trades.  No longer able to hide its actions from investors, these extraordinary losses forced PGE to disclose that it had been conducting speculative and risky trades in the hope of generating revenue and profit, and not just to hedge against price fluctuations.

8.    The fallout was fast and severe. After PGE's August 24, 2020 announcement, PGE's stock price dropped precipitously from $41.64 per share to $37.16 per share on August 26, 2020, and its earnings guidance was slashed, down from $2.20-$2.50/share – guidance which the Company had reaffirmed just weeks earlier on July 31, 2020 – to $1.30-$1.60/share on the day that the loss was announced.

9.    Also, on August 24, 2020, PGE placed two unnamed employees on administrative leave and created a special committee of the Board of Directors (the "Special Committee") to review the Company's energy trading practices and its controls related to the trading, with the assistance of external advisors.

10.    On October 29, 2020, just two months after the announcement of PGE's significant trading losses, Defendant CFO James Lobdell announced his retirement from PGE.

11.    On December 18, 2020, the Company announced that the Special Committee had completed its review of the Company's trading activity, issuing several shocking findings and directives.  *First*, the Special Committee concluded that the trades were "ill-conceived" and resulted from flaws in PGE's risk management controls.  *Second*, the Company announced the while the Energy Trading Risk Management Unit (which is responsible for ensuring that PGE's energy trades remain within its risk profile) was reporting directly to CEO Pope, as of January 1, 2021, Power Operations would report directly to the Vice President of Strategy, Regulation and Energy Supply.  *Third*, CEO Pope and CFO Lobdell were denied 100% of their incentive

compensation for 2020.    According to the Company's Schedule 14A filed with the SEC on March 12, 2020, which reported Pope's and Lobdell's incentive-based compensation for the years 2018 and 2019, Pope lost up to 73% of her total annual compensation in 2020, and Lobdell lost just over half.  *Fourth*, the two individuals in the energy trading division who had been placed on administrative leave were terminated from the Company.

12.    Based on these facts, throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about PGE's business. Specifically, Defendants failed to disclose to investors that: (1) PGE had entered into an increasing number of speculative energy trades in the wholesale energy markets in the second and third quarters of 2020 in an effort to generate revenue and profit, and not simply to hedge against energy price fluctuation; (2) PGE lacked effective internal controls over its power operations unit which executed those trades; (3) PGE downplayed the risks it faced in commodity price exposure; and (4) the Company's trading in the wholesale energy markets created significant negative exposure and PGE was reasonably likely to incur substantial losses.

13.    Lead Plaintiff's information and beliefs are based on, among other things, its counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Portland General Electric Company ("PGE" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company, including news stories and court filings; and (d) investigative interviews with former PGE employees having first-hand knowledge of the Company's business operations and trading activities.

## II.    THE PARTIES

14.    Lead Plaintiff, Public Employees' Retirement System of Mississippi, purchased PGE common stock during the Class Period and suffered damages as a result of the Defendants' federal securities law violations and false and misleading statements and material omissions alleged in this Complaint.  Lead Plaintiff provides retirement benefits for its state employees who work in state government, public schools, universities, community colleges, municipalities, the state legislature, and highway patrol, among other state funded entities and services.  These retirement benefits help retain a strong public workforce in the state of Mississippi. The 10-member Mississippi PERS Board of Trustees includes the State Treasurer, a gubernatorial appointee who is a member of PERS, two retirees, two state employees, and one representative each of public schools and community colleges, institutions of higher learning, counties, and municipalities.  The Board is responsible for designating the System's executive director and for establishing the policies for administration of the trust.  The Board also works to carry out the intent and purposes of the state legislature by establishing rules and regulations for the administration of PERS and the transaction of its business.

15.    Defendant Portland General Electric Company is an Oregon-based electric utility company headquartered in Portland, Oregon. PGE provides electricity subject to the Oregon Public Utility Commission ("OPUC") and Federal Energy Regulatory Commission ("FERC") rules and regulations. PGE is Oregon's largest electric company, serving over 900,000 residential and commercial customers. Throughout the Class Period, PGE common stock was listed on the NYSE and traded in an efficient market under the ticker symbol "POR."

16.    Defendant Maria Pope ("Pope") became president and CEO of Portland General Electric in January 2018. Defendant Pope remains in her position as president and CEO and

serves on the Company's board of directors.  Pope joined PGE in 2009 as a Senior Vice President, Finance, Chief Financial Officer and Treasurer.  She held those positions until February 2013.  From March 2013 to January 2018, Pope served as the Company's Senior Vice President, Power Supply, Operations and Resource Strategy, where she directly oversaw PGE's energy trading portfolio.  Pope signed and, pursuant to SEC Rule 13(a)-14(a) and the Sarbanes Oxley Act of 2002 ("SOX"), certified the Company's Form 10-K for the fiscal year ended December 31, 2019 ("2019 10-K"), 1Q20 10-Q, and 2Q20 10-Q filings with the SEC.  In 2018, Pope received a base salary of $789,183, and total compensation, including incentive-based compensation, of $3,216,062.  In 2019, Pope received a base salary of $876,077 and total compensation, including incentive compensation, of $4,065,948.

17.    Defendant James Lobdell ("Lobdell") has served as the Company's CFO, and treasurer since March 2013.  Prior to March 2013 Lobdell held various roles within the Company. From May 2001 until September 2002, he served as the Company's Vice President, Risk Management Reporting, Controls and Credit.  From September 2002 until August 2004, he served as Vice President, Power Operations.  In August 2004, he transitioned to Vice President, Power Operations and Resource Strategy, where he remained until March 2013, when he assumed the rule of CFO.  On October 29, 2020, Lobdell announced that he would be retiring from his position at PGE at the end of 2020.  Lobdell signed and, pursuant to SEC Rule 13(a)-14(a), and the Sarbanes Oxley Act certified the Company's 2019 10-K, 1Q20 10-Q and 2Q20 10Q filings with the SEC.  In 2018, Lobdell received a base salary of $459,184, and total compensation, including incentive-based compensation, of $1,358,689.  In 2019, Lobdell received a base salary of $507,892 and total compensation, including incentive compensation, of $1,743,648.  Lobdell and Pope are referred to herein as the "Individual Defendants."

7 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

18.    The Individual Defendants possessed and exercised their power and authority to control the contents of the Company's SEC filings, press releases, and other market communications.  They were provided with copies of the Company's SEC filings, press releases, and statements in earnings calls, which were later shown to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected or supplemented so as to not be materially misleading or incomplete.  Because of their control over the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## III.    JURISDICTION AND VENUE

19.    The claims asserted in this Consolidated Amended Complaint arise under Section 10(b) of the Exchange Act (15 U.S.C. §78j(b) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5)), and under Section 20(a) of the Exchange Act (15 U.S.C. and 78t(a)).

20.    This Court has jurisdiction over the subject matter of this action under §28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

21.    Venue is proper in this Judicial District under Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because PGE's principal place of business lies in Portland, Oregon, which is within this Judicial District. In addition, many of the false and misleading statements and transactions forming the basis of this amended complaint, which violated the federal securities laws, were made within this judicial district.

22.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of national securities exchanges, the New York Stock Exchange.

## IV.    CONFIDENTIAL WITNESSES

23.     CW1 is a former employee of PGE, who served as a principal strategy integrator from August 2019 through May 2020, when she left on her own accord to move to another state. While at PGE, CW1 reported to Brett Sims, Vice President of strategy, regulation and energy supply, who in turn reported to Pope.   In her role at PGE, CW1 also served on a steering committee, which met once a month.   Both Pope and Lobdell attended those committee meetings.   CW1 also had regular in-person meetings with Pope.

24.     CW2 is a former employee of PGE, who was employed as a senior financial analyst from October 2007 through September 2019, when she departed voluntarily for personal reasons.   CW2 worked in the rates and regulatory affairs department, and the budget department during this time.   CW2 worked in the Power Operations Group,[1]  and reported directly to the Power Operations Group General Manager of Risk Management, Jim Barnes.   Jim Barnes, in turn, reported to Lobdell.   The Power Operations Group was the group that negotiated and executed derivatives trades that are the subject of this Action.

25.     CW3 is a former employee of PGE who served as a principal analyst in the Company's strategic planning department from September 2018 through July 2020, when she left voluntarily to pursue a new opportunity.   She was tasked with determining whether new

---

[1] To help maintain the anonymity of the CWs referenced in this Complaint, each CW is referred to in the feminine form, regardless of actual gender.

markets were a viable source of business for PGE.  CW3 reported to Director Lauren Isaac Shapton, who reported to a vice president, who in turn reported to Pope.  CW3's position was newly created in 2018 to help further PGE's goals of increasing its profits, a significant goal of the Company.

