UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

| [X] | | **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE** **SECURITIES EXCHANGE ACT OF 1934** **For the fiscal year ended December 31, 2005** |
|---|---|---|
| | | **OR** |
| [ ] | | **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE** **SECURITIES EXCHANGE ACT OF 1934** **For the Transition period from _____ to _____** |

**Commission File Number 1-5532-99**

## PORTLAND GENERAL ELECTRIC COMPANY

(Exact name of registrant as specified in its charter)

| **Oregon** | **93-0256820** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**121 SW Salmon Street, Portland, Oregon 97204**

(Address of principal executive offices) (zip code)

Registrant's telephone number, including area code: **(503) 464-8000**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | | **Name of each exchange** **on which registered** |
|---|---|---|
| None | | |

Securities registered pursuant to Section 12(g) of the Act:

| **Title of each class** |
|---|
| Portland General Electric Company 7.75% Series, Cumulative Preferred Stock, no par value |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes \_\_\_  No _X_

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes \_\_\_  No _X_

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes _X_ No \_\_\_.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer [ ]          Accelerated filer [ ]          Non-accelerated filer [X]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes \_\_\_  No _X_

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter: $0.

Number of shares of Common Stock outstanding as of February 28, 2006: 42,758,877 shares of common stock, $3.75 par value. (All shares are owned by Enron Corp.)

## DEFINITIONS

| | |
|---|---:|
| 2007 | 7 |
| 2008 | 7 |
| 2009 | 7 |
| 2010 | 7 |
| Remainder | 181 |
| Total | $216 |

Included in the above table is approximately $126 million for PGE's headquarters complex reflecting the base lease period through 2018 and renewal period options through 2043.

**Guarantee**

PGE entered into a sale transaction in 1985 in which it sold an undivided 15% interest in its Boardman coal plant (Plant) and a 10.714% undivided interest in the Pacific Northwest Intertie (Intertie) transmission line (jointly the Boardman Assets) to an unrelated third party (Purchaser). The Purchaser leased the Boardman Assets to a lessee (Lessee) unrelated to PGE or the Purchaser. Concurrently, PGE assigned to the Lessee certain agreements for the sale of power and transmission services from the Plant and the Intertie (P&T Agreements) to a regulated electric utility (Utility) unrelated to PGE, the Purchaser, or the Lessee. The payments by the Utility under the P&T Agreements exceed the payments to be made by the Lessee to the Purchaser under the lease. In exchange for PGE undertaking certain obligations of the Lessee under the lease, the Lessee reassigned to PGE certain rights, including the excess payments, under the P&T Agreements. However, in the event that the Utility defaults on the payments it owes under the P&T Agreements, PGE may be required to pay the damages owed by the Lessee to the lessor under the lease. Assuming no recovery from the Utility and no reduction in damages from mitigating sales or leases related to the Boardman Assets and P&T Agreements, the maximum amount that would be owed by PGE in 2006 is approximately $205 million. Management believes that circumstances that could result in such amount, or any lesser amount, being owed by the Company are remote.

# Note 8 - Price Risk Management

PGE utilizes derivative instruments, including electricity forward, swap, and option contracts and natural gas forward, swap, option, and futures contracts in its retail (non-trading) electric utility activities to manage its exposure to commodity price risk and to minimize net power costs for service to its retail customers. Under SFAS No. 133, derivative instruments are recorded on the Balance Sheet as an asset or liability measured at estimated fair value, with changes in fair value recognized currently in earnings, unless specific hedge accounting criteria are met.

Changes in the fair value of retail (non-trading) derivative instruments prior to settlement that do not qualify for either the normal purchase and normal sale exception or for hedge accounting are recorded on a net basis in Purchased Power and Fuel expense. As derivative instruments are settled, sales are recorded in Operating Revenues, with purchases, natural gas swaps and futures recorded in Purchased Power and Fuel expense. PGE records the non-physical settlement of non-trading electricity derivative activities on a net basis in Purchased Power and Fuel expense, in accordance with EITF 03-11.

Special accounting for qualifying hedges allows gains and losses on a derivative instrument to be recorded in OCI until they can offset the related results on the hedged item in the Income Statement. As discussed below, the effects of changes in fair value of certain derivative instruments entered into to hedge the company's future non-trading retail resource requirements are subject to regulation and are therefore deferred pursuant to SFAS No. 71.

