ORDER NO. 11   432

ENTERED    NOV 0 2 2011

# BEFORE THE PUBLIC UTILITY COMMISSION

## OF OREGON

UE 228

| | |
|---|---|
| In the Matter of<br><br>PORTLAND GENERAL ELECTRIC<br>COMPANY<br><br>2012 Annual Power Cost Update Tariff<br>(Schedule 125). | ORDER |

DISPOSITION:    STIPULATION ADOPTED; ANNUAL UPDATE TARIFF
APPROVED AS MODIFIED

## I.    INTRODUCTION

On April 1, 2011, Portland General Electric Company (PGE) filed its forecast of the company's 2012 net variable power costs (NVPC) under the terms of its Annual Update Tariff (AUT) (Schedule 125). The AUT allows PGE to revise customer rates to reflect changes in its projected NVPC. PGE's initial forecast of 2012 NVPC is $724.9 million, which translates to a rate reduction of about 1.1 percent, effective January 1, 2012.

After conducting discovery and settlement conferences, all parties[1] filed a joint stipulation settling most of the issues raised by PGE's NVPC update. We adopt the parties' stipulation. The sole remaining contested issue is the prudence of PGE's hedging strategy. We find that PGE's hedging strategy is prudently designed, but that we lack sufficient information to determine whether the strategy was prudently executed with regard to certain contracts entered in 2007. We are not persuaded by arguments to reprice those contracts assuming the amount of gas in the contracts would remain unhedged. At the same time, the record is lacking information to allow us to develop suitable proxy prices to reprice the contracts. Because the lack of information about the 2007 hedges was the direct result of PGE's management's failure to follow this Commission's specific instructions in a prior order, we reduce PGE's 2012 NVPC forecast by the monetary equivalent of a one-year, 10-basis-point reduction in PGE's authorized return on equity ($2.6 million).

---

[1] Noble Americas Energy Solutions, LLC, filed a petition to intervene, but did not otherwise participate in the docket.

ORDER NO. 11 432

## II.    PROCEDURAL HISTORY

PGE filed its annual power cost update and supporting testimony on April 1, 2011.  On June 30, 2011, Staff of the Public Utility Commission of Oregon (Staff), the Citizens' Utility Board of Oregon (CUB), and the Industrial Customers of Northwest Utilities (ICNU) filed direct testimony.  PGE filed reply testimony on August 15, 2011, and ICNU filed surrebuttal testimony on August 24, 2011.

PGE, ICNU, CUB, and Staff participated in the hearing held on August 30, 2011.  The parties filed opening and closing briefs in September 2011.  On October 12, 2011, PGE filed a stipulation joined by all parties, as well as the parties' joint testimony in support of the stipulation.

## III.    DESIGNATION OF CONFIDENTIAL INFORMATION

Before we discuss the merits of PGE's filing and the parties' stipulation, we address two procedural issues related to PGE's designation of information as confidential.

### A.    ICNU's Motion to Remove Confidential Designation

On October 19, 2011, ICNU filed a renewed motion challenging PGE's designation of ICNU's proposed adjustments as confidential under the protective order in this docket.[2] PGE objects to the disclosure, stating that ICNU failed to show why the information is non-confidential.

PGE misunderstands its burden in responding to ICNU's motion.  Under the terms of the protective order, as well as OAR 860-001-0080(3)(c), the party challenging a confidentiality designation does not need to show that the information is non-confidential.  Instead, the party need only challenge the designation.  Once the designation is challenged, the designating party (in this case, PGE) must show why the information is protected under ORCP 37(C)(7).  In its response to ICNU's motion, PGE merely asserts that the data underlying the total amounts of ICNU's proposed adjustments is confidential, therefore the adjustments are confidential.  But PGE does not explain how ORCP 37(C)(7) protects the data underlying the adjustments.  PGE has therefore failed to prove that ICNU's proposed adjustments are confidential.  ICNU's motion to remove the designation of the total amounts of its proposed adjustments as confidential is granted.

### B.    CUB's Request for a Rulemaking

In its briefs, CUB argues that PGE over-designated materials as confidential in this docket and states that over-designation has been a problem in other dockets. CUB requests that the Commission open a rulemaking to address excessive designation

---

[2] Order No. 11-102 (Apr 4, 2011).

2

ORDER NO. 11-432

of confidential information or to expand the scope of docket AR 553 to address this issue.[3]

Based upon our own examination of the confidential material submitted in this docket, we agree that PGE's use of the confidential designation appears to be too liberal and includes material that does not appear to be confidential, which made drafting a non-confidential order challenging. We strongly encourage PGE to be more deliberate and moderate in its use of the designation in the future and refer PGE to OAR 860-001-0080(3)(a). But we do not believe that a rulemaking is necessary to address this problem at this time. There are mechanisms in place to challenge the over-designation of confidential information, and CUB did not use these mechanisms. We think that CUB should attempt to enforce the protective order and utilize our existing rules before we consider whether a revised rule is necessary. We encourage CUB to use the informal process in OAR 860-001-0080(3)(d) or to file a formal objection in the future.

## IV.    LEGAL STANDARDS

Over the course of these proceedings, the parties raised arguments about burden of proof, prudence, and the Commission's decision in Order No. 02-772 in docket UE 139. Before addressing the substantive issues, we briefly clarify the applicable legal standards.

### A.    Burden of Persuasion and Production

We reaffirm that for rate revisions proposed by a utility that are subject to ORS 757.210:

> [T]he burden of showing that a proposed rate is just and reasonable
> is borne by the utility throughout the proceeding.

Thus, if PGE makes a proposed change that is disputed by another party, PGE still has the burden to show, by a preponderance of evidence, that the change is just and reasonable. If it fails to meet that burden, either because the opposing party presented compelling evidence in opposition to the proposal, or because PGE failed to present compelling information in the first place, then PGE does not prevail.[4]

To reach a determination on whether proposed rates are just and reasonable, we look at the record as a whole and make a determination based on the preponderance of the evidence. Once a utility has met the initial burden of presenting evidence to support its request, "the burden of going forward then shifts to the party or parties who oppose including the costs in the utility's revenue requirement."[5] Although the burden of production shifts, the burden of persuasion is always with the utility.[6]

---

[3] In Docket AR 553, participants are discussing the procedure for allowing intervenors in a utility's general rate case to access the utility's confidential tax information.

