**David Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Dallas DeLuca, OSB #072992**
DallasDeluca@MarkowitzHerbold.com
**Stanton R. Gallegos, OSB #160091**
StantonGallegos@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Tel:  (503) 295-3085

        Attorneys for Defendants
        (Additional counsel of record listed on signature page)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| In re Portland General Electric Company Securities Litigation | Case No.: 3:20-cv-1583-SI<br><br>**Defendants'**<br><br>**REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>*In part, unopposed*<br><br>**Pursuant to Fed. R. Evid. 201**<br><br>**Request for Oral Argument** |

<u>**LOCAL RULE 7-1 CERTIFICATION**</u>

Pursuant to Local Rule 7-1, counsel for Portland General Electric Company ("PGE"), Maria Pope and James F. Lobdell (the "Individual Defendants" and with PGE, "Defendants") made a good faith effort to confer with counsel for lead plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff").  As described below, the parties were able to resolve some of the issues but were unable to resolve all the issues in this motion.

<u>**MOTION**</u>

Defendants hereby respectfully request, pursuant to Federal Rule of Evidence 201 and the common law, that the Court consider, in connection with Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint ("Motion"), Exhibits 1 through 11 attached to the Declaration of Dallas DeLuca ("DeLuca Declaration"), which are true and correct copies of the following documents:

<u>Exhibit 1</u>:  Excerpts[1] of the Form 10-K filed by PGE with the Securities & Exchange Commission ("SEC") on March 11, 2005 ("2004 10-K").[2]

<u>Exhibit 2</u>:  Excerpts of the Form 10-K filed by PGE with the SEC on March 16, 2006 ("2005 10-K").

<u>Exhibit 3</u>:  The Form 10-K filed by PGE with the SEC on February 14, 2020 ("2019 10-K").

---

[1] Defendants are submitting only excerpts of the documents for Exhibits 1 and 2 for the convenience of the Court because the un-excerpted versions of those publicly available documents are quite long. Defendants will submit a full copy of those documents if the Court so desires.

[2] Names in parentheticals, e.g., 2004 10-K, denotes how the exhibit is cited in the Motion to Dismiss.

**Page 1 –  REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

Exhibit 4:  The Form 10-Q filed by PGE with the SEC on April 24, 2020 ("Q1 10-Q").

Exhibit 5:  The Form 10-Q filed by PGE with the SEC on July 31, 2020 ("Q2 10-Q").

Exhibit 6:  The Form 8-K filed by PGE with the SEC on August 24, 2020 ("8/24/2020 8-K").

Exhibit 7:  The Form 8-K filed by PGE with the SEC on December 18, 2020 ("12/18/2020 8-K").

Exhibit 8:  A PGE press release dated October 29, 2020, titled "Portland General Electric Announces Jim Lobdell to Retire at Year End."

Exhibit 9:  *In the Matter of Portland Gen. Elec. Co. 2019 Integrated Resource Plan*, Public Utility Commission of Oregon ("PUC"), Docket No. LC 73, Order No. 20-152 (May 6, 2020).

Exhibit 10:  The California Independent System Operator, California Public Utilities Commission & California Energy Commission, Final Root Cause Analysis: Mid-August 2020 Extreme Heat Wave 39-40 (January 13, 2021), http://www.caiso.com/Documents/Final-Root-Cause-Analysis-Mid-August-2020-Extreme-Heat-Wave.pdf.

Exhibit 11:  *In the Matter of Portland Gen. Elec. Co. 2012 Annual Power Cost Update Tariff (Schedule 125)*, PUC Docket No. UE 228, Order No. 11-432, (Nov. 2, 2011).

Each of these Exhibits may be properly considered by the Court in connection with Defendants' Motion because each Exhibit is (i) incorporated by reference, in, and integral to, the Amended Consolidated Class Action Complaint for Violations of the Federal Securities Law (Dkt. 26) ("AC"), and/or (ii) subject to judicial notice under Federal Rule of Evidence 201.