26.    CW 4 is a former employee of PGE who worked at the Company for over thirty years, from January 1990 through August 2020.  She retired recently as a senior financial analyst and contract manager.  She was responsible for supporting non-utility related facility operations and reviewing related internal financial statements.

## V.    FACTS

### A.    Background of PGE

27.    Portland General Electric Company, founded in 1888, is a regulated electric utility that engages in the generation, purchase, transmission, distribution and retail sale of electricity in the state of Oregon.  PGE's service area encompasses the cities of Portland and Salem and several other nearby communities.  The Company services over 900,000 retail customers.  The Company has a mix of power generating resources including hydropower, coal and gas combustion, and wind, as well as key transmission resources.

28.    PGE is regulated by both state (Oregon) and federal agencies.  In particular, the Federal Energy Regulatory Commission ("FERC") and the Oregon Public Utility Commission ("OPUC"), review and approve the Company's rates and services.

29.    PGE's revenue comes primarily through its sale and delivery of electricity to Oregon-situated customers.  PGE also distributes power to commercial and industrial customers who purchase from an electricity service supplier ("ESS").

30.     PGE disclosed in its Form 10-K for the year ended December 31, 2019, filed with the SEC by PGE on February 14, 2020 ( "2019 10-K")    that PGE meets its energy requirement for its retail customers with "both company-owned generation and power purchased in the wholesale market."  In addition, "PGE purchases power and natural gas in the open market or under short-term, long-term, or variable-priced contracts".

31.     "Wholesale Revenues" are revenues from sales of energy to utilities or power marketers via interconnected transmission systems within the western United States. These sales are typically performed in order to mitigate risk from having too much supply on hand.  PGE disclosed in its 2019 10-K that such participation is necessary "in order to balance its supply of power to meet the needs of retail customers."  PGE reported that wholesale revenues represented 8% of its total revenues in 2019 and 2018, and 5% of its total revenues in 2017.

32.     PGE further explained how it employs energy trades to mitigate risk.  Thus, on page 11 of its 2019 10-K, PGE stated that it "enters into short-term and long-term power and fuel purchase agreements," and "participates in the wholesale market in an effort to obtain reasonably-priced power for its retail customers, manage risk, and administer its long-term wholesale contracts."  It further explained on page 14 that it "utilizes short-term and long-term wholesale power purchase contracts in an effort to provide the most favorable economic mix on a variable cost basis."  The "medium-term power cost strategy helps mitigate the effect of price volatility on its customers due to changing energy market conditions," and "allows the Company to take positions in power and fuel markets up to five years in advance physical delivery."  This helps PGE "mitigate a portion of the potential future volatility in the average cost of purchase power and fuel."

11 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

33.     Investors in PGE valued the Company for its safe, conservative returns on their investments.  Pope recognized this during the Company's earnings call on July 31, 2020, when she stated, "So first of all, we recognize that our dividend is an important component of our shareholder return and being a steady and financially healthy company.  It's really important that as we invest for the long term in infrastructure to maintain a safe, reliable system and having a financially healthy utility is critically important."

34.     Analysts likewise saw PGE as a safe investment.  For example, in a February 14, 2020 analyst report, CFRA gave PGE a risk assessment of "low" (as compared to "medium" or "high"), and stated, "Our risk assessment reflects the steady cash flows expected from the regulated electric transmission and distribution businesses, slightly faster-than-average population growth and a generally favorable regulatory environment."  This risk rating, which CFRA assigned to PGE in at least the year preceding the Class Period, was also given to PGE in CFRA's reports dated April 27, 2020, July 31, 2020, August 3, 2020, and August 4, 2020.

35.     To maintain its image as a conservative, safe investment, PGE assured investors in its 2019 10-K and in its 10-Qs for the first and second quarters of 2020, that it "does not engage in trading activities for non-retail purposes."  In other words, PGE represented that all of its trades in the energy industry were conducted in order to assist its price risk management activities and not as speculative attempts to generate profit.  PGE also provided lengthy descriptions of its energy trading practices and stressed that these practices were for the purpose of mitigating risks associated with unpredictable power supply and demand swings. PGE never disclosed that it conducted any energy trading for the purpose of generating revenues and profits.

**B.    Background of Energy Trading Within the Power Industry**

36.    Most power companies such as PGE selectively engage in energy trading to hedge against price fluctuations associated with the difficulties in predicting both supply and customer demand.  This type of trading can take many forms, but each carry their own risks.  This is why power companies such as PGE typically limit energy trading to those trades necessary to mitigate pricing risks. These risks are inherent in each of the types of derivative contracts discussed below, in paragraphs 39-45.

37.    Derivative trading can occur with respect to any type of trading instrument.  A derivative trading instrument is simply a contract between two or more parties, whose value is "derived" from the price of an underlying asset or group of assets.  Common derivatives are futures contracts, options and swaps.  They are typically used to hedge risk or speculate on price fluctuation in the underlying asset.  For example, if the underlying asset is electricity, a company might enter into a futures contract to purchase electricity at a particular rate.  The purchaser is hedging against a spike in energy prices, and the seller is hedging against a decline in the price of electricity.  If the price goes up dramatically, the purchaser benefits from the contract because it had locked in the lower price, and the seller forfeits extra profit it would have gained if it had held the electricity and sold at the higher prices.

38.    Valuation of derivative instruments is more complex when the underlying asset is energy-related because there are many fluctuating variables, including seasonal variation in demand, unpredictable weather and, in the case of power, the convenience premium, which is a pricing premium added to peak power in periods of high demand.

39.    Futures contracts are traded on an exchange.  They are contracts for the purchase or sale of an underlying commodity at a specific price, and during a specific timeframe.  They

may mandate physical settlement and delivery of the underlying product.  Settlement of the future via a financial payment, or delivery of the physical product, must occur for the parties to realize the economic profit and loss of the contract.  This can occur in three ways: (1) entering into an offsetting futures position; (2) exchanging a future for a new agreement between a party with a long futures position and a party with the equal size short position; or (3) keeping the contract until expiration and providing physical delivery of the commodity.  If the parties elect the third option, the new owner of the commodity (buyer) may then sell or utilize the commodity at spot market prices.

40.    Forward contracts are similar to futures contracts but do not occur on an exchange. Further, there is no daily settlement of forward contracts, as is the case for futures contracts. Forwards are also referred to as bilateral agreements.

41.    Swaps are utilized to exchange one indexed item for another, e.g. a swap of interest rates from a fixed rate to a variable rate would allow a counterparty to reduce its effective interest rate expense during times of falling interest rates.

42.    Options are commonly referred to as puts and calls, or options to sell or buy. These are used to allow one party to construct a ceiling on the future price of a commodity, or a floor against a possible decrease in a future price.

43.    Spreads are used to differentiate the input of one commodity that is used to produce a second commodity.  The power exchanges utilize the spark-spread of the cost of natural gas to produce a mega-watt ("MW") of electricity for a specific price.  A higher or increasing spark-spread means electricity prices are increasing.

44.    In its Class Period SEC filings, PGE explained that it "enters into contracts for the purchase of fuel for the Company's natural gas and coal-fired generating plants.  These

14 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

contracts for the purchase of power and fuel expose the Company to market risk.  The Company

uses instruments such as: i) forward contracts, which may involve physical delivery of an energy

commodity; ii) financial swap and futures agreements, which may require payments to, or receipt

of payments from, counterparties based on the differential between a fixed and variable price for

the commodity; and iii) option contracts to mitigate risk that arises from market fluctuations of

commodity prices.  **PGE does not engage in trading activities for non-retail purposes**."

(emphasis supplied)  As explained above, each of these types of trades carried some risk.

45.     PGE assured its investors that it did not engage in trading for "non-retail

purposes" because it wanted investors to believe that it was not engaging in these risky trades to

try to generate revenues or profit.  Since they are so risky, energy companies who operate

prudently seek to limit their exposure to derivative trades.  A business model that sought to

generate profits based on these trades could lead to devastation, as occurred in the notorious

example of Enron when it collapsed in 2001.  Indeed, Enron relied on revenue that stemmed

from trading contracts in a variety of energy and water services, products and plants.  Its reckless

use of derivatives, and complex methods of covering up resulting losses, proved fatal.  With

PGE's historical ties to Enron, it was particularly important that it assured investors that

speculative energy trades were no longer a part of its business.

46.     In addition, it was important to investors to know that revenues were not coming

from energy trades made for "non-retail purposes" because they knew they could not rely on

such trades for a steady and reliable stream of revenue and profits.  Even though some trades

could and did yield benefits to the Company's bottom line, the high risk associated with those

trades made it unlikely that such benefits would be sustained.  Investors would have wanted to

know that the Company's revenues and profits were derived, in part, from unsustainable, risky

investments.  Furthermore, investors had placed their funds in what they thought was a standard utility company, not an investment bank.  But PGE was deriving a significant portion of its revenues and profits from speculative energy trades, and not just from delivering electricity to its customers.  Investors would have wanted – and were entitled – to know that PGE's revenues were coming from a source so far afield from its principal business.