PGE discontinued its electricity and natural gas trading (non-retail) activities in early 2005. Unrealized and realized gains and losses on the settlement of all derivative instruments related to such activities were reported on a net basis, as required by EITF 02-3.

**Non-Trading Activities**

PGE participates in the wholesale marketplace in order to balance its supply of power to meet the needs of its retail customers, manage risk, and administer its current long-term wholesale contracts. Such activities include power purchases and sales resulting from economic dispatch decisions for its own generation, which allows PGE to secure reasonably priced power for its customers. Most of PGE's non-trading wholesale sales have been to utilities and power marketers and have been predominantly short-term. In this process, PGE may net purchases and sales with the same counterparty rather than simultaneously receiving and delivering physical power. These net transactions are also referred to as "book outs." Only the net amount of those purchases or sales required to fulfill retail and wholesale obligations are physically settled.

SFAS No. 133 requires unrealized gains and losses on derivative instruments that do not qualify for either the normal purchase and normal sale exception or hedge accounting to be recorded in earnings in the current period. Rates approved by the OPUC are based on a valuation of all the Company's energy resources, including derivative instruments existing on October 27, 2005 that will settle during the 12-month period from January 1, 2006 to December 31, 2006. Such valuation was based on forward price curves in effect on November 8, 2005 for electricity and natural gas. The timing difference between the recognition of gains and losses on certain derivative instruments and their realization and subsequent recovery in rates is recorded as a regulatory asset or regulatory liability to reflect the effects of regulation under SFAS No. 71. As these contracts are settled, the regulatory asset or regulatory liability is reversed. However, as there is currently no power cost adjustment mechanism in effect for 2006, unrealized gains and losses related to new derivatives not included in rates that will settle in 2006, and changes in fair value of financial derivatives used to set rates, are not deferred as regulatory assets or regulatory liabilities.

The following table indicates unrealized gains and losses recorded in earnings for the years indicated (in millions):

| | | 2005 | | 2004 | | 2003 |
|---|---|---|---|---|---|---|
| **Non-Trading Activities** | | | | | | |
| Net unrealized gains | $ | 41 | $ | 6 | $ | 29 |
| SFAS No. 71 regulatory (liability) asset | | (37) | | (22) | | (16) |
| Net unrealized gains (losses) | $ | 4 | $ | (16) | $ | 13 |
| | | | | | | |

The following table indicates derivative activities from cash flow hedges recorded in OCI for the years indicated (in millions):

| | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| **Derivative Activities Recorded in OCI** | | | | | | |
| Other unrealized holding net gains arising during the period | $ | 46 | $ | 20 | $ | 14 |
| Reclassification adjustment for contract settlements included in net income | | 7 | | (10) | | (4) |
| Reclassification adjustment in net income due to discontinuance of cash flow hedges (*) | | (2) | | - | | (15) |
| Reclassification of unrealized (gains) losses to SFAS No. 71 regulatory (liability) asset | | (48) | | (16) | | 4 |
| Total - Unrealized gains (losses) on derivatives classified as cash flow hedges | $ | 3 | $ | (6) | $ | (1) |
| | | | | | | |
| (*) Due to the probability that the original forecasted transactions will not occur. | | | | | | |

Hedge ineffectiveness from cash flow hedges was not material in 2005, 2004, and 2003. As of December 31, 2005, the maximum length of time over which PGE is hedging its exposure to such transactions is approximately 69 months. The Company estimates that of the $65 million of net unrealized gains in OCI at December 31, 2005, $55 million will be reclassified into earnings within the next twelve months (offset by a $55 million SFAS No. 71 regulatory liability), and $10 million will be reclassified over the remaining 57 months (fully offset by a SFAS No. 71 regulatory liability).

<u>Trading Activities</u>

Prior to 2005, PGE utilized forward, swap, option, and futures contracts to participate in electricity and natural gas markets for non-retail purposes. In early 2005, PGE discontinued its trading activities for non-retail purposes, with existing trading transactions settled by December 31, 2005. Such activities were not reflected in PGE's retail prices.