[4] *In Re Portland General Electric Co., Proposal to Restructure and Reprice its Services in Accordance with the Provisions of SB 1149*, Docket No. UE 115, Order No. 01-777 at 6 (Aug 31, 2001).

[5] *In Re Northwest Natural Gas Company*, Docket No. UG 132, Order No. 99-697 at 3 (Nov 12, 1999).

[6] *In Re PGE, Application to Amortize the Boardman Deferral*, Docket No. UE 196, Order No. 09-046 at 7-8 (Feb 5, 2009).

3

ORDER NO.  11  432

## B.    Prudence

To be recoverable in customer rates, costs must be prudently incurred by the utility. To determine whether a particular cost was prudently incurred and recoverable in rates under ORS 757.210, "the Commission examines the objective reasonableness of a company's actions measured at the time the company acted[.]"[7]  Prudence is not a post hoc analysis that focuses on the outcome of the utility's decision, but instead examines what the utility knew, or should have known, at the time the utility incurred the costs.[8]

## C.    Docket UE 139

Docket UE 139 was PGE's first annual revision to its power supply costs under its resource valuation mechanism, which was later changed to the AUT.[9]  One of the issues in docket UE 139 was PGE's decision to enter into power purchase contracts outside its usual timeframe for short-term market purchases. Our approach to determining the prudence of PGE's hedging contracts in this docket is largely based on our decision in Order No. 02-772.

ICNU argues that the Commission adopted a three-part test for reviewing hedging contracts in docket UE 139. ICNU's three-part test considers whether (1) the decision to purchase the power was "unusual" (meaning outside of the utility's usual hedging strategy), (2) whether the market was liquid, and (3) whether the utility adequately documented its reasoning and analysis at the time of making the purchase. ICNU interprets the decision in docket UE 139 as requiring contemporaneous documentation supporting each transaction.

Although we agree with ICNU that the order in docket UE 139 is applicable in this case, we disagree with ICNU's interpretation of the order. As established in Order No. 02-772, we determine the prudence of a hedging contract by first examining the utility's hedging strategy. If the strategy is prudently designed (for example, the strategy includes sound hedging goals, methodology, and targets, among other things), we next examine whether the utility executed its strategy prudently, including whether the transactions were executed in a liquid market. If the market is liquid and transactions are consistent with a prudent hedging strategy, we do not require contemporaneous documentation of each transaction to prove prudence. If a particular transaction is inconsistent with the strategy or there are questions about market liquidity, however, we then examine whether the utility provided adequate and contemporaneous analysis and documentation and a sound justification to support the transaction.

---

[7] *In Re PacifiCorp, dba Pacific Power, Application for an Accounting Order Regarding Excess Net Power Costs*, Docket No. UM 995, Order No. 02-469 at 4 (Jul 18, 2002).
[8] *Id.*
[9] *In Re PGE, Application for Annual Adjustment to Schedule 125 under the Terms of the Resource Valuation Mechanism*, Docket No. UE 139, Order No. 02-772 (Oct 30, 2002).

4

ORDER NO.    11   432

## V.    DISCUSSION

### A.    Stipulated Issues

On October 12, 2011, PGE filed a joint stipulation resolving all disputed issues except those related to PGE's hedging strategy. The stipulating parties are PGE, Staff, CUB, and ICNU. Under the terms of the stipulation, PGE agrees to the following:

- PGE will continue to use its internal forward curves in projecting power costs in this and future AUT proceedings.

- In future AUT proceedings, PGE will provide to the stipulating parties its electricity and gas forward price curves from the last business day of the month by the fifth working day of the immediately following month, beginning with the curve for the last business day in March, and ending with the curve for the last business day in October. The forward price curves will be provided to the stipulating parties upon request and subject to the terms of a protective order.

- The planned maintenance outage for Colstrip Unit 4 included in PGE's initial filing in this docket will not occur in 2012. PGE will remove that planned outage from its power cost modeling.

- The stipulating parties agree that in this and subsequent AUT proceedings no adjustment for price elasticity of demand will be included in the load forecast if the projected impact of the Schedule 125 rate change, positive or negative, is less than three percent. The stipulating parties also agree that in this AUT docket PGE will continue to include an adjustment for energy efficiency in the load forecast, but do not agree regarding the inclusion of an energy efficiency adjustment in future AUT dockets.

- CUB and ICNU each raised issues regarding the modeling of gas costs to reflect differentials in price between Rockies and Sumas that may occur when firm pipeline capacity is available. ICNU also raised an issue regarding the forced outage rate for the Port Westward plant and kVar charges from the Bonneville Power Administration. For the 2012 AUT and subsequent AUT filings, PGE will match the volume of Rockies physical forward purchases with the corresponding Rockies financial contracts (swaps) by the first November update filing. To settle all issues in this docket except the hedging issues, PGE will reduce forecast net variable power costs for 2012 by $600,000. PGE will also address the Rockies/Sumas basis issue in its initial 2013 AUT filing.

The stipulating parties assert that the stipulation is a reasonable resolution of the issues, is in the public interest, and results in fair, just and reasonable rates. We agree. We adopt the stipulation, attached as Appendix A to this order, in its entirety.

5

## B.    Disputed Issue – Hedging

We turn now to the remaining contested issue in this docket—the prudence of PGE's hedging of its 2012 net open position (NOP).[10]  The parties' first focus is on the design of PGE's mid-term strategy (MTS).  PGE created its MTS in 2006 to address the three-year period between the company's 24-month power supply hedging and purchasing and the company's power supply investments beyond five years.  Second, the parties focus on the execution of PGE's overall hedging strategy, including the company's MTS.

PGE asserts that its hedging strategy was prudently designed and executed, and Staff agrees.  ICNU and CUB allege that there are deficiencies in both the design and the execution of PGE's hedging strategy, resulting in imprudent hedges.  ICNU and CUB recommend that the Commission reduce PGE's 2012 NVPC forecast by $65.5 million.