Plaintiff does not oppose defendants' request for judicial notice concerning Exhibits 1 through 7, which are SEC filings.  Plaintiff stated they are unable at this time to take a position

**Page 2 –    REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

on Exhibits 8 through 11 and are reserving the right to oppose that part of this request for judicial notice.

## MEMORANDUM OF LAW

### I.     PRELIMINARY STATEMENT

In assessing securities fraud claims, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Accordingly, Defendants respectfully request that the Court consider Exhibits 1 through 11 to the DeLuca Declaration, because each exhibit is either incorporated by reference in the AC, subject to judicial notice, or both.[3]

### II.     THE COURT SHOULD CONSIDER EXHIBITS 3–7 BECAUSE THEY ARE INCORPORATED BY REFERENCE IN THE AC

In ruling on a motion to dismiss, the "incorporation by reference doctrine . . . permits a district court to consider documents whose contents . . . are not physically attached to the plaintiff's pleading." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *as amended* (Aug. 4, 1999), *abrogated in part on other grounds as stated in S. Ferry LP, No. 2 v.*

---

[3] "Although often conflated, the doctrine of incorporation by reference is distinct from judicial notice." *Gammel v. Hewlett-Packard Co.*, 905 F.Supp.2d 1052, 1061 (C.D. Cal. 2012); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (The incorporation-by-reference doctrine and judicial notice under Federal Rule of Evidence 201 both "permit district courts to consider materials outside a complaint, but each does so for different reasons and in different ways.").

**Page 3 –     REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

*Killinger*, 542 F.3d 776 (9th Cir. 2008).[4] To "prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting . . . documents upon which their claims are based, a court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (alteration in original).

"[T]he incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). It "treats certain documents as though they are part of the complaint itself," and, in doing so, "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* at 1002 (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *as amended* (July 28, 1998)). The Court may consider a document incorporated by reference when a plaintiff "refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002; *Smith v. Cigna Health & Life Ins. Co.,* No. 3:20-CV-624-SI, 2020 WL 5834786, at *3 (D. Or. Sept. 30, 2020) (Simon, J.) (same). If, in a federal securities case, the document "contains [one of the] alleged misrepresentation[s]," the document necessarily "forms the basis of" the claim, and can be considered as incorporated by reference into the complaint. *Khoja*, 899 F.3d at 1005.

"Once a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss, and both parties—and the Court—are free to refer to any of its contents." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014);

---

[4] All emphases are added and internal citations, quotations and alterations are omitted unless stated. Capitalized terms not otherwise defined herein have the same meaning as in the Motion.

**Page 4 –   REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

*see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (where "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim," the "defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)").

Here, Exhibits 3–7 are incorporated by reference in the AC. Those Exhibits are referenced or relied upon in the following paragraphs of the AC:

| Exhibit No. and Description | Paragraph(s) of the AC |
|---|---|
| Ex. 3: Form 10-K filed by PGE with the SEC on February 14, 2020 ("2019 10-K"). | ¶¶ 5, 16–17, 30–32, 35, 44–46, 84, 87–88, 97, 101, 103–15, 135, 142–43, 146–47, 150, 174–75, 180–81. |
| Ex. 4: Form 10-Q filed by PGE with the SEC on April 24, 2020 ("Q1 10-Q"). | ¶¶ 5, 16–17, 35, 45–46, 101, 122–23, 135, 142–43, 146–47, 150, 174–75, 180–81. |
| Ex. 5: Form 10-Q filed by PGE with the SEC on July 31, 2020 ("Q2 10-Q"). | ¶¶ 5, 16–17, 35, 45–46, 101, 130–32, 135, 142–43, 146–47, 150, 174–75, 180–81. |
| Ex. 6: Form 8-K filed by PGE with the SEC on August 24, 2020 ("8/24/2020 8-K"). | ¶¶ 7–9, 82–83, 91–93, 123, 132. |
| Ex. 7: Form 8-K filed by PGE with the SEC on December 18, 2020 ("12/18/2020 8-K"). | ¶¶ 11, 98–101, 115, 123, 132. |