### C.    PGE's Increasing Profits and Pressure to Beat Prior Quarters

47.    Despite being a regulated company with limited control over the prices of the power that it sold to its retail customers, PGE had experienced remarkable increases in profits in nearly every reporting period, as compared to the same reporting period in the prior year, beginning at the end of 2018 and continuing through to the end of the Class Period.  Analysts and investors came to depend on PGE to meet or exceed its prior year's EPS performance for nearly every quarter in 2019 and 2020.

### 1.    Pre-Class Period Earnings and Reactions

48.    According to PGE's Form 8-K filed on February 15, 2019, its earnings per diluted share ("EPS") for the entire year ended December 31, 2018 was $2.37.  This compares to an EPS for the year ended December 31, 2017 of $2.10, an increase of 13%.

49.    The Company also reported net income of $212 million for fiscal year 2018, up from $187 million for fiscal year 2017, an increase of 13%.  For the fourth quarter of 2018, the Company reported net income of $49 million, up from $42 million in the fourth quarter of 2017, an increase of 17%.

50.    On April 26, 2019, PGE filed a Form 8-K announcing that its EPS for the first quarter of 2019 were $0.82, compared to $0.72 of the first quarter of 2018, an increase of 12%.

51.    The Company also reported net income of $73 million for the first quarter of 2019, up from $64 million for the first quarter of 2018, an increase of 14%.

52.    Pope again stressed to investors that these results represented "an increase of $0.10 per share compared to the first quarter of 2018" during the Company's earnings call held on April 26, 2019.

53.    On November 1, 2019, PGE filed a Form 8-K announcing that its EPS for the third quarter of 2019 was $0.61, compared to $0.59 for the third quarter of 2018, an increase of 3.4%.

54.    The Company also reported net income of $55 million for the third quarter of 2019, up from $53 million in the third quarter of 2018.

55.    During the Company's November 1, 2019 earnings call, Pope again stated that this represented "and [sic] increase of $0.02 per share compared to 2018 and increase of $0.12 per share excluding last year's gain associated with the Carty cash settlement," which was a one-time gain.

**2.    Q4 2019 and FY 2019 Earnings and Reactions**

56.    On February 14, 2020, PGE filed a Form 8-K announcing that its EPS for the fourth quarter of 2019 was $0.68, compared to $0.55 for the fourth quarter of 2018, an increase of 23.6%.

57.    In addition, the Company's total EPS for the fiscal year 2019 was $2.39 per diluted share, compared to $2.37 per diluted share in 2018.

58.    Net income for fiscal year 2019 was reported to be $214 million, up from $212 million in fiscal year 2018.  And net income for the fourth quarter of 2019 was reported as $61 million, up from $49 million in the fourth quarter of 2018, a 25% improvement.

59.     The Company touted its increasing EPS on its Q4 2019 earnings call when Pope stated that "In 2019, we recorded net income of $214 million or $2.39 per diluted share, compared with net income of $212 million or $2.37 in 2018. We finished the fourth quarter earning $0.68 per diluted share compared with $0.55 in the fourth quarter of 2018. The increase in earnings per share was driven by improved gross margin due to strong industrial demand and higher earnings from ongoing investment in our system."

60.     During the same February 14, 2020 call, the Company also announced EPS guidance for 2020 of $2.50 - $2.65.  The February 14, 2020 UBS analyst report noted that this, too, "met the $2.56 consensus."

61.     Financial analysts' coverage of PGE also made note of the company's growth from the prior year.  For example, UBS reacted positively to the Company's increase in EPS from 2018 in their report dated February 14, 2020 and stated that  "POR reported 4Q EPS of $0.68 versus $0.55 last year which was in line with the $0.68 consensus. POR reported 2019 EPS of $2.39 versus $2.37 in 2018. The company is doing well to manage the business in a regional economy that delivered 7% industrial delivery sales growth in 2019."

62.     CFRA's February 14, 2020 report on PGE also mentioned the increase in PGE's EPS from the prior year.

63.     Morningstar's February 14, 2020 report stated, "[w]e are reaffirming our $42 per share fair value estimate for Portland General Electric after the Company reported earning $2.39 per share in 2019, slightly ahead of our forecast."

### 3.     Q1 2020 Earnings and Reactions

64.     On April 24, 2020, PGE filed a Form 8-K announcing that its EPS for the first quarter of 2020 was $0.91, compared to $0.82 for the first quarter of 2019, an increase of 9.9%.

18 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

65.    The Company also reported net income of $81 million for the first quarter of 2020, compared to $73 million in the first quarter of 2018, an increase of 11%.

66.    Again, this was highlighted in the Company's earnings call on April 24, 2020, when Pope stated, "[f]or the first quarter of 2020, we reported net income of $81 million or $0.91 per share, an increase of $0.09 per share compared to 2019 results."

67.    Similar to the prior quarter, analysts highlighted this result in their reports.  For example, in its April 24, 2020 analyst report, UBS noted that the $0.91 EPS was "in line with consensus at $0.91 and versus $0.82 last year."  UBS also issues a "First Read" short-hand report, in question and answer format.  The first question associated with the April 24, 2020 earnings call was "How did the results compare vs. expectations," and the answer was "POR reported Q1'EPS of $0.91 versus $0.82 last year in line with consensus."

68.    In its April 24, 2020 report, Morningstar stated, "[w]e are reaffirming our $43 per share fair value estimate for Portland General Electric after the company reported earning $0.91 per share in the first quarter, up 11$ from the first quarter of 2019."

69.    The Company also announced that it was decreasing 2020 EPS guidance by $0.22 to $2.20 - $2.50, down from $2.50 - $2.65.  This was due to uncertainties associated with the Covid-19 pandemic.

### 4.    Q2 2020 Earnings and Reactions

70.    On July 31, 2020, PGE filed a Form 8-K announcing that its EPS for the second quarter of 2020 was $0.43, compared to $0.28 for the second quarter of 2019, an increase of 53.6%.

71.    The Company also reported net income of $39 million in the second quarter of 2020, up from $25 million in the second quarter of 2018, an increase of 56%.

19 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

72.    Pope again touted these results in the July 31, 2020 earnings call, highlighting the increase as compared to 2019, when she stated, "our second quarter 2020, net income was $39 million or $0.43 per share, which represents an increase of $0.15 when compared to 2019 . . . With our year-to-date earnings per share of $1.34, we are more than halfway to our midpoint of our guidance making a solid first half of the year."

73.    Once again, analysts highlighted the importance of meeting expectations and increasing EPS.  UBS's first observation was "POR reported 2Q'20 EPS of $0.43 versus $0.28 last year and the $0.33 consensus."  And again, the first question and answer in its "First Read" report of the same analyst call stated: "POR reported 2Q'20 EPS of $0.43 versus $0.28 last year and the $0.33 consensus."

74.    Similarly, in its July 31, 2020 analyst report, Wells Fargo stated, "Q2 EPS of $0.43 beat our and the consensus estimate of $0.33, which was particularly encouraging given anticipated impacts of at-at-home orders in the quarter."

75.    Morningstar reported in its July 31, 2020 report, "[w]e are raising our fair value estimate for Portland General Electric to $44 form $43 after incorporating first-half results that are on track to meet our full-year outlook. . . . The company reported earning $1.34 per share in the first half of 2020, up from $1.10 per share in the first half of 2019."

76.    PGE was under increasing pressure to continue this trend of quarter over quarter profit increases.  The pressure increased after Pope became CEO.

77.    CW2 described the evolving environment at PGE in the period prior to her departure from the Company in September 2019.  She stated that while the Company was risk-averse earlier in her tenure, by the time of her resignation in September 2019, the Company was assuming increasing risks through its energy trades.  She further stated that the energy traders,

who executed the derivative trades, were "cocky," and were constantly trying to meet their annual revenue goals, which was referred to as "the pledge."  In most cases, they were successful in meeting those revenue goals.  She attributed this new culture to Pope assuming the helm, explaining that traders knew that Pope wanted "big returns" on their trades, which led to intense competition among them, as they jockeyed to become one of Pope's "favorites." CW2 interacted regularly with energy traders in her role, because she was responsible for overseeing derivatives contracts executed by the trading floor. This necessitated frequent conversations between CW2 and PGE's energy traders.

78.    CW2 also provided information about the flawed risk management controls at PGE.  Specifically, the General Manager of Risk Management of the Power Operations Group was Jim Barnes, who retired in May 2020.  He was succeeded by Bill Lopez. As the General Manager of Risk Management in the Power Operations Group, Barnes was responsible for overseeing energy traders and investment contracts.  CW2 explained that traders were told to adhere to certain limits for trades and were required to get approval from Barnes or Lopez if they exceeded those limits.  However, CW2 stated that this policy was not always followed.