As indicated above, all unrealized and realized gains and losses associated with "energy trading activities" are reported on a net basis for all periods presented. The following tables indicate unrealized and realized gains and losses on electricity and natural gas trading activities and transaction volumes for electricity trading contracts that settled in the years indicated:

| | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| **Trading Activities (In Millions)** | | | | | | |
| Unrealized Gain (Loss) | $ | (1) | $ | 1 | $ | 1 |
| Realized Gain | | 1 | | - | | 1 |
| Net Gain in Operating Revenues | $ | - | $ | 1 | $ | 2 |
| | | | | | | |
| **Electricity Trading - MWhs (thousands)** | | | | | | |
| Sales | | 815 | | 9,699 | | 13,551 |
| Purchases | | 815 | | 9,699 | | 13,551 |

## Note 9 - Jointly Owned Plant

At December 31, 2005, PGE had the following investments in jointly owned generating plants (dollars in millions):

| | | | PGE Interest | | | Accumulated Depreciation (*) |
|---|---|---|---|---|---|---|
| **Facility** | **Location** | **Fuel** | **Percent** | **MW Capacity** | **Plant In Service** | |

Ex. 2 - DeLuca Decl.

Page 3 of 4

| Boardman | Boardman, OR | Coal | 65.00 | 380 | $41 | $250 |
|---|---|---|---|---|---|---|
| Colstrip 3 and 4 | Colstrip, MT | Coal | 20.00 | 296 | 469 | 288 |
| Pelton/Round Butte | Madras, OR | Hydro | 66.67 | 298 | 113 | 41 |
|  |  |  |  |  |  |  |

(*) Excludes "Asset Retirement Obligations" and "Accumulated Asset Retirement Removal Costs."

Above amounts represent PGE's share of each jointly owned plant, with the Company's share of both direct expenses and utility plant costs included in its financial statements. Each joint owner of the plants has provided its own financing. PGE operates Boardman and Pelton/Round Butte; PPL Montana, LLC operates Colstrip 3 and 4.

# Note 10 - Legal and Environmental Matters

### Legal Matters

**Trojan Investment Recovery -** In 1993, following the closure of the Trojan Nuclear Plant, PGE sought full recovery of and a rate of return on its Trojan plant costs, including decommissioning, in a general rate case filing with the OPUC. The filing was a result of PGE's decision earlier in the year to cease commercial operation of Trojan as a part of its least cost planning process. In 1995, the OPUC issued a general rate order (1995 Order) which granted the Company recovery of, and a rate of return on, 87% of its remaining investment in Trojan plant costs, and full recovery of its estimated decommissioning costs through 2011.

Numerous challenges, appeals and requested reviews were subsequently filed in the Marion County, Oregon Circuit Court, the Oregon Court of Appeals, and the Oregon Supreme Court on the issue of the OPUC's authority under Oregon law to grant recovery of and a return on the Trojan investment. The primary plaintiffs in the litigation were the Citizens' Utility Board (CUB) and the Utility Reform Project (URP). The Court of Appeals issued an opinion in 1998, stating that the OPUC does not have the authority to allow PGE to recover a return on the Trojan investment, but upholding the OPUC's authorization of PGE's recovery of the Trojan investment and ordering remand of the case to the OPUC. PGE and the OPUC requested the Oregon Supreme Court to conduct a review of the Court of Appeals decision on the return on investment issue. In addition, URP requested the Oregon Supreme Court to review the Court of Appeals decision on the return of investment issue. PGE requested the Oregon Supreme Court to su spend its review of the 1998 Court of Appeals opinion pending resolution of URP's complaint with the OPUC challenging the accounting and ratemaking elements of the settlement agreements approved by the OPUC in September 2000 (discussed below). On November 19, 2002, the Oregon Supreme Court dismissed PGE's and URP's petitions for review of the 1998 Oregon Court of Appeals decision. As a result, the 1998 Oregon Court of Appeals opinion stands and the case has been remanded to the OPUC.