### 1.    Was PGE's Hedging Strategy Prudently Designed?

#### a.    Parties' Positions

PGE's overall hedging strategy contains multiple components.  In this proceeding, the parties' arguments address the design of PGE's MTS.  PGE states that the goal of its MTS is to reduce the volatility of price changes when it purchases over time in the wholesale gas and electricity markets, which then reduces the volatility of retail prices changes for its customers.[11]  PGE states that its customers have stated a strong preference for stability in prices.  PGE notes that it is a uniquely "short" utility because its retail load significantly exceeds its long-term resources; the MTS aims to reduce PGE's unusually large exposure to price fluctuations in the wholesale markets.  PGE notes that prior to its development of the MTS, the company experienced load growth, loss of generating resources, expiration of low-cost hydroelectric power contracts, periods of increased volatility in power and gas markets, and limited resource additions.  All of these drove PGE to develop and implement the MTS.[12]

Under the MTS, PGE secures gas hedges and power hedges to help meet its mid-term power supply needs by layering in transactions over the 3- to 5-year period.  PGE explains that, because its resource portfolio includes two highly efficient combined-cycle combustion turbines, it is most efficient to enter into gas hedges first.[13]  The MTS includes targets for closing the company's NOP established annually by the risk management committee.  PGE advises its traders to close the company's NOP for the given year using these targets.  When a trader identifies a transaction that the trader thinks meets the applicable target and is within the MTS's policies and procedures, the trader is required to seek preapproval from PGE's general manager of risk management and its vice president of power operations and resource strategy.  On a quarterly basis,

---

[10] The NOP is the difference between PGE's needs and its resources.
[11] PGE Opening Brief at 2-3.
[12] PGE/400, Lobdell-Outama/3-4.
[13] PGE Closing Brief at 13.

6

ORDER NO.    11    432

PGE's risk management committee reviews the market, PGE's transactions, and the company's progress toward meeting annual targets for closing the company's NOP. PGE concludes that the design of its MTS is sound, reasoned, and prudent. PGE notes that its expert reviewed PGE's MTS design and concluded that it was consistent with industry practice.[14]

ICNU argues that the design of PGE's MTS was imprudent for three reasons. First, ICNU argues that, faced with market uncertainty, prudent utilities do not hedge more than 48 months in advance, and that customers should not bear the cost of PGE's new and unprecedented purchases.[15] Second, ICNU faults PGE for failing to institute a programmatic approach to hedging and suggests that a more prudent approach would involve setting specific hedging targets (expressed as a percentage of the company's NOP) each year over the four years preceding the prompt year.[16] Third, ICNU contends that PGE's MTS failed to require hedging of gas and power simultaneously.[17]

CUB adopts ICNU's programmatic hedging strategy proposal and its initial disallowance for hedging too much too soon. CUB also requests, however, that the Commission impose an inclining block model, with hedges weighted more heavily closer to the prompt year using a portfolio approach that layers hedges on top of each other over time.[18] Finally, CUB also requests that the Commission impose a limit to PGE's hedging volumes that is similar to the limit agreed upon by a natural gas utility in a different Commission proceeding.[19]

Staff contends that PGE's MTS is prudently designed and concludes that ICNU and CUB fail to rebut PGE's showing of prudence. Staff argues that PGE employees had authority to exercise discretion within the parameters of the MTS and to react to market conditions and indicators, and that ICNU's and CUB's proposed volumetric targets are not probative of whether PGE's adopted strategy was prudent.[20] Staff also finds that PGE's strategic and financial analysis regarding the appropriate tenor of transactions is more persuasive than ICNU's unsupported assertion that any hedge with a tenor greater than 48 months is *per se* imprudent.[21] Staff recommends that the Commission reject the disallowances proposed by ICNU and CUB.[22]

---

[14] PGE Opening Brief at 8.

[15] ICNU Opening Brief at 14.

[16] *Id.* at 22-24; ICNU/102, Schoenbeck/18.

[17] ICNU Opening Brief at 15.

[18] CUB Opening Brief at 3.

[19] *In Re Public Utility Commission of Oregon, Investigation pursuant to ORS 757.210 and 757. 215 to Examine Avista Corp., dba Avista Utilities' Gas Purchasing Strategy*, Docket No. UM 1282, Order No. 07-200 (May 22, 2007) (adopting a stipulation requiring the utility to cap its financial hedging to 70 percent).

[20] Staff Opening Brief at 18.

[21] *Id.* at 19.

[22] *Id.* at 20.

7

ORDER NO.  11  432

b.    Resolution

We conclude that PGE's overall hedging strategy to be prudently designed. Specifically, we find that the MTS is a reasonable approach to addressing the three-year period between the company's short-term hedges and purchases and the company's long-term resource investment, and agree that the appropriate goal is to address PGE's entire NOP. PGE recalculates its purchasing targets annually and requires its traders to seek pre-approval for purchases, with limits on the purchases' term, tenor, and price. PGE's risk management committee reviews and approves changes in the parameters of the MTS annually. Based on the testimony and contemporaneous exhibits PGE introduced documenting the design and goals of the MTS, as well as its expectation at the time the MTS was introduced that gas and power market volatility would remain high, we conclude that PGE's MTS is an objectively reasonable strategy.

We reject ICNU's argument that the MTS should provide for hedging of gas and power simultaneously. PGE introduced contemporaneous documentation demonstrating that the goal of its MTS was to fill a targeted percentage of its NOP with gas first, with the balance to be predominately filled with purchased power. PGE also provided testimony adequately explaining that, because of its high efficiency gas resources, gas was a more efficient hedge, justifying its decision to hedge gas first.

We also do not agree with ICNU and CUB that a utility must adopt a strict programmatic approach to pass a prudence review, and we decline to find that hedges with tenors past 48 months are per se imprudent. But in the absence of a more programmatic approach, such as those proposed by ICNU and CUB, we examine the execution of a utility's strategy more closely to ensure that it meets our prudence standard.

Finally, we decline CUB's request to impose a strict limit on PGE's hedging volumes. In fact, a large share of PGE's original net open position for 2012 remains unhedged. We will examine the need for caps in Commission workshops as discussed later in this order.

Although we find in favor of PGE on this issue, we share ICNU's and CUB's frustration with PGE's failure to clearly explain the specifics of its hedging strategy in this docket. When hedging has been identified as an issue, we expect the utility to provide a clear and complete explanation of its hedging strategy's design, philosophy, and targets. Here, PGE failed to provide key evidence on the company's MTS until late in these proceedings. In its briefs, PGE relies heavily on its supplemental exhibit PGE/601, which is a copy of the company's Energy Risk Management Policies and Procedures. But PGE introduced this exhibit at the end of the hearing in this docket, after all witnesses had testified, so that we do not have any testimony from PGE addressing the document upon which PGE now heavily relies to support the prudence of its strategy. We will expect better from PGE in future proceedings.