The Court should incorporate all of these exhibits by reference for two reasons. First, as the chart above makes clear, the AC references Exhibits 3–7 "extensively," which itself provides a sufficient basis for incorporation by reference. *Khoja*, 899 F.3d at 1002; *see also Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("We have extended the doctrine of incorporation by reference to consider documents in situations where . . . the contents of the document are alleged in a complaint[.]"); *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *5 (N.D. Cal. June 2, 2020) (incorporating by reference document cited

**Page 5 –   REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

multiple times in complaint); *In re Intel Corp. Sec. Litig.*, No. 18-cv-00507-YGR, 2019 WL 1427660, at *6 (N.D. Cal. Mar. 29, 2019) (incorporating by reference document "cited in two paragraphs of the [complaint]" and another document that was "quoted or referenced in three paragraphs" of the complaint).

Second, each of Exhibits 3–7 forms the basis of Plaintiff's claims—a separate and independent basis for the Court to incorporate these Exhibits by reference. *See Khoja*, 899 F.3d at 1002, 1005; *Coto Settlement*, 593 F.3d at 1038. The AC alleges that Exhibits 3–5, SEC filings including a Form 10-K and two Form 10-Qs, contain and reflect the allegedly false or misleading statements at issue (AC ¶¶ 104-15, 122-25, 131-32, 174–75), and support its attempt to establish scienter (*id.* ¶¶ 142, 147, 174-75). The AC also relies on Exhibits 6 and 7—both Form 8-Ks—for its loss causation allegations, including the purported revelation of the alleged fraud. (*See id.* ¶¶ 7–8, 91–93, 98-101, 115, 123, 132.)

Because Exhibits 3-7 "form[] the basis of the plaintiff's claim," each is properly incorporated by reference. *Khoja*, 899 F.3d at 1002; *see also id.* at 1004 (holding that document containing alleged misstatement necessarily "formed the basis of the scheme" and was properly incorporated by reference); *Apple Inc.*, 2020 WL 2857397, at *5; *W. Penn. Elec. Employees Pension Fund v. Mentor Graphics Corp.*, No. 3:16-CV-470-PK, 2018 WL 4524107, at *3 (D. Or. May 29, 2018), *report and recommendation adopted sub nom. W. Penn. Elec. Fund v. Mentor Graphics Corp.*, 3:16-CV-00470-PK, 2018 WL 3618365 (D. Or. July 27, 2018), *aff'd sub nom. W. Penn. Elec. Employees Pension Fund v. Mentor Graphics Corp.*, 788 Fed. App'x 421 (9th Cir. 2019) (finding incorporation by reference appropriate where company's SEC filings were "referenced in the [Plaintiff's] second amended complaint and . . . the claims in this action

Page 6 –    **REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

arise in part out of each of them").[5] Accordingly, the Court should consider these exhibits under the incorporation-by-reference doctrine.

Plaintiff does not oppose defendants' request for judicial notice of those exhibits.

## III.     THE COURT SHOULD TAKE JUDICIAL NOTICE OF EXHIBITS 1–11

Federal Rule of Evidence 201 provides that a fact is subject to judicial notice if it is not subject to reasonable dispute in that it is either "(1) . . . generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "[F]acts subject to judicial notice may be considered on a motion to dismiss." *Mullis v. United States Bankr. Ct. for Dist. of Nev.*, 828 F.2d 1385, 1388 (9th Cir. 1987). Upon proper notice, the Court is required to take judicial notice of information provided by the requesting party. Fed. R. Evid. 201(c)(2) ("The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information."); *accord Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1075 (9th Cir. 2010).