79.    CW3 also described intense pressure to generate profits during her time at PGE. She served as a principal analyst in the strategic planning department from September 2018 through 2020.  CW3's position was created with the purpose of securing more revenue and profit for the Company.  CW3 explained that as a utility company, whose prices were regulated, PGE was in a unique position because it had a monopoly on its customer base.  Thus, to grow profits, CW3 was encouraged to use "more creative means."  CW3 was told by her direct boss that a senior executive, most likely Pope, had told PGE's board of directors that they would "find $60 million in profit" or revenue.  CW3 saw that as an impossible task, since PGE could not just go

out and sign up new customers to pull in $60 million.  She also stated that at one point after Pope assumed the helm, she was asked to "monetize the trading floor."  When she explained that she did not think this was not possible, the request was not made of her again.

80.     As described more fully below, in order to maintain its increasing profits, PGE traders turned to making risky trades that were not for retail purposes.

**D.     PGE's Risky Energy Trades Conducted for Non-Retail Purposes**

81.     In order to beat its prior year earnings consistently, the Company turned to generating profits through speculative energy trades, in direct contravention of its public disclosures.  This is evident from three facts.

82.     *First*, PGE did not seek to mitigate the losses from its trades, as it would normally be able to do if the trades were made to hedge against price fluctuations.  PGE is regulated by OPUC and FERC.  On August 24, 2020, PGE announced in a Form 8-K that it had suffered a realized loss of $103 million, and an additional unrealized loss of $23 million in the Company's energy trading portfolio.  PGE also disclosed that these losses would be reported as ***an increase in its net variable power costs, and the Company would not pursue regulatory recovery.***

83.     Under OPUC's regulations, if the losses had been related to price risk management for PGE's retail customer base, PGE would have been permitted to offset these trading losses with a regulatory asset and seek recovery from OPUC via the Power Cost Adjust Mechanism ("PCAM").  If OPUC approves the use of the PCAM, PGE shares cost variances with its customers and its losses are thus partially mitigated.  The fact that PGE stated it would not be pursing regulatory recovery, i.e., not seeking mitigation via the PCAM, indicates that these trades were conducted for non-retail purposes.

84.    *Second*, PGE's accounting for the loss is significant and demonstrates that it resulted from non-retail-based trading. In its Form 10-K, PGE disclosed that price risk management activities are used to manage power costs related to its regulated retail operations under OPUC. Physically settled sales of electricity and natural gas are recorded as revenues, and physically settled purchases of electricity and natural gas are reported in a line item under "Operating expenses," called "purchased power and fuel expense." PGE explained that transactions that are not physically settled are recorded on a net basis in purchased power and fuel expense once they are financially settled. This indicates that gains and losses on derivative instruments that ***do not result in a physical delivery of power are netted within purchased power and fuel expense.*** Specifically, PGE states, "Physically settled electricity and natural gas sale and purchase transactions are recorded in Revenues, net and Purchased power and fuel expense, respectively, upon settlement, while transactions that are not physically settled (financial transactions) are recorded on a net basis in Purchased power and fuel expense upon financial settlement."

85.    In PGE's Form 10-Q for the quarter ended September 30, 2020, the "purchased power and fuel expense" line item increased from the prior year's third quarter by $127 million. This is consistent with the trading loss of $126 million. PGE's decision to classify this trading loss as "purchased power and fuel expense" is significant. Consistent with PGE's description of its accounting, explained in the preceding paragraph, the energy trades were from purchase of energy and/or settlement of financial transactions, and not from losses related to the physical sale of electricity or natural gas.

86.    *Third*, analysis of the Company's July 31, 2020 earnings call to announce its 2020 second quarter results indicates that the Company was deriving a greater percentage of its year-

over-year revenues from energy trades conducted for non-retail purposes. Specifically, on page 3 of the call transcript, Lobdell is quoted as stating,

> [O]ur earnings per diluted share of $0.43 is up $0.15 from the same period in 2019. Starting with $0.28 in the second quarter of 2019 on the slide, first, gross margin increased earnings a total of $0.04 per diluted share. This increase is the result of a $0.01 decrease in retail revenues, which includes the negative impacts of weather for the quarter and the effects of customer class composition on retail deliveries, and a $0.05 increase in net variable power costs, which includes higher wholesale revenues drive by a surplus of hydro and wind in the region.

This is significant because it demonstrates that the Company was able to generate an *increase* in diluted EPS even though its retail revenues had *declined.* And it attributed that increase to higher operating margins via profits from non-retail energy trading, which is where the Company would have accounted for its profits stemming from speculative energy trades. The positive impact on EPS of $0.05 as a result of a decrease in "net variable power costs" is due to the Company's settling of its speculative forward and futures contracts. Investors would not have known at the time that this increase in revenues resulted from speculative energy trades made for non-retail purposes, but once the Company disclosed a $127 million loss associated with "ill-conceived" energy trades, it becomes apparent that the Company had, indeed, been able to increase its EPS due to speculative trades.

87.    This further accords with the Company's financial statements. Page 39 of the 2019 10-K details "Energy deliveries." "Wholesale energy deliveries," which refers to energy not sold by PGE to its retail customers, shows marked increases from 2017 ($3,193,000) to 2018 ($4,290,000) to 2019 ($4,669,000). These wholesale energy deliveries increased to settle its forwards and/or futures contracts which were not entered into to hedge PGE's supply of energy for its retail customers, but rather for non-retail revenue generation. This is also consistent with

PGE's report on page 11 of the 2019 10-K that it had greatly increased purchased power in connection with short-term contracts, from 273 megawatts in 2018 to 471 megawatts in 2019.

88.     In summary, the fact (i) that PGE did not seek recovery via the PCAM for these massive trading losses, (ii) that it classified the losses as "purchased power and fuel expense" and (iii) that it was able to increase its EPS in the face of declining retail revenues indicate that PGE was making trades for "non-retail purposes," in direct contradiction of its repeated statements that PGE did not engage in energy trading for "non-retail purposes."

89.     CW4, who was employed by the Company for over thirty years, most recently as a senior financial analyst, confirmed that the trades were conducted for "non-retail purposes." CW4 attended an all-hands meeting in late August 2020, which was conducted by videoconference, due to the fact that employees were working remotely in the midst of the Covid-19 Pandemic.  Pope spoke during the videoconference and explained that PGE had publicly announced a $127 million loss due to the actions of two traders who participated in "risky" transactions.  The fact that these trades were characterized as "risky" further supports the conclusion that they were not conducted as a matter of course to hedge against pricing fluctuations, but rather were entered into in order to generate revenues and increase profits.

90.     According to CW4, Pope had previously been the vice president of finance, at a time when CW4 worked in the finance department.  During this time, Pope attended quarterly finance department staff meetings, and made great efforts to communicate regularly with the staff, stressing that communication was very important to her.  CW4 describes Pope as "very hands on."

**E.    The Truth Is Revealed**

91.    On August 24, 2020, PGE announced that it would have to recognize a $127 million loss associated with "a number of energy trades during 2020, with increasing volume accumulating late in the second quarter and into the third quarter, resulting in significant exposure to the Company."  The Company further explained that "[i]n August 2020, this portion of PGE's energy portfolio experienced significant losses as wholesale energy prices increased substantially at various market hubs due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West."

92.    In connection with the loss, PGE slashed its full-year 2020 guidance from $2.20-$2.50 per diluted share to $1.30-$1.60 per diluted share.  It also announced that the PGE Board of Directors had formed a Special Committee comprised of five independent directors to investigate the trades.  The Special Committee retained Simpson Thacher & Bartlett LLP as an independent legal advisor.  The Company retained Skadden, Arps, Slate, Meagher & Flom LLP as a legal advisor and J.P. Morgan Securities LLC as a financial advisor.  In addition, PGE engaged an "external consultant to perform a full operational review of the Company's energy supply risk management policies, procedures and personnel."  Finally, two individuals were placed on administrative leave.

93.    In response to this news, the price of PGE's common stock dropped precipitously, from $41.96 at the close of trading on August 24, 2020 (before the news was announced) to $38.45 at the close of trading on August 25, 2020, a decline of 8.4%.

94.    CFRA, which had previously characterized PGE as a "low" risk investment in each of its prior reports issued during the Class Period, changed its risk assessment to "medium," in its September 10, 2020 report, which was the first report it issued following the announcement

on August 24, 2020. It attributed the change in its assessment to "reflects the recently highlighted exposure to wholesale energy markets." CFRA also stated that there could be "some possible reputational risks that could stem from recent energy trading losses experienced by the company." CFRA noted its concern "over the company's governance and risk controls." CFRA retained this risk assessment through at least November 2, 2020.