While the petitions for review of the 1998 Court of Appeals decision were pending at the Oregon Supreme Court, in 2000, PGE, CUB, and the staff of the OPUC entered into agreements to settle the litigation related to PGE's recovery of, and return on, its investment in the Trojan plant. URP did not participate in the settlement. The settlement, which was approved by the OPUC in September 2000, allowed PGE to remove from its balance sheet the remaining before-tax investment in Trojan of approximately $180 million at September 30, 2000, along with several largely offsetting regulatory liabilities. The largest of such amounts consisted of before-tax credits of approximately $79 million in customer benefits related to the previous settlement of power contracts with two other utilities and the approximately $80 million remaining credit due customers under terms of PGC's 1997 merger with Enron. The settlement also allows PGE recovery of approximately $47 million in income tax benefits re lated to the Trojan investment which had been flowed through to customers in prior years; such amount is being recovered from PGE customers, with no return on the unamortized balance, over an approximate five-year period that began in October 2000. At December 31, 2005, the remaining balance to be collected was approximately $1 million. After offsetting the investment in Trojan with these credits and prior tax benefits, the remaining Trojan regulatory asset balance of approximately $5 million (after tax) was expensed. As a result of the settlement, PGE's investment in Trojan is no longer included in rates charged to customers, either through a return of or a return on that investment. Authorized collection of Trojan decommissioning costs is unaffected by the settlement agreements or the OPUC orders.

The URP filed a complaint with the OPUC challenging the settlement agreements and the Commission's September 2000 order. In March 2002, after a full contested case hearing, the OPUC issued an order (2002 Order) denying all of URP's challenges, and approving the accounting and ratemaking elements of the 2000 settlement. URP appealed the 2002 Order to the Marion County, Oregon Circuit Court. On November 7, 2003, the Marion County Circuit Court issued an opinion remanding the case to the OPUC for action to reduce rates or order refunds. The opinion does not specify the amount or timeframe of any reductions or refunds. PGE and the OPUC have filed appeals to the Oregon Court of Appeals.

In a separate legal proceeding, two class action suits were filed in Marion County Circuit Court against PGE on January 17, 2003 on behalf of two classes of electric service customers. One case seeks to represent current PGE customers that were customers during the period from April 1, 1995 to October 1, 2000 (Current Class) and the other case seeks to represent PGE customers that were customers during the period from April 1, 1995 to October 1, 2000, but who are no longer customers (Former Class). The suits seek damages of $190 million for the Current Class and $70 million for the Former Class, as a result of the inclusion of a return on investment of Trojan in the rates PGE charges its customers. On April 28, 2004, the plaintiffs filed a Motion for Partial Summary Judgment and on July 30, 2004, PGE also moved for Summary Judgment in its favor on all of Plaintiff's claims. On December 14, 2004, the Judge granted the Plaintiff's motion for Class Certification and Partial Summary Judgment and denied PGE's motion for Summary Judgment. PGE filed a proposed order certifying the issue for an interlocutory appeal. An order rejecting the proposed order was entered on February 1, 2005. On March 3, 2005 and March 29, 2005, PGE filed two Petitions for an Alternative Writ of Mandamus with the Oregon Supreme Court, asking the Court to take jurisdiction and command the trial Judge to dismiss the complaints or to show cause why they should not be dismissed and seeking to overturn the Class Certification. On May 3, 2005, the Oregon Supreme Court granted both Petitions. Briefing and oral arguments have been completed and a decision is pending.

On March 3, 2004, the OPUC re-opened three dockets in which it had addressed the issue of a return on PGE's investment in Trojan, including the 1995 Order and 2002 Order related to the settlement of 2000.

On August 31, 2004, the administrative law judge issued an Order (Scoping Order) defining the scope of the proceedings necessary to comply with the Marion County Circuit Court orders remanding this matter to the OPUC. On October 18, 2004, the OPUC affirmed the Scoping Order. On December 20, 2004, the URP and Class Action Plaintiffs filed an application with the OPUC for reconsideration of the Scoping Order. On February 11, 2005, the OPUC denied reconsideration. On April 18, 2005, URP and Linda K. Williams filed a complaint against the OPUC in Marion County Circuit Court challenging the OPUC's affirmation of the Scoping Order. The OPUC filed a motion to dismiss the complaint, and on September 21, 2005, the Marion County Circuit Court granted the OPUC's motion. Hearings in the first phase of the OPUC proceeding have been held and a decision is pending.

On February 14, 2005, PGE received a Notice of Potential Class Action Lawsuit for Damages and Demand to Rectify Damages from counsel representing Frank Gearhart, David Kafoury and Kafoury Brothers, LLC (Potential Plaintiffs) stating that Potential Plaintiffs intend to bring a class action lawsuit against the Company. Potential Plaintiffs allege that for the period from October 1, 2000 to the present, the Company's electricity rates have included unlawful charges for a return on investment in Trojan in an amount in excess of $100 million. Under Oregon law, there is no requirement as to the time the lawsuit must be filed following the 30-day