ORDER NO.  11 432

## 2.    *Was PGE's Hedging Strategy Prudently Executed?*

While we conclude that the design of PGE's overall hedging strategy was prudent, PGE must also demonstrate that its execution of its strategy was prudent. ICNU and CUB raise three objections to PGE's execution. First, they contend that PGE improperly purchased calendar strips that over-procured second quarter (Q2) gas needs for 2012. Second, they argue that PGE's procurement of hedges was erratic and that the utility improperly hedged the majority of its gas needs first. Third, they contend that PGE purchased some hedges in an illiquid market. We address each argument separately.

### a.    *Failure to Purchase Monthly or Quarterly Strips*

#### 1.    Parties' Positions

ICNU argues that PGE's decision to purchase calendar strips in 2007 and 2008 was imprudent because calendar strips over-procured Q2 2012 gas needs, failed to shape to PGE's seasonal needs, and accordingly missed opportunities in the market. But the basis for ICNU's proposed disallowance is unclear because ICNU appears to concede in its reply brief that the products it criticizes PGE for failing to purchase were not available to PGE during the relevant time period.[23] Moreover, it appears that ICNU has backed away from its Q2 over-procurement arguments entirely and instead bases its proposed disallowance on its argument that all products with a tenor beyond 48 months are imprudent.[24]

CUB agrees with ICNU that PGE should have known that shorter-term strips were available because those products had been available for years, and notes that ICNU's expert is "absolutely sure" that monthly and quarterly strips were available looking forward three to four years from 2007.[25] CUB notes that PGE relied on the Intercontinental Exchange (ICE) to perform its market analyses and that ICE is known for providing short-term rather than long-term hedging opportunities.[26] CUB states that a review of the New York Mercantile Exchange (NYMEX) shows that longer-term products were being traded in 2007, but PGE's inadequate market assessments did not consider this information.[27]

---

[23] ICNU states that "During the course of these proceedings, ICNU has become aware that, while liquid markets existed in some places for long-term products, PGE did not have access to these markets. The data responses and workpapers produced by PGE late in these proceedings has made it clear that PGE did not have access to liquid markets for either calendar strips or seasonal products that Mr. Schoenbeck identified, based both on its geographical position and other factors." ICNU Reply Brief at 19 (citations omitted).

[24] After acknowledging PGE's lack of access to certain products and the evolving nature of its position on this issue, ICNU concludes: "As a result, discovery and cross examination during this proceeding has reinforced ICNU's original position that it was imprudent for PGE to hedge gas more than 48 months from the prompt year." *Id.*

[25] CUB Opening Brief at 15-16.

[26] *Id.* at 16-17.

[27] *Id.* at 17. ICE and NYMEX are exchanges that provide trading floors for various products, including natural gas and power.

9

PGE states that it purchased calendar strips in 2007 and 2008, rather than monthly or quarterly strips, because while monthly or quarterly strips may have been available, they were only available at a high premium because the products were not liquid in markets accessible to PGE.[28] PGE notes that while it did not buy products to fill particular quarters, it never hedged more gas than it needed annually, and that it used excess Q2 gas to hedge its gas needs in other quarters and power needs in Q2.[29]

### 2. Resolution

We conclude that PGE provided adequate evidence of the prudence of its decision not to purchase monthly or quarterly products. In particular, we agree with PGE's expert witness that a long-term risk such as PGE's NOP can be managed through long-term contracts and shaped as the prompt year approaches and shorter-term products become more liquid.[30] We also agree with PGE that the premium PGE would have been required to pay to purchase monthly or quarterly strips would have made the purchases unreasonably expensive.

### b. *Pattern of Hedging*

### 1. Parties' Positions

ICNU argues that the pattern of PGE's hedges was imprudent because it acquired the vast majority of its gas needs for 2012 in long-term hedges made during 2007 and 2008, and ceased transactions from late 2008 through 2009. ICNU argues that it is unusual in the industry for a utility to hedge the majority of its need for a commodity so early, because the number of counterparties and market liquidity lessen further out a utility moves from the prompt year.[31] ICNU also renews its argument that PGE imprudently hedged the majority of its gas needs first.

CUB similarly argues that a strategy based on hedging nearly 100 percent of gas requirements in the first two years simply contains too much risk. CUB quotes ICNU's expert, stating that PGE continued buying forward strips even after it was aware that it was oversubscribed for Q2 in 2012.[32] CUB argues that hedging should generally be limited to about 75 percent of gas supply, unless a utility can demonstrate that more is prudent under current market conditions

PGE acknowledges that its pattern of hedging during 2007 through 2010 was irregular. It maintains, however, that its decision to hedge with long-term contracts in 2007 and 2008, cease hedging from late 2008 through 2009, and begin again in 2010 was an objectively reasonable response to structural changes in the market.[33] PGE notes that at the time it

---

[28] PGE/400, Lobdell-Outama/27-33.

[29] PGE Closing Brief at 14-16.

[30] Transcript at 66, ll 18 (Stoddard).

[31] ICNU Opening Brief at 10; ICNU/109, Schoenbeck/27.

[32] CUB Opening Brief at 8-14.

[33] PGE Opening Brief at 20-21.

ORDER NO. 11 432

ceased hedging, a financial crisis was greatly reducing customer load forecasts, counterparties were of questionable credit worthiness, and gas commodity prices were in flux after the revelation that the domestic gas supply would be significantly greater than originally expected due to the development of "fracking."[34]

PGE reiterates reasons discussed above why the company hedges gas first. In addition, PGE cites testimony of its expert witness that the gas market is liquid further out from the prompt year than the power market and that gas and power hedges only become comparable when the tenor of products becomes shorter.[35]

PGE also notes that, contrary to ICNU's objections, its hedges for 2007 and 2008 were within ICNU's recommended targets once customer load forecasts are revised downwards. PGE explains that, using the revised load forecasts, it hedged 19 percent of its 2012 NOP in 2007, and 23 percent of its 2012 NOP in 2008. PGE adds that, prior to its downward load forecast, the proportion of its hedged 2012 NOP was just 32 percent for both 2007 and 2008.[36]

Staff agrees with PGE that, when its gas and power NOP is considered as a whole, PGE did not over-hedge in 2007 and 2008, and that based on PGE's 2009 revised load forecast for 2012, PGE's hedging in 2007 and 2008 fell within the parameters recommended by ICNU.