Courts take judicial notice of public records the contents of which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

---

[5]  Additionally, the Court can incorporate Exhibits 3–7 because they provide the context for Plaintiff's allegations of false and misleading statements and scienter. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("The rationale of the 'incorporation by reference' doctrine" is that "a reader must absorb a printed statement in the context . . . in which it appears[.]"); *In re SunPower Corp. Sec. Litig.*, No. 16-cv-04710-RS, 2018 WL 4904904, at *3 n.2 (N.D. Cal. Oct. 9, 2018) (incorporating exhibits by reference where "plaintiffs refer to all the motion to dismiss exhibits . . . as the ground for [defendant's] false statements and scienter"); *In re Eventbrite, Inc. Sec. Litig.*, No. 5:18-cv-02019-EJD, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020) ("[N]othing in *Khoja* prevents th[e] Court from analyzing an alleged false statement in context.").

Page 7 –   REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL
           NOTICE

Fed. R. Evid. 201(b); *see also Lyon*, 626 F.3d at 1075. Because the contents of public records are not in dispute, courts routinely take judicial notice of what public records contain or what those documents state. *See Henley v. U.S. Bancorp,* No. 3:19-CV-00985-AC, 2020 WL 1038086, at *2 (D. Or. Jan. 21, 2020), *report and recommendation adopted*, No. 3:19-CV-00985-AC, 2020 WL 1033537 (D. Or. Mar. 2, 2020) (noting that a court may consider matters of public record "beyond the pleadings in certain circumstances without converting the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment").

Here, Exhibits 1–11 are proper subjects of judicial notice, because they are publicly-available records and their contents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

First, Exhibits 1–8 are publicly available disclosures made by PGE. Specifically, Exhibits 1–7 are documents filed with the SEC, which are routinely the subject of judicial notice. *See, e.g., Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (SEC filings properly subject to judicial notice on motion to dismiss); *City of Hialeah Employees' Ret. Sys. v. FEI Co.*, 289 F.Supp.3d 1162, 1170 n.2 (D. Or. 2018) (Simon, J.) (citing *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006)) (taking judicial notice of company's public filings with the SEC); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F.Supp.3d 1012, 1021 (D. Or. 2015) ("Courts may take judicial notice of SEC filings . . . [.]").[6] Exhibit 8 is a press release available on PGE's website. Like SEC filings, courts regularly take judicial notice

---

[6] Exhibits 3–6 also constitute information disclosed by PGE during the relevant time period, and are thus proper for judicial notice. *See In re Nuvelo, Inc., Sec. Litig.*, No. C 07-4056 VRW, 2008 WL 5114325, at *2 (N.D. Cal. Dec. 4, 2008) ("Courts hearing securities fraud cases routinely take judicial notice of documents with unquestioned authenticity that . . . demonstrate the information available to the market during the class period.").

**Page 8 –   REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL**
**             NOTICE**

of a company's press releases. *See, e.g., id.*, 129 F.Supp.3d at 1021 ("Courts may take judicial notice of . . . press releases, or contents of a website, when they are "matters of public record.""); *Plevy v. Haggery*, 38 F.Supp.2d 816, 821 (C.D. Cal. 1998) (taking judicial notice of "press releases, analysts' reports, [and] news articles" because the "contents of these exhibits are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

Thus, Defendants request that the Court take judicial notice of each of these exhibits, for the purpose of determining what was disclosed to the market. *See Iron Workers Local 580 Joint Funds v. Nvidia Corp.*, No. 18-cv-07669-HSG, 2020 WL 1244936, at *5 (N.D. Cal. Mar. 16, 2020) ("The Court will consider the SEC filings . . . that Plaintiffs allege contain false and/or misleading statements for the purpose of determining what was disclosed to the market."); *Metzler*, 540 F.3d at 1064 n. 7 (the district court properly took judicial notice of publicly available SEC filings).

Specifically, Defendants request that the Court take judicial notice of the fact that the following information was disclosed to the market in Exhibits 1–8.