95.     CFRA's November 2, 2020 report on PGE raised concerns regarding the trading losses reported by PGE. The report highlighted that the loss experienced by PGE was "highly unusual for a regulated electric utility company". The report further stated that although CFRA believed that losses would be contained in the third quarter, that there was still concern that PGE lacked adequate risk controls and governance, especially given PGE's involvement in the 2001 energy crisis when it was owned by Enron.

96.     Well Fargo noted in its August 24, 2020 report that "[w]hile large swings in power costs would typically be subject to recovery via the PCAM, POR is not seeking regulatory recovery as it appears that the positions taken were imprudent." It further noted that "the development calls into question the company's internal controls and incentives and represents a black mark on the track record. Further, we wonder if this could lead to increased scrutiny on the company's power procurement and hedging strategies by the OPUC."

97.     Morningstar also expressed surprise, stating in its August 25, 2020 report, "Portland General Trading Losses Come as Shocker." It further noted, "[w]e think investors should be most concerned about the size of the loss, which is about one quarter of PGE's typical annual purchased power costs. We believe shareholders are best off if PGE is exceptionally conservative with power costs since Oregon requires shareholders to pay for the bulk of power costs when they are unusually high." PGE stated in its Form 10-K that "[p]hysically settled

electricity and natural gas sale and purchase transactions are recorded in Revenues, net and purchased power and fuel expense, respectively, upon settlement, while transactions that are not physically settled (financial transactions) are recorded on a net basis in purchased fuel expense upon financial settlement." Thus, a loss representing 25% of PGE's purchased power expenses is highly significant and unusual.

98.    On December 18, 2020, PGE announced that the Special Committee of the Board of Directors had concluded its review "of the energy trading activity that led to the losses incurred in the third quarter."

99.    The Special Committee concluded as follows:

[T]he trades were ill-conceived and revealed opportunities for improving the Company's energy trading policies and practices. Additionally, the Board of Directors concluded that the actions the Company began taking in August to enhance oversight of energy trading and associated risk management reporting, policies and practices are consistent with the Special Committee's recommendations and will be monitored by the Board of Directors through enhanced reporting. These actions will strengthen the Company and include:

- **Added expertise:** PGE brought in additional experienced risk management personnel and replaced the Power Operations general manager with a new interim leader.
- **Strengthened trading policies:** Power Operations personnel are operating under revised policies designed to prevent positions of the type that led to the losses. The improved policies place controls on the ability of personnel to enter into wholesale energy transactions to the extent that PGE does not have physical or financial delivery capability.
- **Enhanced risk reporting:** Energy trading activity reporting has been improved to ensure greater visibility into portfolio risk.
- **Changed reporting structures:** Energy Trading Risk Management now reports through a Risk and Compliance team that reports to the Chief Executive Officer. Effective January 1, 2021, Power Operations will report to the Vice President of Strategy, Regulation and Energy Supply.
- **Changed personnel:** The individuals who previously were placed on leave are no longer with the Company.

100.    In addition to the foregoing conclusions of the Special Committee, the Compensation and Human Resources Committee of the Board of Directors determined that, "in

28 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

light of the third quarter losses, it would be inconsistent with PGE's pay-for-performance philosophy for certain senior leaders to receive annual incentive compensation. Accordingly, the CEO, the CFO and one additional executive officer will not receive any annual incentive compensation for 2020."

101.    The Special Committee also gave some details on the problematic trades, explaining that:

> energy trading positions resulting in these losses were short in the desert Southwest and California power markets and long in the Pacific Northwest power markets. In August 2020, wholesale electricity prices increased substantially in the desert Southwest and California power markets due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West. As a result of these market disruptions and the Company's exposure to these positions, the Company's energy portfolio realized significant losses.

This reveals that PGE had engaged in futures or forwards contracts to sell energy to the Southwest and California power markets but did not have sufficient capacity to deliver energy to those locations. Specifically, the reference to "constraints to regional transmission facilities" indicates that the Company did not have the capability to deliver the energy to the Southwest and California. As a result, in order to perform PGE's contracts, it had to purchase energy from a third source that did have the capacity to deliver the electricity (or financially net settle) and at extremely high rates, due to the energy shortage that was occurring in these regions in August 2020. PGE's contracts to sell power to the Southwest and California were designed to take advantage of price differentials in those regions for the purpose of increasing operating margins, net income and EPS. These transactions were not performed to hedge the risk of price fluctuations for its retail customers, and thus were for "non-retail purposes," in direct contravention of the Company's statements.

## VI.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

102.    During the Class Period, Defendants made materially false and misleading statements and omissions regarding PGE's wholesale energy trading activity, as well as its risk management policies and controls.

103.    On February 13, 2020, PGE filed with the SEC its annual report on Form 10-K for the 2019 fiscal year (the "2019 10-K"). The 2019 10-K was signed by Defendant Lobdell and Pope.

104.    Attached to the 2019 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Pope and Lobdell attesting to the accuracy of the financial statements.  Specifically, they state:

> I have reviewed this Annual Report on Form 10-K of Portland General Electric Company;
>
> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have: (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

30 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusion about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation . . .

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions); (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

105.    These statements were false and misleading because the Form 10-K did "contain . . . false statement[s] of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."  In particular, the Company falsely stated that it did not conduct any energy trading for "non-retail purposes," and it omitted to disclose that at least a portion of its reported revenues and profits were derived from energy trades conducted for non-retail purposes.  Further, the Company did not disclose "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," because it later admitted that there were weaknesses in its risk management controls.  Finally, the Company did not disclose all "fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

106.    On page 10, the 2019 10-K disclosed in relevant part the following about its engagement in the wholesale electricity marketplace:

> **PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers**. … Wholesale revenues represented 8% of total revenues in 2019 and 2018, and 5% in 2017. PGE utilizes its generating resources, as well as wholesale power purchases from third parties to meet the needs of its retail customers.  The volume of electricity

31 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

the Company generates is dependent upon, among other factors, the capacity and availability of its generating resources and the price and availability of wholesale power and natural gas.  As part of its power supply operations, the Company enters into short- and long-term power and fuel purchase agreements. ***PGE executes economic dispatch decisions concerning its own generation and participates in the wholesale market in an effort to obtain reasonably-priced power for its retail customers, manage risk, and administer its long-term wholesale contracts***. The Company also promotes energy efficiency measures to meet its energy requirements.

107.    This statement was materially false and misleading when made by the Defendants because it omitted to disclose the fact that PGE was participating in the wholesale electricity marketplace for purposes other than to "balance its supply of power to meet the needs of its retail customers" and other than "in an effort to obtain reasonably-priced power for its retail customers, manage risk, and administer its long-term wholesale contracts." Specifically, PGE was participating in the wholesale electricity market to generate profits for the Company.

108.    On page 40, the 2019 10-K disclosed another false and misleading statement about PGE's participation in the wholesale energy market, stating:

***Results from sales of electricity to utilities and power marketers made in the Company's efforts to secure reasonably priced power for its retail customers, manage risk, and administer its current long-term wholesale contracts***. Such sales can vary significantly from year to year as a result of economic conditions, power and fuel prices, hydro and wind availability, and customer demand. In 2019, an $11 million, or 7%, increase in wholesale revenues over 2018 resulted from $14 million related to a 9% increase in wholesale sales volume partially offset by $3 million from a 1% decrease in average prices received when the Company sold power into the wholesale market. ***PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers***.

109.    This statement was materially false and misleading when made by the Defendants because it omitted to disclose the fact that PGE was participating in the wholesale electricity marketplace for purposes other than to "balance its supply of power to meet the needs of its retail customers" and to "secure reasonably priced power for its retail customers, manage risk, and

administer its current long-term wholesale contracts;" specifically, it was participating in the wholesale electricity market to generate profits for the Company.

110.    On page 48, the 2019 10-K disclosed the following about the company's exposure to commodity price risks:

> PGE is exposed to commodity price risk, as its primary business is to provide electricity to its retail customers. ***The Company engages in price risk management activities to manage exposure to volatility in net power costs for its retail customers.*** The Company uses power purchase contracts to supplement its own generation and to respond to fluctuations in the demand for electricity and variability in generating plant operations. The Company also enters into contracts for the purchase of fuel for the Company's natural gas- and coal-fired generating plants. These contracts for the purchase of power and fuel expose the Company to market risk. The Company uses instruments such as: i) forward contracts, which may involve physical delivery of an energy commodity; ii) financial swap and futures agreements, which may require payments to, or receipt of payments from, counterparties based on the differential between a fixed and variable price for the commodity; and iii) option contracts to mitigate risk that arises from market fluctuations of commodity prices. ***PGE does not engage in trading activities for non-retail purposes.***

111.    This statement was false because PGE was, in fact, engaging "in [energy] trading activities for non-retail purposes" and for reasons other than to "manage exposure to volatility in net power costs for its retail customers." Specifically, PGE was engaging in risky trades for the purpose of generating revenues and increasing the Company's profitability so that it could continue to show improvement each quarter over the prior year's results.