2.     Resolution

We conclude that PGE's testimony and exhibits adequately demonstrate that PGE's decision to hedge in 2007 and 2008, cease hedging in 2009, and begin again in 2010 were objectively reasonable. As PGE notes, the market underwent a structural change in 2008 because of the financial crisis and the development of fracking. We find PGE's decision to respond to those changes within the parameters of its MTS to be prudent. Moreover, the amount of PGE's hedging was reasonable. When considering PGE's NOP as a whole (both gas and power), PGE hedged less than 20 percent of its 2012 NOP in 2007 and 2008. Finally, as discussed above, PGE adequately explained its intent to hedge gas first. We find the pattern of PGE's hedges to be reasonable.

c.     *Market Liquidity*

1.     Parties' Positions

ICNU argues that PGE traded in an illiquid market in 2007 and 2008. In the alternative, ICNU argues that the market was illiquid for at least a portion of PGE's 2007 hedges. ICNU contends that PGE offers contradictory and inventive definitions of liquidity that are inconsistent with the definition the Commission adopted in docket

---

[34] Hydraulic fracturing, commonly referred to as "fracking," is used to stimulate the production of natural gas from reservoirs with low permeability, such as shale rock reservoirs.
[35] Tr. at 67, ll 19 (Stoddard).
[36] PGE/400, Lobdell-Outama/36-38.

11

UE 139. ICNU states that PGE's claims regarding liquid markets are not only unsupported by any data or analysis, but also contradict the workpapers of PGE's own expert.[37]

ICNU argues PGE did not use objective market measures to determine liquidity and that the market was illiquid because there were few available counterparties and a low volume of transactions shown in ICE. ICNU states that PGE failed to rebut the presumption of illiquidity created by ICE data and provided no contemporaneous documentation showing that the market became liquid over time. ICNU alleges that PGE determined liquidity by ascribing a price to a particular product and then seeing if any of its authorized counterparties would offer the product at that price. ICNU argues that in a liquid market, the market—not PGE's traders—set a product's price.

ICNU argues that PGE must provide contemporaneous documentation to justify each of its contracts.[38] ICNU notes that in docket UE 139, the Commission disallowed imprudently incurred power costs because PGE failed to provide adequate documentation to justify purchases or show market liquidity.[39] ICNU notes that here, as in docket UE 139, there are few counterparties, few if any transactions, and a lack of contemporaneous analysis or evidence of liquidity. ICNU argues that if PGE trades in an illiquid market, it must at a minimum provide some supporting evidence or internal company analysis to justify that decision.

ICNU notes that PGE introduced preapproval memoranda for the questionable hedges, but these memoranda did not provide sufficient information to be considered adequate contemporaneous justification. ICNU states that, although PGE introduced electronic mails and trade journal articles about market conditions and testified about its practice of phone calls to discuss conditions and limits set by the risk management committee, PGE introduced no contemporaneous evidence showing PGE's internal analyses.

ICNU recommends disallowing the mark-to-market losses associated with any contract that was entered into in an illiquid market and not supported by contemporaneous documentation.[40] ICNU's proposed disallowance assumes that the amount of gas hedged in 2007 and 2008 would remain unhedged until 2012, then purchased at the price forecasted in PGE's 2012 forward price curves as of February 17, 2011.

CUB also argues that contemporaneous documentation supporting each hedging transaction is required. CUB states that PGE's MTS permitted skimpy approval memorandums with little to no market analysis. CUB notes that all transactions under PGE's MTS require pre-approval and that PGE provided all of the supporting documentation that it had for the mid-term transactions, including the strategy itself, but there are no documents that discuss why PGE entered into specific transactions.[41] CUB

---

[37] ICNU Opening Brief at 10-14.
[38] *Id.* at 3-6.
[39] ICNU Reply Brief at 11-14.
[40] ICNU Opening Brief at 10.
[41] CUB Opening Brief at 17-20.

ORDER NO.    11    432

claims that the template that the traders used to obtain permission to execute gas hedging transactions provides little room to relate information to management, does not require any analysis of the market, and gives only basic information about the transaction's type, length, and goal, with no analysis or comparison of other products on the market. CUB argues that good risk management policies would have required traders to adequately document the reasons for trades outside the trading zone and would have required more analysis by management of the trading decisions.[42] CUB supports ICNU's proposed disallowance.

PGE responds that the hedging contracts it entered in 2007 and 2008 were reasonable because they were purchased in a liquid market and were within the parameters of the company's MTS. PGE argues that the market was liquid for yearly strips at the time PGE purchased them and points to ICE data showing that yearly strips were being traded in 2007 and 2008 for 2012. PGE cites to testimony from its expert noting that, while 2012 calendar strips were not traded in all quarters of 2007, there was a significant volume being traded, indicating market liquidity for these products. PGE also notes that ICNU's expert admits there was a liquid market for monthly and quarterly gas hedges in 2007 and 2008 for 2012, and that calendar products were more readily available than monthly and quarterly products.[43]

PGE argues that liquidity may be defined using a number of different criteria. PGE notes that under its MTS, traders determined if there was sufficient liquidity in the gas and power markets using a variety of methods—these included considering whether a product was being traded on ICE, consultations with brokers' markets and bilateral markets, and examining the tightness of the bid-offer spread for a product. PGE argues that market liquidity is not demonstrated by the number of counterparties PGE was authorized to buy from, but rather by the number of parties participating in the market. PGE adds that a lack of transactions on ICE is not dispositive; instead, PGE's traders supplement that information with additional information. PGE states that its policies were documented and transparent, that its MTS provided strong oversight of its traders, and that the company was not required to document the reasonableness or prudence of each individual hedge.[44]

Staff agrees with PGE that the record demonstrates PGE's 2007 and 2008 hedges were purchased in a liquid market, were consistent with PGE's MTS, and were therefore reasonable. Staff notes that even ICNU admits that monthly and quarterly strips were liquid in 2007 and 2008, and calendar strips are generally more liquid than monthly or quarterly strips.

2.    Resolution

As discussed above, we decided in docket UE 139 that hedging contracts would be considered reasonable if property executed under a prudently designed hedging strategy.

---

[42] *Id.* at 20-22.

[43] PGE Closing Brief at 7-9.

[44] PGE Opening Brief at 9-10.

13

If a particular hedging transaction is inconsistent with the strategy, then we examine whether the utility provided adequate contemporaneous analysis and documentation and a sound justification to support the transaction.