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
| --- | --- |
| Ex. 1: Form 10-K filed by PGE with the SEC on March 11, 2005 ("2004 10-K"). | PGE disclosed to the market that it once derived "operating revenues" from "net gains and losses from PGE's participation in energy trading activities" that were "not reflected in the Company's retail rates." (Ex. 1 at 4.) |
| Ex. 2: Form 10-K filed by PGE with the SEC on March 16, 2006 ("2005 10-K"). | PGE disclosed to the market that "[i]n early 2005, PGE discontinued its trading activities for non-retail purposes . . . . Such activities were not reflected in PGE's retail prices." (Ex. 2 at 3.) |
| Ex. 3: Form 10-K filed by PGE with the SEC on February 14, 2020 ("2019 10-K"). | PGE disclosed to the market that it "is exposed to commodity price risk as its primary business |

**Page 9 –    REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| | is to provide electricity to its retail customers. The Company engages in price risk management activities to manage exposure to volatility in net power costs for its retail customers. The Company uses power purchase contracts to supplement its own generation and to respond to fluctuations in the demand for electricity and variability in generating plant operations. The Company also enters into contracts for the purchase of fuel for the Company's natural gas- and coal-fired generating plants. These contracts for the purchase of power and fuel expose the Company to market risk. The Company uses instruments such as: i) forward contracts, which may involve physical delivery of an energy commodity; ii) financial swap and futures agreements, which may require payments to, or receipt of payments from, counterparties based on the differential between a fixed and variable price for the commodity; and iii) option contracts to mitigate risk that arises from market fluctuations of commodity prices. PGE does not engage in trading activities for non-retail purposes." (Ex. 3 at 54.)<br><br>PGE disclosed to the market that "[t]he OPUC has approved an Annual Power Cost Update Tariff (AUT) by which PGE can adjust retail customer prices annually to reflect forecasted changes in the Company's net variable power costs (NVPC). NVPC consists of the cost of power purchased and fuel used to generate electricity, as well as the cost of settled electric and natural gas financial contracts (all classified as Purchased power and fuel expense in the Company's consolidated statements of income) and is net of wholesale revenues, which are classified as Revenues, net in the consolidated statements of income. The OPUC has also authorized a Power Cost Adjustment Mechanism (PCAM), under which PGE may |

**Page 10 –  REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| | share with customers a portion of actual cost variances associated with NVPC." (*Id.* at 7.) |
| | PGE disclosed to the market "[i]n accordance with state regulations, PGE's retail customer prices are based on the Company's cost of service and are determined through general rate case proceedings and various tariff filings with the OPUC." (*Id.* at 77.) |
| | PGE disclosed to the market that "PGE is subject to a power cost adjustment mechanism (PCAM), as approved by the OPUC. Pursuant to the PCAM, future customer prices can be adjusted to reflect a portion of the difference between: i) NVPC forecast each year and included in customer prices (baseline NVPC); and ii) actual NVPC for the year. NVPC consists of the cost of power purchased and fuel used to generate electricity to meet PGE's retail load requirements, as well as the cost of settled electric and natural gas financial contracts, all of which is classified as Purchased power and fuel in the Company's consolidated statements of income, and is net of wholesale sales, which are classified as Revenues, net in the consolidated statements of income." (*Id.* at 71.) |
| | PGE disclosed to the market that "[t]o the extent actual NVPC, subject to certain adjustments, is outside the deadband range, the PCAM provides for 90% of the excess variance to be collected from, or refunded to, customers. Pursuant to a regulated earnings test, a refund will occur only to the extent that it results in PGE's actual regulated return on equity (ROE) for the given year being no less than 1% above the Company's latest authorized ROE, while a collection will occur only to the extent that it results in PGE's actual regulated ROE for that year being no greater than 1% |