112.    On page 78, the 2019 10-K stated as follows:

> PGE utilizes derivative instruments to manage its exposure to commodity price risk and foreign exchange rate risk in order to manage volatility in NVPC for its retail customers. Such derivative instruments, recorded at fair value on the consolidated balance sheets, may include forward, futures, swap, and option contracts for electricity, natural gas, and foreign currency, with changes in fair value recorded in the consolidated statements of income. In accordance with ratemaking and cost recovery processes authorized by the OPUC, the Company recognizes a regulatory asset or liability to defer the gains and losses from derivative activity until settlement of the associated derivative instrument. PGE may designate certain derivative instruments as cash flow hedges or may use

derivative instruments as economic hedges. ***The Company does not engage in trading activities for non-retail purposes.***

113.    This statement was false because PGE was, in fact, engaging "in trading activities for non-retail purposes" and for reasons other than to "manage exposure to volatility in net power costs for its retail customers." Specifically, PGE was engaging in risky trades for the purpose of generating revenues and increasing the Company's profitability so that it could continue to show improvement each quarter over the prior year's results.

114.    On page 106, the 2019 10-K disclosed the following about PGE's controls and procedures:

> Under the supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report pursuant to Rule 13a-15(b) under the Exchange Act. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective.***
>
> *****
>
> Management of the Company, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's internal control over financial reporting as of the end of the period covered by this report pursuant to Rule 13a-15(c) under the Exchange Act. Management's assessment was based on the framework established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that, as of December 31, 2019, ***the Company's internal control over financial reporting is effective.***

115.    The foregoing statements made by the Defendants regarding the Company's management and internal controls were materially false and misleading because the report failed to disclose that PGE's energy trading unit lacked adequate controls, as the Special Committee concluded on December 18, 2020.

34 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

116.    The Company also issued a Form 8-K filed with the SEC on February 14, 2020 to announce its earnings results for the fourth quarter of 2020.  It reported that the Company's EPS and net income had increased, as compared to 2019, and further stated, "[t]he increase in full-year 2019 earnings was driven by an increase in revenues from higher retail prices and increased loads from industrial customers when compared to 2018."

117.    The foregoing statement is false and misleading  because it omitted to disclose that the "increase in full-year 2019 earnings" was driven, in part, by speculative energy trades which were made for non-retail purposes in order to generate revenue, rather than to hedge against price fluctuations.

118.    During the Q4 2019 Earnings Call on February 14, 2020, CEO Maria Pope stated the following about when asked by an analyst about the company's investment opportunities as it related to PGE's Integrated Resource Plan:

> "***So, we take the least cost, least risk proposals that come our way.*** We work with an independent evaluator in determining that and we'll have a fully transparent and open process as we move through this next year and into 2021."

119.    This statement was materially false and misleading because the CEO failed to disclose that PGE had in fact been engaging in an increasing number of energy trades that were both speculative in nature and extremely risky. Therefore, the Company was not pursuing the "least cost, least risk" trading proposals when it came to its proprietary energy trading activity. The statement also mischaracterizes PGE's investment activity as conservative, when in fact, the power operations group was engaging in proprietary energy trades for non-retail purposes. The statement also fails to disclose the lack of adequate controls in the Power Operations Group.

120.    During the February 14, 2020 earnings call, Pope also announced that the Company's earnings per share for the fourth quarter 2019 were $0.68 per share, compared to

$0.55 per share in the fourth quarter of 2018.  Pope further stated, "[t]he increase in earnings per share was driven by improved gross margin due to strong industrial demand and higher earnings from ongoing investment in our system."

121.    The foregoing statement was false and misleading because it omitted to disclose that the "increase in earnings per share" was driven, in part, by speculative energy trades which were made for non-retail purposes in order to generate revenue, rather than to hedge against price fluctuations.

122.    On April 24, 2020, PGE filed its quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2020 (the "1Q20 Report"). Defendant Lobdell signed the 1Q20 Report.  Additionally, Defendants Pope and Lobdell also signed SOX certifications, attesting to the accuracy of the financial statements and adequacy of controls. The 1Q20 Report stated the following, in pertinent part, regarding the Company's wholesale activities and downplayed the risks the company was taking in its wholesale trading activities:

> PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers. … PGE's Wholesale revenues are primarily short-term electricity sales to utilities and power marketers that consist of single performance obligations that are satisfied as energy is transferred to the counterparty…
>
> ***Price Risk Management: PGE participates in the wholesale marketplace to balance its supply of power, which consists of its own generation combined with wholesale market transactions, to meet the needs of its retail customers, manage risk, and administer its existing long-term wholesale contracts.*** .…PGE utilizes derivative instruments to manage its exposure to commodity price risk and foreign exchange rate risk to reduce volatility in NVPC [net variable power costs] for its retail customers. Such derivative instruments, recorded at fair value on the condensed consolidated balance sheets, may include forward, futures, swaps, and option contracts for electricity, natural gas, and foreign currency, with changes in fair value recorded in the condensed consolidated statements of income and comprehensive income….
>
> ***The Company does not engage in trading activities for non-retail purposes***. The Company participates in wholesale markets by purchasing and selling electricity

and natural gas in an effort to meet the needs of, and obtain reasonably-priced power for, its retail customers. ***The Company generates revenues and cash flows primarily from the sale and distribution of electricity to retail customers in its service territory.***

*****

***The Company generates revenues and cash flows primarily from the sale and distribution of electricity to its retail customers****.*

123.    These statements were false and misleading because, in direct contravention to its statement, PGE *did* engage in trading activities for non-retail purposes during the Class Period.  Specifically, as the Company revealed on August 24, 2020 and later again on December 18, 2020, traders had engaged in "ill-conceived" trades which were for the purpose of generating revenues and profits, and not for hedging against price fluctuations.  Further, the Company's statements that its revenues and cash flows were "primarily from the sale and distribution of electricity" was misleading because it failed to mention that PGE's energy traders were engaging in trades designed to generate revenues and cash flows.

124.    Form 8-K filed by PGE on April 24, 2020 contained a press release entitled "Portland General Electric announces first quarter 2020 results". In that press release  Pope disclosed the following regarding the Company's first quarter results :

> Our financial performance this quarter largely reflects conditions experienced prior to the COVID-19 pandemic," said Maria Pope, PGE president and CEO. "PGE is committed to serving the needs of our customers and our community during this time. Given the deteriorating economic outlook, the company is revising full-year earnings guidance to $2.20 to $2.50 per diluted share. This guidance includes a decrease in annual retail deliveries of 1 to 2%, weather adjusted, and reflects management actions to reduce operating and maintenance and  capital spending. Our forecasts of long-term earnings growth remain at 4 to 6%.
>
> Total revenues showed no change as increases in retail revenues and wholesale revenues were offset by a decrease in other operating revenues. Lower purchased power and fuel expense resulted from a lower power cost per MWh primarily due to strong wind production. In addition, lower operating expenses were driven by reduced plant maintenance expense, which was partially offset by increased

37 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

distribution expense. Earnings were also impacted by a decline in the market value of the non-qualified benefit trust and higher depreciation and amortization as the result of capital additions.

125.    These statements regarding the company's first quarter earnings were false and misleading because they omitted to include the possible exposure the company faced as a result of PGE's energy trading activity for non-retail purposes.

126.    During the Q1 2020 earnings call on April 24, 2020 Pope reassured investors that the Company was continuing to lower costs and that its long term strategy remained unchanged despite the COVID-19 Pandemic:

> **I would also add that our long-term strategy has not changed.** In fact, early discussions and findings that we see is that our customers in the state of Oregon are as focused on decarbonizing our energy supply today as they were before the pandemic. We continue to see interest in electrification of sectors and an overall focus on continuing to build out a smart and integrated grid…So we really see through this period of time the ability to, in many ways, accelerate the transformation from a technological standpoint and to emerge stronger and lower cost after the pandemic.

127.    The statements were false and misleading because they omitted to disclose that PGE had departed significantly from its long term strategy by engaging in energy trading for non-retail purposes in order to generate revenue, rather than to hedge its retail supply.

128.    Also on the April 24, 2020 earnings call, Pope told investors, "[f]or the first quarter of 2020, we reported net income of $81 million or $0.91 per share, an increase of $0.09 per share compared to 2019 results. ***The strong first quarter was driven by an increase in high-tech and digital services demand as well as lower power costs and operating expenses***."

129.    The foregoing statement was false and misleading because it omitted to disclose that the "strong first quarter" which resulted in a more than 10% increase in EPS

38 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

as compared to the prior year was driven, in part, by speculative energy trades which were made for non-retail purposes in order to generate revenue, rather than to hedge its retail supply.