At the outset, we disagree with ICNU and CUB's assertions that contemporaneous documentation justifying each hedging transaction is required. As noted above, if transactions are within the parameters of a prudently designed hedging strategy and executed under that strategy in a liquid market, then contemporaneous documentation for each transaction is not required.

Turning to the challenged transactions, we make different findings for PGE's 2007 and 2008 hedges. First, regardless of the definition of liquidity offered by the parties, the record shows objective evidence of market liquidity for 2012 calendar strips in 2008. ICE data shows that, by 2008, there were a sufficient number of counterparties and volume of transactions to establish a liquid market.[45] Because PGE's 2008 hedges were within the parameters of the MTS and were purchased in a liquid market, PGE did not need to provide contemporaneous documentation justifying each transaction. We find that PGE's 2008 hedges were prudent.

For the 2007 hedges, however, PGE did not provide sufficient information to allow us to determine whether the market was liquid for 2012 calendar strips in 2007. The contemporaneous documentation and analysis supporting PGE's 2007 hedges is sparse. PGE offers multiple explanations for its entry into the 2007 market for 2012 calendar strips, but little contemporaneous evidence to support these explanations. Given this lack of contemporaneous documentation or analysis and the absence of proof of market liquidity in 2007, PGE has not established the reasonableness of its decision to enter long-term hedging contracts in 2007.

We now face the question of how to address PGE's failure to provide sufficient information. In docket UE 139, we similarly concluded that PGE had failed to provide sufficient justification to support certain wholesale power transactions. To address that deficiency, we adopted a disallowance based on the difference between the actual contract prices and proxy prices. The proxy prices used were based on reasonable assumptions and consistent with PGE's power procurement policies.

In this docket, ICNU proposes disallowing mark-to-market losses associated with the contracts. ICNU's disallowance assumes that PGE would not have hedged the amount of gas that it hedged in 2007 at any other time from 2008 to 2011, and calculates the proposed disallowance assuming PGE purchased that amount of gas in 2012 at the prices in PGE's forward price curve as of February 17, 2011.

We reject ICNU's proposed disallowance, because we think it is unreasonable to assume that the amount of gas PGE hedged in 2007 would remain unhedged until 2012. Thus, even assuming PGE's 2007 hedges were unreasonable, we cannot adopt ICNU's proposed disallowance, and no party offered an alternative disallowance that is

---

[45] *See* ICNU/705; ICNU/110, Schoenbeck/4, 7.

14

ORDER NO.    11   432

reasonable.[46]  Moreover, the record does not provide sufficient data for us to develop our own proxy prices and perform our own calculations.

We nonetheless find it necessary to address PGE's failure to provide sufficient evidence of market liquidity or adequate contemporaneous documentation supporting hedging transactions in the absence of market liquidity.  We made it clear in docket UE 139 that in future dockets involving hedging, we would expect PGE to be able to prove market liquidity or to provide "internal company analysis of [the] advanced market to justify its decision" to enter into hedging contracts.[47]  PGE failed to do either in this docket.  PGE's management must ensure that the company complies with Commission orders.  From the facts of this case, we find that PGE's management is not complying with our instructions in docket UE 139, and to ensure the company's future compliance, we reduce PGE's 2012 NVPC forecast by $2.6 million.  This amount is the monetary equivalent of a one-year, 10-basis-point reduction in PGE's authorized ROE.  When PGE files its 2012 power cost adjustment mechanism tariff to true-up actual 2012 NVPC with the forecast, PGE must ensure that the full $2.6 million reduction flows to customers.

This was a difficult issue for us to decide.  The evidentiary record was poorly developed and, at times, confused.  Legal arguments failed to appropriately frame the issues for resolution with proper citations to the record.  We were required to dissect the record to understand the various positions of the parties and to find evidence to support them.  To prevent this from happening again, we will meet with stakeholders (not limited to the parties in this proceeding) to discuss the parties' relative responsibilities in cases such as this, and the information the Commission needs to adequately decide a case based on evidence in the record.

### 3.    *Other Issues*

#### a.    *Issue Preclusion*

##### 1.    Parties' Positions

PGE argues that its MTS has been clearly, repeatedly, and openly communicated to the Commission and parties since before its adoption in 2006.  PGE states that many of the contracts in dispute here have been included in rates in previous PGE AUT proceedings, as well as in PGE's Integrated Resource Planning dockets, without objection from the Commission, CUB, or ICNU.[48]  PGE states that it is not claiming the Commission is barred from a prudence review in this docket, but rather claiming that deeming a multi-year contract imprudent after finding the same contract prudent in previous years creates

---

[46] We note that ICNU offered an alternative disallowance based on the assertion that PGE entered into transactions at particular gas hubs before they were readily quoted.  ICNU offered this proposal, however, in its closing brief, depriving PGE or any other party the opportunity to respond.  *See* ICNU Reply Brief at 8-10.  In any event, ICNU's alternative disallowance suffers from the same deficiencies as its primary disallowance because it is not based on reasonable assumptions.

[47] Order No. 02-772 at 13.

[48] PGE Opening Brief at 10-12.

15

ORDER NO.  11  432

inconsistency that elevates the perception of risk by investors in Oregon's regulatory framework.[49]

ICNU states that PGE's contention that the hedges at issue cannot be challenged because some agreements were included in power costs approved in previous AUT cases amounts to collateral estoppel, and that PGE fails to meet the test for issue preclusion because the issues here are different. ICNU states that the Commission adopted PGE's 2010 and 2011 AUT settlement stipulations in their entirety, and PGE agreed in those dockets that no stipulation provision would be used to resolve issues in any other proceedings. ICNU notes that the Commission has stated all settlements are limited to their specific circumstances.[50]

CUB notes that when PGE presented its strategy to parties, there were limits on access to and use of the information. CUB states that it did not have full access to information or the opportunity to review and discuss the MTS until this docket. CUB objects to PGE's claim that including transactions in prior AUT proceedings constituted approval.[51]

### 2.    Resolution

We agree with ICNU and CUB that the inclusion of some of the disputed hedges in previous proceedings does not prevent our review here because none of those proceedings substantively addressed the disputed contracts. PGE's point about its informal presentations to the Commission and parties regarding the MTS are unclear. While PGE acknowledges repeatedly that the Commission's awareness of the company's MTS did not constitute pre-approval or a finding of prudence, the company also exhaustively reviews each time that it notified the Commission of its MTS. We reaffirm that a party's informal presentations to Commissioners at a public meeting and updates to our Staff do not waive a thorough prudence review.