**Page 11 –  REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| | below the Company's authorized ROE." (*Id.*) |
| | PGE disclosed to the market the risks associated with its trading in the wholesale energy and derivatives market. For example, PGE disclosed that: "Market prices for power and natural gas are subject to forces that are often not predictable and that can result in price volatility and general market disruption, adversely affecting PGE's costs and ability to manage its energy portfolio"; "Volatility in these markets can affect the availability, price and demand for power and natural gas. Disruption in power and natural gas markets could result in a deterioration of market liquidity . . . affect regulatory and legislative processes in unpredictable ways, affect wholesale power prices, and impair PGE's ability to manage its energy portfolio"; and "Changes in power and natural gas prices can also affect the fair value of derivative instruments and cash requirements to purchase power and natural gas. . . . [I]f power and natural gas prices rise, especially during periods when the Company requires greater-than-expected volumes that must be purchased at market or short-term prices, PGE could incur greater costs than originally estimated." (*Id.* at 21.) |
| | PGE disclosed to the market that "Weather conditions can adversely affect PGE's revenues and costs, impacting the Company's results of operations" and "Severe weather can also disrupt energy delivery and damage the Company's transmission and distribution system. Rapid increases in load requirements resulting from unexpected adverse weather changes, particularly if coupled with transmission constraints, could adversely impact PGE's cost and ability to meet the energy needs of its customers." (*Id.* at 22.) |

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| | PGE disclosed to the market that "[t]he risk of volatility in power costs is partially mitigated through the AUT and the PCAM. Application of the PCAM requires that PGE absorb certain power cost increases before the Company is allowed to recover any amount from customers. Accordingly, the PCAM is expected to only partially mitigate the potentially adverse financial impacts of forced generating plant outages, reduced hydro and wind availability, interruptions in fuel supplies, and volatile wholesale energy prices. The effects of weather on electricity usage can adversely affect results of operations." (*Id.* at 21.) |
| | PGE disclosed to the market that it "attempts to manage its costs at levels consistent with the OPUC approved prices. However, if the Company is unable to do so, or if such cost management results in increased operational risk, the Company's financial and operating results could be adversely affected." (*Id.*) |
| | PGE disclosed to the market that "[i]n accordance with ratemaking and cost recovery processes authorized by the OPUC, the Company recognizes a regulatory asset or liability to defer the gains and losses from derivative activity until settlement of the associated derivative instrument. PGE may designate certain derivative instruments as cash flow hedges or may use derivative instruments as economic hedges. The Company does not engage in trading activities for non-retail purposes." (*Id.* at 84.) |
| | PGE disclosed to the market that "[t]he timing differences between the recognition of gains and losses on certain derivative instruments |

**Page 13 – REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| | and their realization and subsequent recovery in prices are deferred as regulatory assets and regulatory liabilities to reflect the effects of regulation, significantly mitigating commodity price risk for the Company. As contracts are settled, these deferrals reverse and are recognized as Purchased power and fuel in the statements of income and included in the PCAM." (*Id.* at 54.)<br><br>PGE disclosed to the market that it derived revenues from wholesale trades and the precise amount of those revenues over time. (*Id.* at 5–7, 10–11, 14, 17, 21–23, 37–38, 41–43, 54, 67–68, 77, 79–85, 87.)<br><br>PGE disclosed to the market that James Lobdell was 61 years old at the time. (*Id.* at 19.) |
| Ex. 4: Form 10-Q filed by PGE with the SEC on April 24, 2020 ("Q1 10-Q"). | PGE disclosed to the market that it "is exposed to various forms of market risk, consisting primarily of fluctuations in commodity prices, foreign currency exchange rates, and interest rates, as well as credit risk" and "[o]ther than items noted below, there have been no material changes to PGE's risk factors set forth in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 14, 2020." (Ex. 4 at 56-57.) |
| Ex. 5: Form 10-Q filed by PGE with the SEC on July 31, 2020 ("Q2 10-Q"). | PGE disclosed to the market that "Other than items noted below, there have been no material changes to PGE's risk factors set forth in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on February 14, 2020." (Ex. 5 at 59.) |
| Ex. 6: Form 8-K filed by PGE with the SEC on August 24, 2020 ("8/24/2020 8-K"). | PGE disclosed to the market "energy trading activity in certain wholesale electricity markets that has resulted in realized and unrealized |