130.    On July 31, 2020, PGE filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2020 (the "2Q20 Report"). Defendant Lobdell signed the 2Q20 Report. Additionally, Defendants Pope and Lobdell also signed SOX certifications, attesting to the accuracy of the financial statements and the disclosure of all fraud.

131.    The 2Q20 Report stated the following, in pertinent part, regarding the Company's Wholesale trading activities and downplaying its risks with wholesale activities:

> PGE participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of its retail customers. … PGE's Wholesale revenues are primarily short-term electricity sales to utilities and power marketers that consist of single performance obligations that are satisfied as energy is transferred to the counterparty…
>
> ***Price Risk Management: PGE participates in the wholesale marketplace to balance its supply of power, which consists of its own generation combined with wholesale market transactions, to meet the needs of its retail customers, manage risk, and administer its existing long-term wholesale contracts***. ….PGE utilizes derivative instruments to manage its exposure to commodity price risk and foreign exchange rate risk to reduce volatility in NVPC [net variable power costs] for its retail customers. Such derivative instruments, recorded at fair value on the condensed consolidated balance sheets, may include forward, futures, swaps, and option contracts for electricity, natural gas, and foreign currency, with changes in fair value recorded in the condensed consolidated statements of income and comprehensive income….
>
> ***The Company does not engage in trading activities for non-retail purposes***. The Company participates in wholesale markets by purchasing and selling electricity and natural gas in an effort to meet the needs of, and obtain reasonably-priced power for, its retail customers. ***The Company generates revenues and cash flows primarily from the sale and distribution of electricity to retail customers in its service territory.***
>
> *****
>
> ***The Company generates revenues and cash flows primarily from the sale and distribution of electricity to its retail customers***.

39 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

132.    These statements were false and misleading because, in direct contravention to its statement, PGE *did* engage in trading activities for non-retail purposes during the Class Period.  Specifically, as the Company revealed on August 24, 2020 and later again on December 18, 2020, traders had engaged in "ill-conceived" trades which were for the purpose of generating revenues and profits, and not for hedging against price fluctuations.  Further, the Company's statements that its revenues and cash flows were "primarily from the sale and distribution of electricity" was misleading because it failed to mention that PGE's energy traders were engaging in trades designed to generate revenues and cash flows.

133.    Form 8-K filed by PGE on July 31, 2020 contained a press release entitled "Portland General Electric announces second quarter 2020 results". In that press release,  Pope Disclosed the following regarding the Company's second quarter results :

> "We achieved solid second quarter financial results, driven by a combination of favorable hydro and wind conditions and lower operating expenses," said Maria Pope, PGE president and CEO. "As an essential service provider, we will continue working to keep costs low to support economic recovery and the communities we serve in this unprecedented time."
>
> ***Total revenues increased as a result of higher residential, industrial and wholesale demand, which was partially offset by lower commercial demand.*** Power costs increased due to higher overall system deliveries, which more than offset a decline in the average cost per MWh due to lower gas prices and surplus hydro in the region. Operating expense declined due to continuous efforts to reduce the company's overall cost structure as well as lower plant maintenance expense.

134.    The statements in the foregoing paragraph were false and misleading because the Company attributed an increase in "total revenues" to "higher residential, industrial and wholesale demand," but omitted to disclose that in fact, total revenues increased in part due to speculative energy trades made for non-retail purposes.

135.    As summarized in the preceding section, the statements made were materially false and misleading and/or failed to disclose material adverse information, required to be disclosed in order to render them not materially misleading or incomplete, because (i) they failed to disclose the increasing number of energy trades that PGE Power Operations Unit made in the second and third quarter of 2020, and the high level exposure that would result due to the risk level of those trades.  As a result, Defendants' statements and omissions about PGE's trading activity and controls were materially false and misleading at all relevant times.

## VII.    ALLEGATIONS OF SCIENTER

136.    The Exchange Act Defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  These Defendants, by virtue of their association with and control over the Company, which made them privy to confidential information, participated in the fraudulent scheme designed to mask PGE's financial prospects and PGE's departure from its established practice of exclusively entering energy trades for the purposes of hedging its own energy supply.

### A.    Maria Pope

137.    Pope's scienter is further evidenced by the following facts:

138.    *First*, prior to the Special Committee's investigation, Energy Trading Risk Management Unit reported directly to Pope.  Since there was a direct line of reporting from the emerging trading desk to Pope, she was aware that trades were being made to generate profits

rather than for retail purposes. Following its review, the Special Committee announced that "[e]ffective January 1, 2021, Power Operations will report to the Vice President of Strategy, Regulation and Energy Supply." This indicates that the Special Committee concluded that Pope was not satisfactorily performing her role as the person responsible for overseeing Energy Trading Risk Management or the Power Operations group.

139.    *Second*, the Compensation and Human Resources Committee determined that Pope was not entitled to any incentive compensation for the year 2020. Pope's incentive compensation was comprised of two segments: the annual cash incentive ("ACI") and the equity-based long-term incentive award ("LTI"). In 2019, the Compensation committee set goals for Pope of $826,923 in ACI and $2,125,000 in LTI. In 2019, Pope's ACI actually totaled $861,406, and her LTI totaled $2,124,935, for a total of $2,986,341 in total incentive-based compensation. This compares to a base salary of $876,077 and $69,058 in "other" compensation in 2019. Thus, Pope's incentive-based compensation in 2019 amounted to 73% of her total 2019 compensation. Similarly, in 2018, Pope received ACI of $853,078 and LTI of $1,499,987, for a total of $2,353,065. This comprised 73% or her total reported compensation of $3,216,062. Thus, the decision to withhold Pope's incentive-based compensation was not a mere slap on the wrist; it removed the vast majority of the income she likely expected to receive for 2020.

140.    *Third*, Pope previously served as the Company's Senior Vice President, Power Supply, Operations and Resource Strategy, where she directly oversaw PGE's energy portfolio. In her role overseeing the energy portfolio, Pope gained extensive knowledge and insight into the risks associated with the different types of energy trades that are conducted to hedge against price fluctuations. Pope's high level of familiarity with the Company's energy trading practices,

and knew that the Company's increased use of purchased power signaled that it was engaging in energy trades for non-retail purposes, specifically, to generate greater revenues.

141.    *Fourth*, CW4 explained that Pope was a very "hands on" manager, further allowing for the inference that she personally knew about the "ill-conceived" trades that occurred for non-retail purposes during the Class Period.  In addition, CW4 described a change of culture when Pope ascended to the role of CEO.  In particular, the pressure on the entire Company increased to beat prior years' profits, and Pope looked for alternative and nontraditional ways to generate revenues.  CW1, who interacted with Pope at least once a week, and often more than that, described Pope as detail oriented, and explained that Pope was focused on how PGE's "business was being conducted."

142.    *Fifth*, Pope signed SOX certifications, in which she attested to having reviewed the Company's disclosure controls.  Specifically, Pope attested that she was "responsible for establishing and maintaining disclosure controls and procedures . . . to ensure that material information relating to [PGE] . . . is made known to us by others within [PGE]," and "[e]valuated the effectiveness of [PGE/s] disclosure controls and procedures."  The SOX certification further states that Ms. Pope had disclosed to PGE's auditors and the Board's audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [PGE's] ability to record, process, summarize and report financial information."  Having performed this review, Pope would have been aware of that PGE's Power Operations Group was engaging in risky energy trades for non-retail purposes.

143.    *Sixth*, Pope held the highest-level position in the Company, controlled the contents of PGE's public statements, and had access to material, adverse, nonpublic information

concerning the fact that the energy traders were engaging in risky trades for the purpose of boosting revenue and profits, and not simply to hedge against price fluctuations. Because of her high-level position, Pope was provided to, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of her position and access to material non-public information about PGE, Pope knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As the Company's senior-most executive, Pope was responsible for the accuracy of PGE's corporate statements and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

### B. James Lobdell

144. The CFO, James Lobdell was also highly knowledgeable regarding PGE's energy trading operations.

145. *First*, similar to Pope, the Compensation and Human Resources Committee determined that Lobdell was not entitled to any incentive compensation for the year 2020. Like Pope, Lobdell's incentive compensation was comprised of ACI and LTI. In 2019, the Compensation committee set goals for Lobdell of $292,465 in ACI and $600,000 in LTI. In 2019, Lobdell actually received $304,661 in ACI and $599,952 in LTI, which comprised 52% of his total reported compensation of $1,743,648. And in 2018, Lobdell received $303,606 in ACI and $534,677 in LTI, which represented 62% of his total compensation for 2018, reported as $1,358,689. Similar to Pope, the decision to withhold any incentive-based compensation to Lobdell had significant financial effects on him.