### b.    Impact of Disallowance

#### 1.    Parties' Positions

PGE argues that a decision denying hedging costs that were part of the MTS would be viewed as a hindsight adjustment by the investment community, resulting in financial impacts and loss in investor confidence. PGE asserts that a retroactive disallowance creates a significant disincentive to hedge.[52]

ICNU notes that PGE was on notice that it was subject to a prudence disallowance for illiquid hedges because Commission disallowed nearly $15 million for imprudent hedges in docket UE 139. ICNU notes that the Commission has never recognized an exception to its prudence requirement that would allow imprudently incurred costs to be recovered

---

[49] *Id* at 22-24.
[50] ICNU Opening Brief at 20-22.
[51] CUB Opening Brief at 26-30.
[52] PGE Opening Brief at 12-13.

16

in rates due to the alleged adverse financial implications of a disallowance.[53] ICNU states that there is no evidence that a disallowance of imprudently incurred costs has a negative effect on a utility's ability to attract capital. ICNU notes that the Commission disallowed $13.2 million related to the 2005 outage at PGE's Boardman power plant, but ICNU was not able to find any reference to the disallowance in any ratings agency materials related to PGE.[54]

CUB notes that the investment community understands prudence review and that PGE's investors and ratings agencies will only be surprised by a disallowance if PGE deliberately failed to inform them of its investments and the possibility of a disallowance.[55] CUB also notes that Standard and Poor's index has not previously downgraded PGE in response to Commission disallowances. CUB states that PGE admits that the dollar impact PGE would suffer if the Commission granted the disallowance requested by CUB and ICNU would not be too great for PGE to withstand.

        2.      Resolution

We agree with ICNU that under ORS 757.210, we may not allow imprudently incurred costs to be included in rates due to concerns about the possible impact on the investment community. PGE's claims regarding the investment community are irrelevant to our determination of whether PGE's purchases were prudent.

## VI.   CONCLUSION

We adopt the stipulation attached as Appendix A in its entirety. We conclude that PGE's overall hedging strategy was prudently designed, but find that PGE's management failed to ensure that the Commission had adequate information to determine whether the strategy was properly executed with regard to certain transactions. We reduce PGE's 2012 NVPC forecast by $2.6 million to ensure management's future compliance with Commission orders.

Finally, in light of the focus on hedging in this docket and in docket UE 227, *In the Matter of PacifiCorp, dba Pacific Power, 2012 Transition Adjustment Mechanism,* we will convene Commission workshops to further address the use of hedges by electric utilities in Oregon.

---

[53] ICNU Opening Brief at 19.
[54] *Id.* at 18-19.
[55] CUB Opening Brief at 23-24.

ORDER NO.    11  432

## VII.  ORDER

IT IS ORDERED that:

1.    The stipulation by and among Portland General Electric Company, the Staff of the Public Utility Commission of Oregon, the Citizens' Utility Board of Oregon, and the Industrial Customers of Northwest Utilities, attached as Appendix A, is adopted in its entirety.

2.    Portland General Electric Company must file an updated Annual Update Tariff (Schedule 125) consistent with the terms of this order, to be effective January 1, 2012.

Made, entered, and effective    NOV 0 2 2011    .

_____          _____
**John Savage**                                    **Susan K. Ackerman**
Commissioner                                        Commissioner

A party may request rehearing or reconsideration of this order under ORS 756.561. A request for rehearing or reconsideration must be filed with the Commission within 60 days of the date of service of this order. The request must comply with the requirements in OAR 860-001-0720. A copy of the request must also be served on each party to the proceedings as provided in OAR 860-001-0180(2). A party may appeal this order by filing a petition for review with the Court of Appeals in compliance with ORS 183.480 through 183.484.

18

BEFORE THE PUBLIC UTILITY COMMISSION
OF OREGON

UE 228

| | |
|---|---|
| In the Matter of Portland General Electric Company's 2012 Annual Power Cost Update Tariff (Schedule 125) | **STIPULATION** |

This Stipulation ("Stipulation") is among Portland General Electric Company

("PGE"), Staff of the Public Utility Commission of Oregon ("Staff"), the Citizens' Utility

Board of Oregon, and the Industrial Customers of Northwest Utilities (collectively, the

"Parties").

## I. INTRODUCTION

In accordance with its tariff Schedule 125, PGE filed its annual power cost update

in this docket on April 1, 2011, including PGE's initial testimony regarding 2012 power

costs. PGE also provided the information required under the agreed upon minimum filing

requirements. The Parties subsequently sent and responded to data requests. PGE has

filed, and will continue to file, updates to its power costs in accordance with the schedule

set by the ALJ in this docket. Staff, CUB and ICNU filed testimony on June 30, 2011.

The Parties have also held settlement conferences. As a result of those discussions, the

Parties have reached agreement settling all issues raised in this proceeding except one, as

set forth below. The Parties request that the Commission issue an order adopting this

Stipulation.

Page 1 – UE 228 STIPULATION

## II. TERMS OF STIPULATION

1.      This Stipulation settles all issues raised by all parties in this docket except for the issue of hedging raised by CUB and ICNU.

2.      Forward Curves. PGE will continue to use its internal forward curves in determining projected power costs in this and future Annual Power Cost Update Tariff ("AUT") proceedings.  In future AUT proceedings PGE will, if asked and subject to a Protective Order, provide to the Parties its electricity and gas forward price curves from the last business day of the month by the fifth working day of the immediately following month, beginning with the curve for the last business day in March, and ending with the curve for the last business day in October.

3.      Colstrip Unit 4 Planned Maintenance Outage. The planned maintenance outage for Colstrip Unit 4 included in PGE's initial filing in this docket will not occur in 2012.  Accordingly PGE has removed that planned outage from its power cost modeling, as shown in its latest power cost update.

4.      Load Forecast. The Parties agree that in this and subsequent AUT proceedings no adjustment for price elasticity of demand will be included in the load forecast if the projected impact of the Schedule 125 rate change, positive or negative, is less than three percent (3%). The Parties also agree that in this AUT docket PGE will continue to include an adjustment for energy efficiency in the load forecast. The Parties make no agreement regarding the inclusion of an energy efficiency adjustment in future AUT dockets.