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| | losses of $127 million as of August 24, 2020." (Ex. 6 at 3.) |
| | PGE disclosed to the market that its "personnel entered into a number of energy trades during 2020, with increasing volume accumulating late in the second quarter and into the third quarter, resulting in significant exposure to the Company. In August 2020, this portion of PGE's energy portfolio experienced significant losses as wholesale electricity prices increased substantially at various market hubs due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West. During this time period, the California Independent System Operator (CAISO) declared a Stage 3 Electrical Emergency and ordered the first rolling blackouts in the state of California since 2001." (*Id.*) |
| | PGE disclosed to the market that "[t]he increase in net variable power costs due to this trading activity will be recognized in PGE's results of operations. There will be no impact to customer prices, as the Company will not pursue regulatory recovery." (*Id.* at 4.) |
| | PGE disclosed to the market that "[p]romptly upon learning of the issue, the PGE Board of Directors formed a Special Committee . . . to review the energy trading that led to the losses and the Company's procedures and controls related to the trading, and to make recommendations to the Board for appropriate action." PGE also disclosed that the Committee retained an independent legal advisor. (*Id.*) |
| | PGE disclosed to the market that "[c]ertain PGE personnel entered into a number of energy trades during 2020, with increasing |

**Page 15 – REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| | volume accumulating late in the second quarter and into the third quarter, resulting in significant exposure to the Company. Simply put, these trades were ill conceived." (*Id*. at 38.)<br><br>PGE disclosed to the market that "we have enhanced oversight including implementing immediate supervisory and reporting changes that involve new responsibilities for both Jim Lobdell and Larry Bekkedahl. Effective immediately, power operations will report to Jim Lobdell. Jardon Jaramillo, with assistance from Paymon Aliabadi, will report to myself overseeing risk management. Brad Jenkins and Kristin Stathis will report to Larry Bekkedahl." (*Id.* at 38-39.) |
| Ex. 7: Form 8-K filed by PGE with the SEC on December 18, 2020 ("12/18/2020 8-K"). | PGE disclosed to the market that it "announced the Special Committee of the Board of Directors concluded its independent review of the energy trading activity that led to the losses incurred in the third quarter . . . . The Compensation and Human Resources Committee of the Board of Directors, in consultation with the other independent directors of the Board, has determined, in light of the third quarter losses, it would be inconsistent with PGE's pay-for-performance philosophy for certain senior leaders to receive annual incentive compensation. Accordingly, the CEO, the CFO and one additional executive officer will not receive any annual incentive compensation for 2020." (Ex. 7 at 3-4.) |
| Ex. 8: Press release dated October 29, 2020, titled "Portland General Electric Announces Jim Lobdell to Retire at Year End." | PGE disclosed to the market that "Jim Lobdell, senior vice president of Finance, CFO and treasurer, plans to retire at year end," after serving 36 years at PGE. (Ex. 8 at 1.) |

As noted above, plaintiff does not oppose this request concerning exhibits 1 through 7.

**Page 16 –  REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

Second, Exhibits 9–11 are publicly available documents from government regulators, including the Oregon PUC and the California Independent System Operator. Courts routinely take judicial notice of "records and reports of administrative bodies." *United States v. 14.02 Acres of Land More or Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir. 2008); *Interstate Nat. Gas Co. v. So. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (same); *see also Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 926 n.9 (9th Cir. 2013) (taking judicial notice of a report from the Receiver of a state agency); *Sierra Club v. Trump*, 379 F.Supp.3d 883, 892 (N.D. Cal. 2019), *aff'd*, 963 F.3d 874 (9th Cir 2020), *cert. granted*, 141 S.Ct 618, 208 L.Ed.2d 227 (2020); *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F.Supp.3d 1132, 1153 (E.D. Cal. 2017); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F.Supp.2d 1026, 1031 (E.D. Cal. 2009) (taking judicial notice of state agency's report on water services). In fact, multiple courts have taken judicial notice of documents from these agencies. *See*, *e.g.*, *W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1192 n.4 (9th Cir. 2008) (taking judicial notice of Oregon PUC order approving interconnection agreement); *Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.* (*CAISO*), No. 15-cv-1576-AJB-RBB, 2016 WL 4087302, at *6 n.5 (S.D. Cal. Aug. 1, 2016) (taking judicial notice of letter from CAISO to Federal Energy Regulatory Commission); *Utility Cost Mgmt, LLC v. Freeman Expositions, Inc.*, No. CV1601516BRORAOX, 2016 WL 9343761, at *2 (C.D. Cal. Apr. 8, 2016) (taking judicial notice of decisions from the California Public Utilities Commission).