146.    *Second*, Lobdell held the second highest-level position in the Company, controlled the contents of PGE's public statements, and had access to material, adverse, nonpublic information concerning the fact that the energy traders were engaging in risky trades for the purpose of boosting revenue and profits, and not simply to hedge against price fluctuations.  Because of his high-level position, Lobdell was provided to, or had access to, copies of the documents alleged herein to be false or misleading, prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information about PGE, Lobdell knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading and/or incomplete. As the Company's senior-most executive, Lobdell was responsible for the accuracy of PGE's corporate statements, and is therefore responsible and liable for the representations contained therein, or omitted therefrom.

147.    *Third*, Lobdell signed SOX certifications, in which he attested to having reviewed the Company's disclosure controls.  Specifically, Lobdell attested that he was "responsible for establishing and maintaining disclosure controls and procedures . . . to ensure that material information relating to [PGE] . . . is made known to us by others within [PGE]," and "[e]valuated the effectiveness of [PGE/s] disclosure controls and procedures."  The SOX certification further states that Ms. Pope had disclosed to PGE's auditors and the Board's audit committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [PGE's] ability to record, process, summarize and report financial information."  Having performed this review, Lobdell

would have been aware of that PGE's energy trading department was engaging in risky energy trades for non-retail purposes.

### C.    Imputed Knowledge of Facts Critical to the Company's Energy Trading Operations

148.    Defendants Pope and Lobdell were aware of and informed of matters relating to the Company's energy trading operations, as well as its established business policies and practices.   Consequently, their experience and responsibilities necessarily further support a strong inference that they knew (or at least recklessly disregarded) that the statements at issue herein and made during the Class Period were materially false and misleading and contained material omissions.

149.    As detailed above, PGE considers its participation in the wholesale electricity market, as integrally important to the Company's success, and the Section 10b (like the other Exchange Act) Defendants can therefore also be presumed to have had knowledge of inadequacies of their disclosures in this regard.

150.    Moreover, the Company's policy and practice of participating in the wholesale electricity market "for retail purposes only" (meaning that they only participated in energy trades to the extent it was required to ensure an adequate electricity supply for their customers, and hedge its own energy supply) was a core aspect of the Company's business, and it defies credulity to believe that each of the Exchange Act Defendants would not have been well aware of the Company's decision to abandon this established policy and practice by the start of the Class Period.

## VIII.   ADDITIONAL LOSS CAUSATION ALLEGATIONS

151.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. Throughout the Class Period,

46 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Portland General Electric's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions. After the Company disclosed the existence of the proprietary trading unit, and the $127 million dollars in unrealized trading losses, PGE's stock price fell by nearly 8% on unusually heavy volume as a direct result of the announcement. The stock's decline of $3.51 per share wiped out of over $300 million in shareholder value. On September 2, 2020, PGE issued a press release confirming that total third quarter 2020 losses arising from the wholesale energy trades was $127 million.

152.    One financial analyst noted in a report, where it downgraded PGE stock from buy to hold, that the level of trading losses experience by PGE "was highly atypical of a regulated public utility, and could indicate issues with serious issues with risk controls and management."

153.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of PGE common stock, since investors could not accurately evaluate the amount of trading exposure PGE actually faced, and the stock price decline described above was directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## IX.    PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET

154.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts that are required to be disclosed;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Lead Plaintiff and other members of the Class purchased PGE common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts or their consequences were disclosed, without knowledge of the misrepresented or omitted facts.

155.    At all relevant times, the market for PGE's common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, PGE filed periodic public reports with the SEC;

(b)    PGE regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(c)    PGE's common stock traded at a large volume on a weekly basis;

(d)    A significant number of analysts followed PGE regularly, including CFRA, Guggenheim, JP Morgan, Morningstar, UBS and Wells Fargo;

(e)    PGE was eligible to file an S-3 registration statement; and

(f)    PGE's stock trades on the New York Stock Exchange, which is an efficient market.

156.    As a result of the foregoing, the market for PGE's common stock promptly digested current information regarding PGE from all publicly available sources and reflected such information in PGE's stock price.  Under these circumstances, all purchasers of PGE's

common stock during the Class Period suffered similar injury through their purchases of PGE's common stock at artificially inflated prices, and a presumption of reliance applies.

157.    In addition, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

158.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and/or misleading statements described in this Complaint.  The specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because, at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of PGE who knew that those statements were false or misleading when made.

## XI.    CLASS ALLEGATIONS

### A.    Definition of Class

159.    Lead Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the common stock of Portland General Electric between February 14, 2020 and August 24, 2020, both dates inclusive (the "Class Period"), (the "Class").

160.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of PGE, members of PGE's Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of PGE.

**B.    The Class Satisfies the Requirements of Rule 23**

161.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the Class.   Record owners and other members of the Class may be identified from records maintained by PGE or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

162.    Lead Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Further, Lead Plaintiff will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

163.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a)    Whether the Exchange Act Defendants violated the Exchange Act;

(b)    Whether Defendants' statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements to the investing public during the Class Period omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    Whether the price of PGE common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

164.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All the Defendants)

165.    This Count is asserted on behalf of all members of the Class against PGE and Defendants Maria Pope and James Lobdell for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

166.    These Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Lead Plaintiff and other Class

51 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

members, as alleged herein; and (2) cause Lead Plaintiff and other members of the Class to purchase PGE's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

167.    During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew or recklessly disregarded were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for PGE's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

169.    These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about  PGE's increased engagement in speculative energy trades  as specified herein.

170.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PGE's value and performance and continued substantial growth, which included the making of, or participation in the making of, materially false and misleading statements, including statements that omitted

52 – AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

to state material facts necessary in order to make the statements made about PGE's energy trading operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of PGE common stock.

171.    As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's exposure to significant trading losses, thereby artificially inflating the price of its common stock.  As demonstrated by Defendants' omissions and misstatements concerning the Company's business strategy, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading, or suffered from actionable material omissions.

172.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PGE's common stock was artificially inflated.  In ignorance of the fact that market prices of PGE's common stock was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements made and approved by these Defendants, or upon the integrity of the market in which its common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public

statements by Defendants,  Lead Plaintiff and the other members of the Class acquired PGEs common stock without any knowledge of the extent of risk that PGE was taking in their wholesale electricity trading positions .

173.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and incompleteness, and believed them to be true and free of any omissions of material fact required to be disclosed.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's increased proprietary energy trading activity, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their PGE common stock, or, if they had acquired such common stock, they would not have done so at the artificially inflated prices that they paid.

174.    Pope is liable for the statements that appeared in PGE's public filings alleged in paragraphs 104, 106, 108, 110, 112, 114, 122 and 131 because she signed those filings.  In addition, Pope is liable for the statements alleged in paragraphs 118, 120,124,126, 128 and 133 because she personally made those statements.

175.    Lobdell is liable for the statements that appeared in PGE's public filings as alleged in paragraphs 104, 106, 108, 110, 112, 114, 116, 122, 124, 131 and 133 because he signed those filings.

176.    By virtue of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

177.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock.

178.    This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchases of PGE common stock giving rise to the cause of action.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### (Against the Individual Defendants)

179.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

180.    Defendants Maria Pope and James Lobdell acted as controlling persons of Portland General Electric within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

181.    In particular, Defendants Pope and Lobdell had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions, statements and SEC filings giving rise to the securities violations as alleged herein, and exercised the same.

182.    As set forth above, Portland General Electric, Maria Pope, and James Lobdell each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

183.    By virtue of their positions as CEO and CFO respectively of the Company, Defendants Pope and Lobdell are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock.

184.    As a direct and proximate result of the foregoing wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock.

185.    This action was filed within two years of discovery of the fraud and within five years of the Lead Plaintiff's purchases of PGE common stock giving rise to the cause of action.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and (i) appointing Lead Plaintiff as representatives of the proposed Class; and (ii) appointing their undersigned counsel as Class Counsel for the Class;

B.    Awarding compensatory damages in favor of Lead Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED this 11th day of January, 2021.

**STOLL STOLL BERNE LOKTING &
SHLACHTER P.C.**


By: s/ Keil M. Mueller
    **Keith S. Dubanevich,** OSB No. 975200
    **Keil M. Mueller**, OSB No. 085535

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:      (503) 227-1600
Facsimile:      (503) 227-6840
Email: Kdubanevich@stollberne.com
       kmueller@stollberne.com

*Liaison Counsel for the putative class*

and

**Daniel L. Berger**, *to be admitted pro hac vice*
**Caitlin M. Moyna**, *to be admitted pro hac vice*
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:      (646) 722 8500
Facsimile:      (646) 722 8501
Email: dberger@gelaw.com
       cmoyna@gelaw.com

*Counsel for Lead Plaintiff and Lead Counsel for
the Proposed Class*