5.      Other Issues. CUB and ICNU each raised issues regarding the modeling of gas costs to reflect differentials in price between Rockies and Sumas that may occur when firm pipeline capacity is available.  ICNU also raised an issue regarding the forced outage

Page 2 – UE 228 STIPULATION

APPENDIX A
PAGE 2 OF 5

rate for the Port Westward plant, and kVar charges from BPA. For the 2012 AUT and subsequent AUT filings, PGE will match the volume of Rockies physical forward purchases with the corresponding Rockies financial contracts (swaps) by the first November update filing. To settle all issues in this docket except the hedging issues, PGE will reduce forecast net variable power costs for 2012 by $600,000. PGE will also address the Rockies/Sumas basis issue in its initial 2013 AUT filing.

6.    The Parties recommend and request that the Commission approve the adjustments described above to PGE's 2012 power costs as appropriate and reasonable resolutions of the issues settled herein.

7.    The Parties agree that this Stipulation is in the public interest and will result in rates that are fair, just and reasonable.

8.    The Parties agree that this Stipulation represents a compromise in the positions of the parties. Without the written consent of all parties, evidence of conduct or statements, including but not limited to term sheets or other documents created solely for use in settlement conferences in this docket, are confidential and not admissible in the instant or any subsequent proceeding, unless independently discoverable or offered for other purposes allowed under ORS 40.190.

9.    If the Commission rejects all or any material part of this Stipulation, or adds any material condition to any final order that is not consistent with this Stipulation, each Party reserves its right (i) pursuant to OAR 860-001-0350(9), to present evidence and argument on the record in support of the Stipulation and (ii) pursuant to OAR 860-001-0720, to seek rehearing or reconsideration. Nothing in this paragraph provides any Party the right to withdraw from this Stipulation as a result of the Commission's resolution of issues that this Stipulation does not resolve.

Page 3 – UE 228 STIPULATION

ORDER NO.   11   432

10.    This Stipulation will be offered into the record in this proceeding as evidence pursuant to OAR § 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(7).  The Parties agree to support this Stipulation throughout this proceeding and in any appeal, provide witnesses to support this Stipulation, and recommend that the Commission issue an order adopting the settlements contained herein.  By entering into this Stipulation, no Party shall be deemed to have approved, admitted or consented to the facts, principles, methods or theories employed by any other Party in arriving at the terms of this Stipulation.  Except as provided in this Stipulation, no Party shall be deemed to have agreed that any provision of this Stipulation is appropriate for resolving issues in any other proceeding.

11.    This Stipulation may be signed in any number of counterparts, each of which will be an original for all purposes, but all of which taken together will constitute one and the same agreement.

DATED this _11_ day of October, 2011.

PORTLAND GENERAL ELECTRIC
COMPANY

STAFF OF THE PUBLIC UTILITY
COMMISSION OF OREGON

CITIZENS' UTILITY BOARD
OF OREGON

INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES

Page 4 – UE 228 STIPULATION

APPENDIX A
PAGE 4 OF 7

Ex. 11 - DeLuca Decl.

10.    This Stipulation will be offered into the record in this proceeding as evidence pursuant to OAR § 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(7).  The Parties agree to support this Stipulation throughout this proceeding and in any appeal, provide witnesses to support this Stipulation, and recommend that the Commission issue an order adopting the settlements contained herein.  By entering into this Stipulation, no Party shall be deemed to have approved, admitted or consented to the facts, principles, methods or theories employed by any other Party in arriving at the terms of this Stipulation.  Except as provided in this Stipulation, no Party shall be deemed to have agreed that any provision of this Stipulation is appropriate for resolving issues in any other proceeding.

11.    This Stipulation may be signed in any number of counterparts, each of which will be an original for all purposes, but all of which taken together will constitute one and the same agreement.

DATED this 11th day of October, 2011.

PORTLAND GENERAL ELECTRIC
COMPANY

STAFF OF THE PUBLIC UTILITY
COMMISSION OF OREGON

CITIZENS' UTILITY BOARD
OF OREGON

INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES

Page 4 – UE 228 STIPULATION

10.    This Stipulation will be offered into the record in this proceeding as evidence pursuant to OAR § 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(7). The Parties agree to support this Stipulation throughout this proceeding and in any appeal, provide witnesses to support this Stipulation, and recommend that the Commission issue an order adopting the settlements contained herein. By entering into this Stipulation, no Party shall be deemed to have approved, admitted or consented to the facts, principles, methods or theories employed by any other Party in arriving at the terms of this Stipulation. Except as provided in this Stipulation, no Party shall be deemed to have agreed that any provision of this Stipulation is appropriate for resolving issues in any other proceeding.

11.    This Stipulation may be signed in any number of counterparts, each of which will be an original for all purposes, but all of which taken together will constitute one and the same agreement.

DATED this 7 day of October, 2011.

PORTLAND GENERAL ELECTRIC COMPANY

STAFF OF THE PUBLIC UTILITY COMMISSION OF OREGON

CITIZENS' UTILITY BOARD OF OREGON

INDUSTRIAL CUSTOMERS OF NORTHWEST UTILITIES

Page 4 – UE 228 STIPULATION

APPENDIX A
PAGE 6 OF 7

ORDER NO. 11 232

10.    This Stipulation will be offered into the record in this proceeding as evidence pursuant to OAR § 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(7).  The Parties agree to support this Stipulation throughout this proceeding and in any appeal, provide witnesses to support this Stipulation, and recommend that the Commission issue an order adopting the settlements contained herein.  By entering into this Stipulation, no Party shall be deemed to have approved, admitted or consented to the facts, principles, methods or theories employed by any other Party in arriving at the terms of this Stipulation.  Except as provided in this Stipulation, no Party shall be deemed to have agreed that any provision of this Stipulation is appropriate for resolving issues in any other proceeding.

11.    This Stipulation may be signed in any number of counterparts, each of which will be an original for all purposes, but all of which taken together will constitute one and the same agreement.

DATED this 12th day of October, 2011.


PORTLAND GENERAL ELECTRIC
COMPANY


STAFF OF THE PUBLIC UTILITY
COMMISSION OF OREGON


CITIZENS' UTILITY BOARD
OF OREGON


INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES


Page 4 – UE 228 STIPULATION

APPENDIX A
Ex. 11 – DeLuca Decl.
Page 25 of 25