Here, Defendants ask the Court to take judicial notice of Exhibits 9–11 for the following purposes:

**Page 17 –  REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

| Exhibit No. and Description | Fact(s) for Which Notice Is Requested |
|---|---|
| Ex. 9: *In the Matter of Portland Gen. Elec. Co. 2019 Integrated Resource Plan*, PUC Docket No. LC 73, Order No. 20-152, Docket LC 73 (May 6, 2020). | To establish that, according to the PUC, "[t]he IRP [integrated resource plan] is a road map for providing reliable and least cost, least risk electric service to the utility's customers" concerning energy generation and demand reduction, (Ex. 9 at 2-3), and to establish that PGE's IRP uses a 30-year planning horizon.  (Ex. 9 at 4.) |
| Ex. 10: California Independent System Operator, California Public Utilities Commission & California Energy Commission, Final Root Cause Analysis: Mid-August 2020 Extreme Heat Wave 39-40 (January 13, 2021), http://www.caiso.com/Documents/Final-Root-Cause-Analysis-Mid-August-2020-Extreme-Heat-Wave.pdf. | To establish that the California Independent System Operator, California Public Utilities Commission, and California Energy Commission observed that an "extreme heat wave experienced in August was a 1-in-30 year weather event for August . . . impact[ing] the entire western United States for several days . . . [.]" (Ex. 10 at 52.) |
| Ex. 11: *In the Matter of Portland Gen. Elec. Co. 2012 Annual Power Cost Update Tariff (Schedule 125)*, PUC Docket No. UE 228, Order No. 11-432 (Nov. 2, 2011). | To establish that a PUC Order provided that "[t]o be recoverable in customer rates, costs must be prudently incurred by the utility. To determine whether a particular cost was prudently incurred and recoverable in rates under ORS 757.210, 'the Commission examines the objective reasonableness of a company's actions measured at the time the company acted[.]'" The PUC "examin[es] the utility's hedging strategy," whether the utility executed its strategy prudently, including whether the transactions were executed in a liquid market," and "whether the utility provided adequate and contemporaneous analysis and documentation and a sound justification to support the transaction." (Ex. 11 at 4.) |

**Page 18 –   REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE**

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court consider, in ruling on Defendants' Motion, the Exhibits attached to the DeLuca Declaration, filed herewith.

Dated this 12th day of March, 2021.

MARKOWITZ HERBOLD PC

By:    *s/Dallas DeLuca*

David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Dallas DeLuca, OSB #072992
DallasDeluca@MarkowitzHerbold.com
Stanton R. Gallegos, OSB #160091
StantonGallegos@MarkowitzHerbold.com

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

Susan L. Saltzstein (*admitted pro hac vice*)
Alexander C. Drylewski (*admitted pro hac vice*)
Shaud G. Tavakoli (*admitted pro hac vice*)
One Manhattan West
New York, New York 10001
susan.saltzstein@skadden.com
alexander.drylewski@skadden.com
shaud.tavakoli@skadden.com
Tel: 212-735-3000

Peter B. Morrison (*admitted pro hac vice*)
Virginia Milstead (*admitted pro hac vice*)
300 S Grand Avenue Suite 3400
Los Angeles, California 90071
peter.morrison@skadden.com
virginia.milstead@skadden.com
Tel: 213-687-5000

*Attorneys for Defendants*

**Page 19 –   REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL
            NOTICE**