**Keith S. Dubanevich**, OSB No. 975200
**Keil M. Mueller**, OSB No. 085535
**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
209 S.W. Oak Street, Suite 500
Portland, OR  97204
Email:  kdubanevich@stollberne.com
        kmueller@stollberne.com
Telephone:     (503) 227-1600
Facsimile:     (503) 227-6840

*Liaison Counsel for the putative class*

**Daniel L. Berger**, *admitted pro hac vice*
**Barbara Hart**, *admitted pro hac vice*
**Caitlin M. Moyna**, *admitted pro hac vice*
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:     (646) 722 8500
Facsimile:     (646) 722 8501
Email:  dberger@gelaw.com
        bhart@gelaw.com
        cmoyna@gelaw.com

*Lead Counsel for the putative class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IN RE: PORTLAND GENERAL ELECTRIC COMPANY SECURITIES LITIGATION | Case No. 3:20-cv-01583-SI<br><br>**<u>CLASS ACTION</u>**<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>ORAL ARGUMENT REQUESTED |

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1 |
| II. | FACTS | 4 |
| | A. PGE'S BUSINESS | 4 |
| | B. ENERGY TRADING IN THE POWER INDUSTRY | 4 |
| | C. PGE'S INCREASING PROFITS AND PRESSURE TO BEAT PRIOR QUARTERS | 5 |
| | D. PGE'S USE OF SPECULATIVE ENERGY TRADING TO BOOST ITS PROFITS | 6 |
| | E. PGE'S CONCEALMENT OF ITS SPECULATIVE TRADES AND SOURCE OF REVENUES | 8 |
| | F. THE CONSEQUENCES OF PGE'S NON-RETAIL TRADING | 9 |
| |     1. PGE's $127 Million Loss Due to Non-Retail Energy Trading | 9 |
| |     2. The Special Committee's Finding That PGE's Trade Was "Ill-Conceived" and Resulting Fall-Out | 10 |
| III. | ARGUMENT | 11 |
| | A. THE AMENDED COMPLAINT ALLEGES ACTIONABLE FALSE STATEMENTS AND OMISSIONS | 11 |
| |     1. PGE's Statements That It Did Not Engage in Trading Activities for Non-Retail Purposes Were False and Misleading | 12 |
| |         a. PGE Did Not Seek Regulatory Recovery for Its Losses Via the PCAM | 15 |
| |         b. PGE Classified the Losses as "Purchased Power and Fuel Expense" | 16 |
| |         c. PGE Increased Its EPS Despite Declining Retail Revenues | 17 |
| |         d. PGE's Trading Losses Were Caused by Regional Transmission Restraints | 18 |

2.    Defendants' Earnings Statements That Omitted to Include Non-Retail Trading as a Driver of Revenue Were Materially Misleading    19

3.    Defendants' False SOX Statements and Omissions Are Actionable    22

B.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES SCIENTER    24

1.    Standard for Scienter    24

2.    Allegations Regarding the Individual Defendants Support a Finding of Scienter    25

a.    The Denial of Pope' and Lobdell's Incentive-Based Compensation Supports Scienter    25

b.    Stripping Pope of Risk Management Oversight Contributes to an Inference of Scienter    26

c.    James Lobdell's Resignation in the Midst of an Investigation Supports Scienter    27

3.    Confidential Witness Allegations Support an Inference of Scienter    28

4.    Pope's and Lobdell's SOX Certifications Support an Inference of Scienter    30

5.    The Complaint Alleges That Pope and Lobdell Had Motive and Opportunity to Commit Fraud    31

6.    An Inference of Scienter Is the Most Compelling Inference    32

C.    THE AMENDED COMPLAINT ALLEGES LOSS CAUSATION    33

D.    THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY UNDER SECTION 20(A)    35

IV.    CONCLUSION    35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amgen Inc. Sec. Litig.*,
   No. CV 07–2536 PSG, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)....................24, 32

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ...........................................................................11, 14, 22

*In re Autodesk, Inc. Sec. Litig.*,
   132 F. Supp. 2d 833 (N.D. Cal. 2000) ...........................................................................27

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ........................................................................................11

*Brendon v. Allegiant Travel Co.*,
   412 F. Supp. 3d 1244 (D. Nev. 2019)............................................................................35

*Bruce v. Suntech Power Hldgs. Co.*,
   No. CV 12–04061 RS 2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ...........................23

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ................................................................................31

*Christian v. BT Group, plc*,
   No. 17-497(KM)(JBC),  2020 WL 1969941 (D.N.J. Apr. 24, 2020)  ...........................26

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*,
   713 F. Supp. 2d 378 (D. Del. 2010)................................................................................26

*In re Cognizant Tech. Sols. Corp. Secs. Litig.*,
   No. 2:16-cv-06509, 2018 WL 3772675 (D.N.J. Aug. 8, 2018) ................................ 27-28

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................................................21

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .......................................................................................33

*Desai v. Deutsche Bank Sec. Ltd.*,
   573 F.3d 931 (9th Cir. 2009) .........................................................................................19

*In re Dothill Sys. Corp., Sec. Litig.*,
   2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ............................................................ 23-24

*DoubleLine Cap. LP v. Odebrecht Fin.*, Ltd.,
   323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018) ...................................................................20

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ...................................................................20, 24

*Fleming v. Impax Labs. Inc.*,
   No. 16-CV-0655'7-HSG, 2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) .......................19

*Freedman v. Louisiana-Pac. Corp.*,
   922 F. Supp. 377 (D. Or. 1996) ...................................................................................19

*Fresno Cty. Employees' Ret. Ass'n. v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)............................................................................31

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ...............................................................20, 27, 35

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ......................................................................................30

*Henning v. Orient Paper, Inc.*,
   No. CV 10–5887–VBF, 2011 WL 2909322 (C.D. Cal. July 20, 2011).........................33

*In re Impac Mortg. Hldgs., Inc. Sec. Litig.*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........................................................................23

*In re Intrexon Corp. Sec. Litig.*,
   No. 16-cv-02398-RS, 2017 WL 732952 (N.D. Cal. Feb. 24, 2017)......................... 20-21

*Kaplan v. Charlier*,
   426 F. App'x 547 (9th Cir. 2011) ................................................................................22

*Khoja v. Orexigen Therapeutics*, Inc.,
   899 F.3d 988, 1008 (9th Cir. 2018) .......................................................................11,14

*Kyung Cho v. UCBH Hldgs., Inc.*,
   890 F.Supp.2d 1190 (N.D. Cal. 2012) ..........................................................................35

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) .....................................................................................24

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .....................................................................................34

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ......................................................................................34

*Mahapatra v. Truecar, Inc.*,
  NO. CV 15-3979-R, 2015 WL 12552062 (C.D. Cal. Dec. 9, 2015) .............................24

*Mallen v. Alphatec Hldgs., Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012).............................................................................28

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  No. 619CV619ORL40LRH, 2019 WL 5394011 (M.D. Fla. Oct. 16,
  2019) ..................................................................................................................................23

*In re Metawave Communications Corp. Sec. Litig.*,
  298 F.Supp.2d 1056 (W.D.Wash.2003)............................................................................31

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ..........................................................................................34

*Monroe Cty. Employees' Ret. Sys. v. S. Co.*,
  No. 1:17-CV-241-MHC, 2018 WL 1558577 (N.D. Ga. Mar. 29, 2018).........................16

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F.Supp.3d. 1215 (N.D. Cal. Jan. 29, 2015)..................................................................35

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ..............................................................................30

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................29

*Neborsky v. Valley Forge Composite Techs., Inc.*,
  No. 13-CV-2307-MMA BGS, 2014 WL 3767011 (S.D. Cal. July 29,
  2014) ..................................................................................................................................20

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding
  Corp.*, 320 F.3d 920 (9th Cir. 2003) ................................................................................31

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ..........................................................................................34

*Petrie v. Elec. Game Card, Inc.*,
  761 F.3d 959 (9th Cir.2014) ..............................................................................................20

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................................... 30-31

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ..........................................................................................30

*Retirement Bd. of Policemen's Annuity & Benefit Fund of Chicago ex rel.*
*Policemen's Annuity and Benefit Fund of Chicago v. FXCM, Inc.*,
333 F. Supp. 3d 338 (S.D.N.Y. 2018)................................................................14

*In re ProShares Trust Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013).................................................................................14

*Rabkin v. Lion Biotechnologies, Inc.*,
No. 17-CV-02086-SI, 2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ................23

*In re Rigel Pharm, Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .............................................................................31

*In re Salix Pharms., Ltd.*,
No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .......25

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016).................................................................33

*Santa Fe Indus. Inc. v. Green*,
430 U.S. 462 (1977)...........................................................................................22

*In re Seadrill Ltd. Sec. Litig.*,
No. 14 CIV. 9642 (LGS), 2016 WL 3461311 (S.D.N.Y. June 20, 2016) ........33

*Simons v. Dynacq Healthcare, Inc.*,
No. CIV.A. H-03-05825, 2006 WL 1897270 (S.D. Tex. July 10, 2006) .........13

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)...............................................................................33

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ...............................................................18

*Southeastern Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
No. 12-cv-00993, 2016 WL 466958 (M.D. Pa. Feb. 8, 2016)...........................28

*Tellabs, Inc. v. Makor Issues & rights, Ltd.*,
551 U.S. 308, 319 (2007)..............................................................................24, 32

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) .............................................................31

*TSC Indus., Inc. v. Northway,* Inc.,
426 U.S. 438, 449 (1976) ..................................................................................11

*In re VeriFone Hldgs. Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ........................................................................24, 30

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3058563 (N.D. Cal. July 19, 2017) ......................................................................................................23

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ......................................................................13

*In re Xcel Energy, Inc., Sec., Deriv. & "ERISA" Litig.*,
286 F. Supp. 2d 1047 (D. Minn. 2003)..........................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..................................................................24, 28

Lead Plaintiff, the Public Employees' Retirement System of Mississippi, respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 36) by Defendants, Portland General Electric Company ("PGE" or the "Company") and Maria Pope and James Lobdell (the "Individual Defendants).[1]

## I.    PRELIMINARY STATEMENT

In early 2020, PGE found itself in a conundrum resulting from its own success. Its profits had been rising quarter over quarter for nearly two years, much to the delight of its investors and analysts, who then came to expect such record profits every quarter. ¶¶3, 47-79. But as an energy company whose prices are limited by its regulator, the Oregon Public Utility Commission ("OPUC"), PGE's available means to continue generating increased profits were constrained.

Maria Pope ("Pope") had assumed the helm as CEO just two years prior and was eager to find a way to continue PGE's string of record quarters. She drew upon her prior experience overseeing PGE's energy portfolio and turned to PGE's energy trading desk. Energy companies typically employ an energy trading desk to hedge against supply and demand fluctuations. ¶4. Regulators support this conduct by allowing energy companies to pass any losses from these transactions through to customers through the Price Cost Adjustment Mechanism or "PCAM."

The inherent risks associated with energy trading require companies like PGE to limit their trading to that necessary to hedge against price fluctuations for their customers. Divested from Enron in 2006, PGE knew that speculative energy trading carried outsized risks. ¶¶1-2. Always trying to distance itself from Enron's notorious bankruptcy, PGE repeatedly assured its investors

---

[1] Plaintiff does not oppose Defendants' Request for Incorporation by Reference and Judicial Notice (ECF No. 38).

that its energy trades were conducted solely as "price risk management activities to manage exposure to volatility in net power costs for retail customers." ¶¶110, 112.

Now looking to increase its quarterly earnings to satisfy its investors, PGE turned to its energy traders to boost its profits – a purpose at direct odds with its statements that it did not engage in "trading activities for non-retail purposes." The strategy worked for some time, and PGE was able to beat its prior quarters' numbers in both EPS and revenues. ¶¶86, 133. PGE ascribed its success to factors *other* than its non-retail trading, carefully continuing to conceal from investors that its trading practices deviated from their stated purposes. ¶¶120-121, 128-129.

PGE's strategy unraveled in August 2020. PGE had engaged in speculative trading in the Southwest, and when energy prices spiked, PGE was required to purchase energy at sharply inflated prices to deliver the energy it had promised its contractual counterparties. This resulted in a $127 million loss to the Company, which PGE disclosed on August 24, 2020. ¶91. The Company also announced it would not seek regulatory abatement through the PCAM, indicating that these trades were not executed to hedge against price fluctuations. ¶¶83, 96. Investors dumped PGE stock, driving down its price by 8.4%, as analysts expressed concern. ¶¶93-97.

A Special Committee of PGE's Board of Directors investigated the cause of the losses, ¶98, reporting findings on December 18, 2020 that the trades were "ill-conceived," ¶99. It also determined to overhaul the Company's internal controls, including by adding "experienced risk management personnel," revising "policies designed to prevent positions of the type that led to the losses," and creating a new risk management reporting structure that reassigned Pope's previous oversight. ¶99. In addition, the Compensation and Human Resources Committee determined that neither Pope nor James Lobdell ("Lobdell") (PGE's CFO who resigned in the midst of the

2 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

investigation, ¶17) were entitled to any incentive compensation in 2020, which had comprised significantly over half their compensation in recent years. ¶¶139, 145.

Defendants' motion to dismiss asserts that Plaintiff did not allege actionable false statements; did not allege scienter; and did not allege loss causation. Each of these arguments fails.

Defendants' argument that Plaintiff did not allege an actionable false statement relies on a re-write of the Complaint, incorrectly construing it as a claim that PGE adequately disclosed risks associated with energy trades. Def. Br. at 11-14. But the gravamen of the Complaint rests not on inadequate risk disclosures; rather, PGE was running a side business in speculative energy trades, for the purpose of generating profits, which it concealed from investors. Defendants also claim that Plaintiff did not demonstrate that the trades at issue were for "non-retail purposes" and that Plaintiff inaccurately defines "non-retail purposes." Def. Br. at 12. But PGE's own public filings define "non-retail trades" as those not made to hedge customers' prices, and the Complaint provides ample support through PGE's accounting of its trades and its failure to pass them through the PCAM to demonstrate that PGE's energy trades were not made to hedge price variations.

Defendants' scienter arguments get them no further. They have not meaningfully explained the Company's decision to deny Pope and Lobdell their incentive-based compensation and to strip Pope of risk oversight duties. They further ignore Pope's prior position overseeing PGE's energy portfolio and attempt to discount the corroborating the testimonials of confidential witnesses. A holistic review of the facts allows for an inference of scienter.

Finally, Defendants' argument that loss causation is not alleged because the market already knew of the risks associated with energy trading fails because these risk disclosure did nothing to alert investors of PGE's concealed side business in speculative energy trading.

3 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## II.    FACTS

### A.    PGE's Business

PGE is an energy company that provides power for residential and commercial customers in Portland, Salem, and their environs.  ¶1.  PGE was divested as part of Enron's bankruptcy in 2006, and has been operating as a standalone, publicly-traded business since that time.  *Id.*

Since its inception in 2006, investors have valued PGE as a reliable, low-risk investment, whose sole business has been to provide electricity to retail customers, at rates set by the OPUC.  ¶¶27-28, 34.   Pope, PGE's CEO, acknowledged that PGE's conservative risk profile was paramount to its investors, stating on the Company's July 31, 2020 earnings call, "we recognize that our dividend is an important component of our shareholder return and being a steady and financially healthy company.  It's really important that as we invest for the long term in infrastructure to maintain a safe, reliable system and having a financially healthy utility is critically important."  ¶33.

### B.    Energy Trading in the Power Industry

As a part of its provision of energy to retail customers, PGE (and many other similarly situated power companies) selectively engages in energy trading to hedge against outsized and unpredictable price fluctuations associated with the difficulties in forecasting both energy supply and customer demand.  ¶¶4, 36.  PGE has characterized this form of energy trading to be for "retail purposes."  Specifically, PGE repeatedly explains in its public disclosures that "[t]he Company engages in price risk management activities to manage exposure to volatility in net power costs for its retail customers . . . PGE does not engage in trading activities for non-retail purposes."  ¶¶110, 112, 122.  Thus, trading for "non-retail purposes" is, according to PGE, trading for purposes other than for "price risk management activities to manage exposure to volatility in net power costs for its retail customers," and would include trading for the purposes of boosting revenues or profits.

4 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

This type of trading can take many forms, each carrying certain risks. ¶¶36-43. Thus, most power companies such as PGE typically limit their energy trading activity to those trades necessary to mitigate pricing risks, in order to limit the Company's trading losses. *Id*. History has shown that an energy company's unchecked and speculative energy trades can result in disastrous consequences. Indeed, this rampant trading was what led to the infamous collapse of Enron, in which PGE's roots lay. ¶¶5, 45. This is why investors are particularly concerned that a power company such as PGE conducts only as much trading as is necessary to hedge against unpredictable price fluctuations and does not look to trading as a source of revenues or a profit-driver. ¶¶45-46.

To encourage companies to engage in some trading in order to hedge prices, PGE's regulators allow losses from such trades to be passed through the PCAM, meaning consumers absorb the losses associated with these trades. ¶¶82-83. Thus, when a trade entered into for the purpose of hedging generates a loss, it is the consumers – not the Company or its shareholders – who bear the costs.

### C.    PGE's Increasing Profits and Pressure to Beat Prior Quarters

PGE's business flourished in the years preceding the Class Period. In all but one quarter, PGE reported an increase in diluted earnings per share ("EPS") and net income, as compared to the prior year. ¶¶48-60, 64-66, 70-72. Analysts took note, lauding the Company's ability to increase its financial results quarter after quarter. ¶¶61-63, 67-68, 73-75. But with each success, the pressure on PGE to continue to show improvement in its finances grew and weighed heavily on its new CEO, Pope, who assumed the helm in January 2018. ¶16.

Adding to the pressure were constraints that PGE faced as a regulated utility company, with prices set by the OPUC. Thus, PGE found it increasingly difficult to sustain the growth that investors had come to expect. ¶¶3, 76. As a result, PGE's employees faced pressure from

5 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

executive management and particularly Pope, to generate revenues and profits through more creative means. ¶¶3, 77, 79. For example, CW3, a former principal analyst at PGE, stated she was tasked with finding a way to "monetize the trading floor" and find more "creative" means for generating revenue. ¶¶27,79. CW3 reported to Director Lauren Isaac Shapton, who reported to a vice president, who in turn reported to Pope. ¶27. CW2 worked directly with PGE's energy traders in the Power Operations Group and reported directly to the Power Operations Group General Manager of Risk Management, Jim Barnes who, in turn, reported to Lobdell. CW2 noted that increased pressure to generate more revenue had resulted in a distinct shift in the culture of PGE's trading desk and deterioration of the Company's risk management controls. ¶ 8. For example, CW2 attested to the fact that PGE's energy traders, who executed the derivative trades, were "cocky," and were constantly trying to meet their annual revenue goals, which was referred to as "the pledge." ¶77. CW2 further explained that Pope wanted "big returns" on their trades, which led to intense competition among them, as they jockeyed to become one of Pope's "favorites." *Id*. CW2 was responsible for overseeing derivatives contracts executed by the trading floor and interacted regularly with energy traders. ¶24.

### D.    PGE's Use of Speculative Energy Trading to Boost Its Profits

The increasing pressure for PGE to generate revenue and increase its EPS caused PGE to turn to speculative trades in energy derivatives, in contravention of its public disclosures. ¶¶6, 80-81. For a period of time, this strategy worked, as PGE was able to bolster its revenues through increased non-retail trading activity. ¶¶46, 86.

A series of facts demonstrates that PGE was engaging in trading for non-retail purposes during the Class Period. *First*, trades that are conducted for retail purposes, *i.e.*, to hedge against unpredictable prices increases, are passed through the PCAM. ¶¶82-83. This ensures that customers benefit from any hedges that result in lower prices, but it also passes any losses on to

6 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

customers.  Here, when PGE suffered outsized losses of $127 million due to its trades, it did not even attempt to process those losses through the PCAM, and instead chose to absorb them itself, to the detriment of its shareholders.  *Id.*  If the trades had been for retail purposes, they would have been processed through the PCAM.

*Second*, a close examination of PGE's accounting for the $127 million loss demonstrates that PGE was engaging in non-retail energy trading.  ¶¶84-85.  In its Form 10-K, PGE disclosed that price risk management activities are used to manage power costs related to its regulated retail operations under OPUC.  ¶84.  Sales of electricity and natural gas that are settled with actual physical delivery of the product are recorded as revenues and are reported in a line item under "operating expenses," called "purchased power and fuel expense."  *Id*.  PGE explained that transactions that are not physically settled are recorded on a net basis in purchased power and fuel expense once they are financially settled.  *Id*.  Thus, gains and losses on derivative instruments that do not result in a physical delivery of power are netted within purchased power and fuel expense.  *Id*.[2]

In PGE's Form 10-Q for the quarter ended September 30, 2020, the "purchased power and fuel expense" line item increased from the prior year's third quarter by $127 million.  ¶85.  This is consistent with the trading loss of $127 million.  *Id*.  PGE's decision to classify this trading loss as "purchased power and fuel expense" reveals that the energy trades were from purchase of energy and/or settlement of financial transactions, and not from losses related to the physical sale of electricity or natural gas.  *Id*.

---

[2] Defendants assert, with no support, that PGE's "financial derivative trades are designed to benefit customers."  Def. Br. at 14-15 n.7.  But the Court cannot credit facts inserted by Defendants that are contradicted by the Complaint.  Thus, Defendants' assertion that the Company's accounting for these transactions in "purchased power and fuel expense" is "of no moment" should be disregarded.

7 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Third*, a careful review of the Company's July 31, 2020 earnings call to announce its 2020 second quarter results also confirms that the Company was deriving a significant percentage of its year-over-year revenues from energy trades conducted for non-retail purposes. ¶86. Specifically, the Company was able to generate an *increase* in diluted EPS of $0.04 even though its retail revenues contributed a *reduction* of $0.01 to the Company's EPS. *Id*. PGE attributed that increase to higher operating margins via profits from non-retail energy trading. *Id*. The positive impact on EPS of $0.05 as a result of a decrease in "net variable power costs" is due to the Company's settling of its speculative forward and futures contracts. *Id*. Investors would not have known at the time that this increase in revenues resulted from these non-retail trades, but once the Company disclosed a $127 million loss associated with "ill-conceived" energy trades, it became apparent that the Company had, indeed, been able to increase its EPS due to speculative trades. *Id*.

### E.    PGE's Concealment of Its Speculative Trades and Source of Revenues

PGE did not disclose the shift in its business strategy to investors because this would have tainted its image as a reliable low-risk investment. ¶5. To the contrary, PGE's Class Period SEC filings specifically and repeatedly assured investors that: "PGE does not engage in trading activities for non-retail purposes." ¶¶5, 6, 44, 110, 112, 122, 131. In addition, when PGE announced its successful results, it attributed its profits to factors other than its non-retail trades, omitting to disclose that a significant driver of its revenue came from the risky, speculative trades that investors thought they were carefully avoiding.

PGE not only made false statements that it did not conduct energy trading for non-retail purposes, but it also failed to disclose to its investors that PGE had begun deriving revenues from this highly speculative proprietary energy trading activity. ¶¶116, 118, 120, 127-28, 132, 133. The Company continued to attribute its increased earnings compared to the prior year to revenue generated from its retail customers. For example, on the July 31, 2020 earnings call, Pope

8 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

attributed PGE's increased revenues to "***an increase in high-tech and digital services demand as well as lower power costs and operating expenses***." (emphasis added). ¶128. These statements omitted to disclose that PGE's increased revenues were profits generated from non-retail energy trades; trades which PGE could not rely on to maintain steady and reliable stream of revenue and profits that were typical of a standard electric company. ¶46.

    **F.**    **The Consequences of PGE's Massive Non-Retail Trading**

        **1.**    **PGE's $127 Million Loss Due to Non-Retail Energy Trading**

On August 24, 2020 PGE announced that it had incurred $127 Million in trading losses due to entering an increased numbers of "ill-conceived trades" during the second and third quarters of 2020. ¶¶7, 91. The Company further disclosed that the losses were a result of "a substantial increase in wholesale energy prices at various market hubs due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West." ¶¶7, 91. The Company's press release further stated that PGE would not seek to recover those losses through the PCAM, which is how losses sustained from energy trading for retail purposes are typically sought to be recovered. ¶¶83, 96. The Company's press release also stated that the that an independent Special Committee of the Board of Directors would commence an investigation into PGE's energy trading practices and internal controls and that PGE's 2020 guidance would be slashed from $2.20-$2.50 per diluted share to $1.30-$1.60 per diluted share. ¶92. Analysts expressed shock at the sheer size of the loss that had been incurred; particularly unusual for a regulated electric utility. ¶95. Analyst coverage of the loss also observed that the loss, "called into question the Company's internal controls and incentives." ¶97.

In response to this disclosure, PGE's stock price plummeted from $41.96 at the close of trading on August 24, 2020 (before the news was announced) to $38.45 at the close of trading on August 25, 2020, a decline of 8.4%. ¶93.

9 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### 2. The Special Committee's Finding That PGE's Trade Was "Ill-Conceived" and Resulting Fall-Out

The Special Committee announced the findings from its investigation of PGE's trading activity on December 18, 2020. The announcement included several shocking findings and directives and provided additional insight into the trading positions that had caused PGE's massive losses. ¶¶11, 99. Specifically, the Committee concluded that:

> Energy trading positions resulting in these losses were short in the desert Southwest and California power markets and long in the Pacific Northwest power markets. In August 2020, wholesale electricity prices increased substantially in the desert Southwest and California power markets due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West. As a result of these market disruptions and the Company's exposure to these positions, the Company's energy portfolio realized significant losses. ¶101.

This finding confirmed that PGE had engaged in futures or forwards contracts to sell energy to the Southwest and California power markets but did not have sufficient capacity to deliver energy to those locations. *Id.* Specifically, the reference to "constraints to regional transmission facilities" indicates that the Company did not have the capability to deliver the energy to the Southwest and California. Thus, in order to satisfy its contractual obligations, PGE had to purchase energy from a third source that did have the capacity to deliver the electricity (or financially net settle) and at extremely high rates, due to the energy shortage that was occurring in these regions in August 2020. *Id.* If PGE had entered into these trades to hedge against its excess supply, it would have had infrastructure in place to deliver such supply, negating any transmission constraints. Rather, PGE's contracts to sell power to the Southwest and California were designed to take advantage of price differentials in those regions for the purpose of increasing operating margins, net income and EPS. *Id.* These transactions were not performed to hedge the risk of price fluctuations for its retail customers, and thus were for "non-retail purposes," in direct contravention of the Company's statements. *Id.*

10 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The Committee's report also concluded that trading losses were attributable to deficiencies in the Company's risk management controls. To this effect, the Committee announced significant structural changes in the Company's energy trading practices and that the Power Operations Group would no longer report to Pope as of January 1, 2021. ¶99. This decision indicated that the Special Committee concluded that Pope was not satisfactorily performing her role as the person responsible for overseeing Energy Trading Risk Management or the Power Operations group. The Special Committee also sought to eliminate "positions *of the type* that led to the losses," providing further indication that these were of a different *type* than PGE's ordinary trades done for retail purposes. *Id.* Finally, the Compensation Committee denied both Pope and Lobdell all of their incentive-based compensation for 2020 because of the third quarter losses. ¶100.

## III.    ARGUMENT

### A.    The Amended Complaint Alleges Actionable False Statements and Omissions

The Complaint alleges actionable statements and omissions under Section 10(b)(5) of the Exchange Act of 1934. A statement is actionable "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *see also Khoja v. Orexigen Therapeutics*, *Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (holding that falsity is adequately alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time). An omission is material, and thus actionable, if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway,* Inc., 426 U.S. 438, 449 (1976); *see also In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (citation omitted) (materiality found where allegations, "[r]aise a reasonable

expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable").

Here, the Complaint alleges that Defendants made false statements and material omissions falling into three categories: (1) false statements in PGE's SEC filings stating that PGE did not engage in trading activities for non-retail purposes; (2) statements that omitted to disclose that PGE's increased earnings were attributable to profits from non-retail energy trades; and (3) falsely certifications that PGE's disclosure controls were adequate.

### 1.    PGE's Statements That It Did Not Engage in Trading Activities for Non-Retail Purposes Were False and Misleading

PGE asserted that the Company did not engage in energy trading for non-retail purposes. ¶¶5, 35, 110, 112, 122, 131. Thus, for example, PGE stated in two separate places its Form 10-K filed on February 14, 2020, "The Company engages in price risk management activities to manage exposure to volatility in net power costs for its retail customers. . . . PGE does not engage in trading activities for non-retail purposes." ¶¶110, 112. It repeated nearly verbatim that "The Company does not engage in trading activities for non-retail purposes" in its Form 10-Qs filed on April 24, 2020 and July 31, 2020. ¶¶122, 131. The Complaint details why these statements were false, and that PGE *was* in fact "engag[ing] in trading activities for non-retail purposes." Indeed, PGE was engaging in trading activities in order to generate profit for the Company so that it might beat its earnings estimates. ¶¶47, 81. Similarly, PGE assured its investors that it "participates in the wholesale electricity marketplace in order to balance its supply of power to meet the needs of retail customers," ¶¶106,108, but these statements were false because PGE was participating in the wholesale electricity marketplace in order to boost its profits and beat prior quarters' earnings results, ¶¶107, 109.

12 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants argue that Plaintiff concocted a definition of trading for "non-retail purposes" which is not supported by the facts, Def. Br. at 11-12, but they are wrong. Far from being "invented" by Plaintiff, the definition of "non-retail purposes" comes directly from Defendants' public statements, where they discuss permissible energy trading. For example, on page 48 in its 2019 Form 10-K, PGE explains that :

> The Company engages in price risk management activities to manage exposure to volatility in net power costs for its retail customers. The Company uses power purchase contracts to supplement its own generation and to respond to fluctuations in the demand for electricity and variability in generating plant operations. The Company also enters into contracts for the purchase of fuel for the Company's natural gas- and coal-fired plants.

PGE then states, in that same paragraph, that it "does not engage in trading activities for non-retail purposes." Trading for "non-retail purposes," then, is trading for any "purpose" other than to "engage[] in price risk management . . . to manage exposure to volatility in net power costs for its retail customers."[3] As Defendants themselves acknowledge, statements must be evaluated in context, Def. Br. at 13, and here the context demonstrates that "non-retail trading" is trading for any purpose other than that described in the paragraph. *See Simons v. Dynacq Healthcare, Inc.*, No. CIV.A. H-03-05825, 2006 WL 1897270, at *2 (S.D. Tex. July 10, 2006).

The Complaint provides ample detail in explaining that PGE did, in fact, trade for purposes other than to "engage[] in price risk management." To begin with, the Special Committee recommended "[s]trengthened trading polices . . . designed to prevent positions *of the type that*

---

[3] Defendants rely on *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1193 (9th Cir. 2021), to argue that Plaintiff "invented" the definition of trading for non-retail purposes. But this case does not help them. In *Tesla*, the statements were non-actionable because the plaintiffs *re-wrote* the alleged false statements by inserting a new word, "automated", in front of "production. Plaintiff here does not insert any words, or re-write any of Defendants' disclosures. Instead, Plaintiff simply takes Defendants' disclosures at face value and explains why they are false and misleading. This is distinguishable from the term "installation" which was at issue in *Tesla*, where there was no context for Tesla's statements that indicated that the definition of "installation" meant the installation of automated equipment.

13 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*led to the loss.*"  ¶99.  This indicates that the trades that resulted in the loss of $127 million were of some "type" other than the retail trading which PGE disclosed (and was not looking to "prevent," even following the committee's investigation).   Further, the individuals who specifically conducted the trades were fired, *id.*, further revealing that they were for non-retail purposes.

PGE's non-retail trading is further demonstrated by the following, none of which PGE disputes: (1)  PGE did not seek regulatory recovery for its losses via the PCAM for the massive trading losses it incurred; (2) PGE classified the $127 million in losses as "purchased power and fuel expense" rather than "net variable power costs;"  (3) PGE was able to increase its EPS in the face of declining retail revenues and (4) PGE's trading losses were caused by regional transmission restraints.  ¶88.[4]  Each of these demonstrates a "direct contradict[ion]" to Defendants' statements that they were not engaging in non-retail trading.  *Khoja*, 899 F.3d at 1008; *see also In re Atossa,*

_____

[4] Ironically, Defendants engage in a substantial re-write of their own, when they argue that "Plaintiff does not plead any facts . . . to show that PGE held itself out as conducting a risk-free operation, or that trading for retail purposes meant risk-free or conservative trading."  Def. Br. at 13; *see also id.* at 14-15.  The gravamen of the Complaint is not that Defendants misled investors about the risks associated with their retail trades.  Rather, the Complaint alleges that Defendants essentially developed an entire side-business of trading for non-retail purposes and did not inform investors of that business – much less the additional risk it presented.  ¶¶46, 81-88, 106-113.  Thus, warnings about "weather changes" and "extreme weather conditions" are irrelevant to Plaintiff's claims.  Def. Br. at 15.  Defendants' cases cited in support are likewise inapposite.  In *Retirement Bd. of Policemen's Annuity & Benefit Fund of Chicago ex rel. Policemen's Annuity and Benefit Fund of Chicago v. FXCM, Inc.*, 333 F. Supp. 3d 338, 348 (S.D.N.Y. 2018), the court dismissed claims that risk statements were misleading because the defendant company made clear that not all risk was eliminated.  In *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013), the court found that defendants conveyed the specific risk that materialized.  Here, in contrast, Defendants did not disclose that they were engaging in non-retail energy trades.  Moreover, even if relevant, the risk statements that Defendants point to are insufficient because they do not include sufficient cautionary language.  *See In re Atossa*, 868 F.3d at 797(holding that a general disclaimer that company could be subject to future regulatory action from "other matters" does not cure the misleading nature of its alleged filings which omitted to disclose that the Defendants were under investigation by the FDA).

868 F.3d at 794 (finding falsity alleged where defendants stated that a drug had gone through the FDA clearance process when the complaint alleged facts that the drug had not received such clearance).

### a. PGE Did Not Seek Regulatory Recovery for Its Losses Via the PCAM

The PCAM allows energy companies to pass on losses from certain energy trades to their customers, so long as those trades were arranged specifically to mitigate fluctuations in customers' energy prices. ¶¶82-83; *see also* Def. Br. at 14. It is undisputed that PGE did not even attempt to seek abatement of the losses at issue through the PCAM. ¶¶82-83; Def. Br. at 15. Defendants argue that PGE's decision not to seek regulatory abatement was because it concluded that the trades were "ill-conceived," and that they would likely not be approved by the OPUC. Def. Br. at 15-16. This plainly supports Plaintiff's claim that the trades were conducted for non-retail purposes. As Defendants note in their brief, OPUC generally determines whether a public utility may recover any losses under the PCAM based on whether the utility's energy trades were "prudently" or "imprudently" incurred. Def. Br. at 18. Defendants argue that the trades were "ill-conceived," i.e., "imprudent," and that they would not have qualified for abatement. However, it is unfathomable that an energy company would not at least submit for abatement to OPUC, a trade made to hedge against pricing fluctuations and that generated significant losses. The fact that Defendants chose not to attempt to seek abatement for these trades indicates that the trades were *not* made to hedge against price fluctuations, i.e., were made for non-retail purposes.[56]

---

[5] PGE is an investor-owned utility. So, if the Company believed that there was a chance for them to mitigate its trading losses through the PCAM, they certainly would have done so. The Defendants' argument that PGE "chose" to not recover its losses through the PCAM so as to not pass on the losses to its retail customers is unpersuasive.

[6] OPUC regulates the prices PGE sets for its customers. Thus, energy trades made to generate profits, and not to hedge against price fluctuations, are outside OPUC's purview and instead are

15 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants deflect from the point with their non-responsive assertion that, "PGE's financial trading is designed to be included in the retail rate-setting process and Cost Adjustment Mechanism." Def. Br. at 14. This assertion further supports Plaintiff's allegation that these trades were a departure from PGE's traditional price-hedging trades done for retail purposes. In any event, Plaintiff need not disprove this bald assertion by Defendants at the motion to dismiss.

Analysts covering PGE when the trading losses were disclosed noted that the failure to seek abatement likely indicated that the trades were imprudently incurred. Courts have held that engaging in undisclosed activities that threaten energy companies' ability to seek regulatory relief renders investments less attractive. *See Monroe Cty. Employees' Ret. Sys. v. S. Co.*, No. 1:17-CV-241-MHC, 2018 WL 1558577, at *25 (N.D. Ga. Mar. 29, 2018), order clarified, No. 1:17-CV-241-MHC, 2018 WL 1702675 (N.D. Ga. Apr. 6, 2018) (holding that the possibility of the elimination of regulatory incentives for Southern Company (also a power company) due to an impermissible rate increase would render it a less attractive investment).

### b.    PGE Classified the Losses as "Purchased Power and Fuel Expense"

The accounting treatment of PGE's loss also indicates that PGE engaged in trading for non-retail purposes. In its 2019 10-K, PGE explained that price risk management activities are used to manage power costs related to its regulated retail operations under OPUC. ¶83. Physically settled sales of electricity and natural gas are recorded as revenues, and physically settled purchases of electricity and natural gas are reported in a line item under "Operating expenses," called "purchased power and fuel expense." ¶84. PGE further explained that transactions that are not physically settled are recorded on a net basis in purchased power and fuel expense once they are

---

regulated by the federal agency, FERC. This is the most likely reason why PGE did not submit its trades to OPUC for abatement.

financially settled. *Id.* ***Gains and losses on derivative instruments that do not result in a physical delivery of power are netted within purchased power and fuel expense***. Specifically, PGE states, "Physically settled electricity and natural gas sale and purchase transactions are recorded in Revenues, net and Purchased power and fuel expense, respectively, upon settlement, while transactions that are not physically settled (financial transactions) are recorded on a net basis in Purchased power and fuel expense upon financial settlement." *Id.*

In PGE's Form 10-Q for the third quarter, the "purchased power and fuel expense" line item increased from the prior year's third quarter by $127 million. ¶85. This is consistent with the trading loss of $127 million. *Id.* PGE's decision to classify this trading loss as "purchased power and fuel expense" – and to do so through netting, rather than as a line item – demonstrates that the trades causing PGE's losses were from purchase of energy and/or settlement of financial transactions and not from losses related to the physical sale of electricity or natural gas. *Id.* Defendants' statements regarding its general policy of classifying "wholesale revenues" does not address (or deny) Defendants' decision to classify its trading losses as "purchased power and fuel expense." Def. Br. at 16-17.

### c.    PGE Increased Its EPS Despite Declining Retail Revenues

The Complaint also alleges that in the first and second quarters of 2020, PGE was able to increase its earnings per share despite the fact that retail revenues were declining. ¶¶86-87. This further demonstrates the falsity of PGE's statements. In the second quarter of 2020, the Company announced that it had increased its EPS by $0.04 per share. ¶86. The Company notes that an "increase in net variable power costs, which includes higher wholesale revenues" contributed $0.05 to its EPS. *Id.* The Company noted that it had suffered a ***decline*** in "retail revenues" which contributed a ***negative*** $0.01 per share to its EPS. Thus, the "higher wholesale revenues" were separate and apart from "retail revenues," and is further evidence that the trades were made for

17 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

non-retail purposes. *Id.* This conclusion is supported by PGE's "wholesale energy deliveries," which is energy ***not sold by PGE to its retail customers***. ¶87. The amount of "wholesale energy deliveries" increased markedly from 2017 through 2019. These deliveries were not sold to its customers but were used to settle forwards and/or futures contracts, *i.e.*, were for non-retail purposes. *Id.* Defendants' argument that Plaintiff did not "identify the number or amount of" non-retail energy trades ignores the detailed allegations explaining how PGE accounted for these trades and the amount by which they comprised PGE's profits. Def. Br. at 18.[7]

> ### d.     PGE's Trading Losses Were Caused by Regional Transmission Restraints

The Special Committee attributed PGE's losses to "constraints to regional transmission facilities," further evidencing that PGE was engaging in energy trading for non-retail purposes. ¶ 91, 101. Defendants argue that "Plaintiff pleads no facts to explain how or why the existence of 'constraints to regional transmission facilities' shows that any of PGE's trades were not designed as hedges or otherwise for price risk management purposes." Def. Br. at 18.

Defendants are incorrect. The Complaint alleges that the fact that PGE's losses were due to "constraints to regional transmission facilities" reveals that PGE had engaged in futures or forwards contracts to ***sell*** energy to distant power markets (specifically the Southwest). ¶101. The transactions were thus not designed to sell its own excess energy, which cannot easily be transported over long distances; rather, they were designed to sell power to non-local markets and take advantage of prices differentials in those regions for the purpose of boosting its earnings results, i.e., for "non-retail purposes." *Id.* If PGE had truly intended to sell its excess power, it

---

[7] Defendants cite *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 998 (N.D. Cal. 2017), but that case faulted the plaintiffs for not properly describing what "low quality" contracts actually meant. Here, the definition of "non-retail trades" comes from Defendants' own filings.

would have ensured that the infrastructure was in place to allow for the transmission of that power. Ultimately, PGE was forced to purchase energy from a third source, which did have the capacity to deliver the electricity in the Southwest, but at extremely high rates due to the energy shortage that was occurring in these regions in August 2020. *Id.*

### 2. Defendants' Earnings Statements That Omitted to Include Non-Retail Trading as a Driver of Revenue Were Materially Misleading

The Complaint also alleges actionable omissions in Defendants' earning statements. Actionable omissions "stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it." *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009). PGE's filings throughout the class period omitted to disclose that it was deriving revenues from non-retail energy trading activity. PGE certainly had a duty to disclose that it was engaging in energy trading for non-retail purposes because it was necessary to make its statements regarding PGE's assertion that it did not engage in energy trading for non-retail purposes not misleading. *Freedman v. Louisiana-Pac. Corp.*, 922 F. Supp. 377, 387 (D. Or. 1996).

Specifically, the Complaint alleges that PGE omitted to disclose in all of its earning statements during the Class Period, that PGE's increased EPS was due, at least in part, to profits from non-retail trades. ¶¶116, 120-121, 122, 128, 133. Specifically, the Company attributed its success to "an increase in revenue from higher retail prices and increased loads from industrial customers," ¶116; to "the sale and distribution of electricity to its retail customers," ¶122; and to "higher residential, industrial and wholesale demand, which was partially offset by lower commercial demand," ¶133. Pope, for her part, specifically told investors that PGE's profitability resulted from "improved gross margin due to strong industrial demand and higher earnings from ongoing investment in our system," ¶120; and "an increase in high-tech and digital services demand as well as lower power costs and operating expenses," ¶128. These statements are

actionable because they omitted to disclose the material fact PGE's speculative, non-retail trading activities were significant drivers of its revenues and increased profits.[8]

A failure to disclose a significant source of revenues and contributor to profits amounts to concealment and courts regularly hold that omissions regarding revenue sources are actionable, even if the revenue figures are accurate.[9] *See Neborsky v. Valley Forge Composite Techs., Inc.*, No. 13-CV-2307-MMA BGS, 2014 WL 3767011, at *4 (S.D. Cal. July 29, 2014) (holding that investors had plead actionable omissions where Defendant failed to disclose that the actual source of revenues was the illegal exportation of semi-conductors and not the sale of "momentum wheels and other mechanical devices."); *Evanston Police Pension Fund v. McKesson Corp.,* 411 F. Supp. 3d 580, 599 (N.D. Cal. 2019) (holding that defendants failure to attribute increases in revenue to a drug price-fixing conspiracy rendered its earning statements attributing increased revenue to supply disruption to be false and misleading); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018)  (holding that statements that put the source of the revenue at issue may be actionable if they fail to disclose the impropriety of the source); *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1 (D. Or. 2015) (the securities laws "prohibit[] the telling of material half-truths") (quoting *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir.2010).[10]

---

[8] Omissions are actionable where they "make the actual statements misleading…." *Fleming v. Impax Labs. Inc.,* No. 16-CV-06557-HSG, 2018 WL 4616291, at *2 (N.D. Cal. Sept. 7, 2018). Thus, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Petrie v. Elec. Game Card, Inc.,* 761 F.3d 959, 970 (9th Cir.2014) (quoting S.E.C. v. Todd, 642 F.3d 1207, 1215 (9th Cir.2011)).  "[A] statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making a decision*." In re Galena Biopharma*, 117 F. Supp. at 1145 (citation omitted).

[9] Defendants' argument that its financial statements were accurate, and cases cited therein, are thus inapposite.  Def. Br. at 19.

[10] *In re Intrexon Corp. Sec. Litig.*, No. 16-cv-02398-RS, 2017 WL 732952, at *5 (N.D. Cal. Feb. 24, 2017) is distinguishable because there, the Court found Intrexon's omissions not to be misleading because defendant specifically disclosed that a portion of its revenue was derived from

Here, PGE's decision to engage in speculative trading to generate profits represents a marked departure from the conservative picture it had painted. Trading to boost profitability was an entirely new business venture, wholly apart from the energy supplier that investors thought they were entrusting with their funds. ¶46. Investors were entitled to know that they were, in effect, investing in an energy company with a side-business of risky investments, particularly in light of PGE's prior ties to Enron, which was caught doing essentially the same thing. ¶45. Failing to disclose its non-retail trading is akin to a car manufacturer that boosts its profits and beats prior quarters' results by opening a side business of providing auto loans to low credit customers, and fails to mention anything about this ancillary venture.

The duty to disclose heightens when the sources of revenue are risky or improper. *In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132, 1153 (C.D. Cal. 2008) is instructive here. There, a bank failed to disclose to investors that it was deriving revenue from assuming increasingly risky mortgages, and weakening its underwriting standards, while simultaneously touting its underwriting procedures. Just as the defendants in *Countrywide* concealed revenue derived from risky mortgages likely to default, PGE hid that its revenue resulted from extremely volatile derivative instruments, with increased likelihood of resulting in a loss to the Company. This is especially true given PGE's conservative risk profile, and its historical ties to Enron. It is highly likely that investors, looking for a reliable low risk investment in a public utility, would not have invested in PGE had they known that the Company was making such risky bets in the energy markets.

---

the transactions at the crux of the complaint, *i.e.*, round-trip transactions. Here, in contrast, Defendants never disclosed that PGE was deriving revenue from non-retail energy trades.

21 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

PGE's omissions in its earning statements are also analogous to the omissions at issue in *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1056 (D. Minn. 2003). There, the court found that defendants' omissions about revenue from improper "round trip" energy trades rendered misleading their statements that they were generating revenue from energy trading subsidiaries. *Id*. The court held that the failure to disclose the fact that Xcel had derived revenue from these improper trades was material, because the fact that a public utility was deriving revenues from improper energy trades was information that would alter the total mix of information for investors. *Id.*[11]

### 3.    Defendants' False SOX Statements and Omissions Are Actionable

Throughout the Class Period, Defendants also made materially false and misleading statements regarding its risk management policies and controls as they pertained to PGE's energy trading policies in their Sarbanes Oxley Act Certifications. ¶¶103-105, 114-115. These statements failed to disclose that PGE's energy trading unit lacked adequate controls, as the Special Committee later confirmed, and that PGE's filings contained material misstatements and omissions regarding the Company's non-retail energy trading activity. Courts routinely hold that false SOX Certifications are actionable, particularly where, as here, the Complaint "asserts facts

---

[11] Defendants also argue that Plaintiff alleges mere mismanagement. Def. Br. at 21-22. That is not correct. Plaintiff's claims are not based on the fact of the speculative, non-retail trades themselves. They are based on the fact that Defendants did not disclose their existence to investors, depriving investors of the opportunity to decide whether they wanted to place their funds in a venture that was engaging in these types of trades. Defendants' cited cases are therefore inapposite. *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 479 (1977) (holding that plaintiffs had alleged mere corporate mismanagement where allegations of fraud were based solely on mistreatment of investors fiduciarily); *In re LifeLock, Inc. Sec. Litig.*, 690 App'x 947, 955 (9th Cir. 2017) (holding that the "federal securities laws do not protect investors from, "quality control problems, service lapses, or management miscues", where Plaintiffs had failed to demonstrate that statements regarding compliance with an FTC order were actually false); *Kaplan v. Charlier*, 426 F. App'x 547, 549 (9th Cir. 2011) (finding that defendants were merely negligent, and thus only guilty of mismanagement).

indicating that, at the time of the [SOX] certification, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their [SOX] certification erroneous, a false or misleading certification may form the basis of a § 10(b) and Rule 10b–5 claim." *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 619CV619ORL40LRH, 2019 WL 5394011, at *11 (M.D. Fla. Oct. 16, 2019); *see also Rabkin v. Lion Biotechnologies, Inc.*, No. 17-CV-02086-SI, 2018 WL 905862, at *9 (N.D. Cal. Feb. 15, 2018) (finding defendants' SOX certifications which failed to disclose that defendants engaged in a promotional scheme to inflate their stock price to be actionable); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,* No. MDL 2672 CRB (JSC), 2017 WL 3058563, at *7 (N.D. Cal. July 19, 2017).

Here, the Complaint has adequately alleged that Defendants knew that its filings contained false statements that it did not conduct energy trading for "non-retail purposes" and omitted to disclose that at least a portion of its reported revenues and profits were derived from energy trades conducted for non-retail purposes. ¶105. The Complaint also alleges that Defendants knew that that the Company did not disclose "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," because it later admitted that there were weaknesses in its risk management controls. *Id.* Finally, the Company did not disclose all "fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." *Id.*[12]

---

[12] Defendants' cases are distinguishable. *Bruce v. Suntech Power Hldgs. Co.*, 2013 WL 6843610, at *4, *9 (N.D. Cal. Dec. 26, 2013), held that defendants' SOX certifications were not actionable misstatements because plaintiffs' allegations that the company undervalued the Loan Guarantee according to GAAP rested solely on later-discovered fraud. Here, the Complaint alleges that Defendants knew that their filings contained false statements and that the Company was conducting trades for non-retail purposes. *See also In re Impac Mortg. Hldgs, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1091 (C.D. Cal. 2008) (dismissing plaintiff's claims based on defendants' SOX certifications because plaintiffs failed to allege that the remedial statements regarding the defendants' internal controls in the corresponding 10Q were false); *In re Dothill Sys. Corp., Sec.*

23 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### B. The Amended Complaint Adequately Alleges Scienter

#### 1.    Standard for Scienter

Plaintiffs must allege a strong inference of scienter, that is, that "a mental state embracing the intent to deceive, or defraud." *Tellabs, Inc. v. Makor Issues & rights, Ltd.*,551 U.S. 308, 319 (2007).  Actual knowledge is not required; rather, an inference of recklessness is enough to satisfy scienter.  *In re VeriFone Hldgs. Inc. Sec. Litig.,* 704 F.3d 694, 708 (9th Cir. 2012) (emphasizing that a plaintiff is not required to plead that a defendant "actually knew," that the fraudulent conduct alleged was improper because "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5); *In re Amgen Inc. Sec. Litig.*, No. CV 07–2536 PSG (PLAx), 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) (finding that scienter was alleged where it was "eminently likely" that defendants "had access to and were put on notice of" the concealed facts).[13]

---

*Litig.*, 2009 WL 734296, at *6 (S.D. Cal. Mar. 18, 2009) (holding that defendants' SOX certifications were not false because their admission of a material weakness in their internal controls did not contradict the prior statement certifying the company's disclosure controls).

[13] Defendants fault the Complaint for not identifying a particular document demonstrating their knowledge of non-retail trading activity. Def. Br. at 23.  But such allegations are not essential to establish scienter, and none of the cases Defendants rely upon hold as such. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (holding that scienter was not established because plaintiff's allegations were based on conclusory statements that defendants had access to data demonstrating a decline in sales); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009) (holding that allegations of unreliable confidential witnesses and bare allegations of falsity were not sufficient to establish scienter); *Mahapatra v. Truecar, Inc.*, NO. CV 15-3979-R, 2015 WL 12552062, at *2 (C.D. Cal. Dec. 9, 2015) (finding no strong inference of scienter where plaintiff's complaint contained only "vague allegations" that defendants had access to unspecified information."). Indeed, scienter is routinely established in the absence of these types of allegations. *See Evanston,*411 F. Supp. 3d at 602 (rejecting defendants' argument that plainitffs had merely shown that corporate management was generally aware of the day-to-day workings of the business).

2.   **Allegations Regarding the Individual Defendants Support a Finding of Scienter**

a.   **The Denial of Pope's and Lobdell's Incentive-Based Compensation Supports Scienter**

At the conclusion of its investigation into PGE's trading activity and internal controls, the Special Committee announced that both Pope and Lobdell would be denied 100% of their incentive-based compensation for 2020, which was likely to have comprised the substantial majority of their total compensation in 2020. ¶¶ 139, 145. This fact contributes to a strong inference of scienter because the denial of compensation was directly related to the alleged fraud. *In re Salix Pharms., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (Board's decision to claw back millions of dollars from the individual defendants weighed in favor of a strong inference of scienter).

Defendants argue that the denial of incentive-based compensation did not equate to a finding of wrongdoing. Def. Br. at 26. But this is a question of fact that is not properly resolved on a motion to dismiss. Further, the announcement and decision to withhold Pope's and Lobdell's incentive-based compensation was made simultaneously with the announcement of the Special Committee's findings, including flawed risk controls. ¶100. The Company specifically attributed this decision to the "third quarter losses." *Id*. Thus, the Company decided to withhold their compensation by no later than December 18, 2020, before the Company's fiscal year had closed and well before the Company's annual results would be finalized. Thus, the compensation committee did not bother to determine whether under the Company's *annual* performance either Pope or Lobdell would have been entitled to their *annual* incentive-based compensation, which

allows for the inference that the decision to withhold Pope's and Lobdell's incentive-based compensation was grounded in a finding of their culpability.[14]

### b.    Stripping Pope of Risk Management Oversight Contributes to an Inference of Scienter

The Complaint alleges that prior to the Special Committee's investigation, the Energy Trading Risk Management Unit reported to Pope, but that effective January 1, 2021, this line of reporting was re-directed to the Vice President of Strategy Regulation and Energy Supply, effectively removing that responsibility from Pope's purview.  ¶138.  Defendants state that the Energy Trading Risk Management Unit did not report to Pope until *after* the trading losses were disclosed.  Def. Br. at 25.  They point to an exhibit attached to a Form 8-K filed on August 24, 2020, an email sent to PGE personnel, in support.  However, the email does not state that Pope's oversight responsibilities began on August 24, 2020.  Rather, it highlights "new responsibilities" for Lobdell and Larry Bekkedahl, and then states that two employees – Jardon Jaramillo and Paymon Aliabadi – would report to "myself," i.e., Pope, "overseeing risk management."  It is not at all clear that Pope's risk management oversight responsibilities began only on that date, particularly since Defendants cannot point to the individual or group of individuals who had previous oversight.  In any event, Defendants do not dispute that ***following the Special Committee's investigation***, Pope was stripped of risk management oversight responsibilities.  ¶138.  Thus, even if she was only granted those responsibilities on August 24, 2020, this would have occurred prior to the Special Committee's investigation that uncovered facts concerning the

---

[14] The cases Defendants cite are distinguishable.  In *Christian v. BT Group, plc*, No. 17-497 (KM) (JBC), 2020 WL 1969941, at *8 (D.N.J. Apr. 24, 2020), the reduction of pay was based on "actual performance," not the performance of one quarter.  In *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 398 (D. Del. 2010), the rejected allegation concerned a failure to compensate an employee at time of resignation, not incentive-based compensation that defendant was contractually owed.

26 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

culpability of various PGE's employees, including Pope herself. The fact that she was then stripped of those responsibilities following the investigation is strong evidence that Pope, at a minimum, recklessly disregarded the non-retail energy trades.

Defendants argue that the Complaint merely argues that Lobdell and Pope "must have known" of the non-retail energy trades by virtue of their positions as CFO and CEO. Def. Br. at 24. But the Complaint does much more than that. Not only did Pope have oversight of the Energy Trading Risk Management Unit, as explained above, but her previous position as Senior Vice President, Power, Supply, Operations and Resource Strategy, in which she directly oversaw energy trading, ¶140, also gives rise to an inference that she would have been kept apprised of the happenings in the energy trading unit. Further, Lobdell, as CFO, would have had detailed knowledge of the accounting for the revenues coming from the non-retail energy trades, and their positive contributions to the Company's EPS in prior quarters. ¶146.[15]

### c.    James Lobdell's Resignation in the Midst of an Investigation Supports Scienter

Lobdell's resignation, which occurred in the heart of the Special Committee's investigation, ¶17, supports an inference that his resignation was connected to the wrongdoing alleged **in** the Complaint. *See In re Galena Biopharma*, 117 F. Supp. 3d at 1167 (holding the fact that CEO resigned after fraudulent conduct came to light is evidence supporting an inference of scienter); *In re Cognizant Tech. Sols. Corp. Secs. Litig.*, No. 2:16-cv-06509 WHW-CLW, 2018

---

[15] Defendants cite *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000), to argue that scienter cannot be established by virtue of Defendants' positions. But in that case, the court found that scienter was not established because the complaint failed to allege that the content of the financial reports that the defendants reviewed as corporate officers contained information that contradicted defendants' public statements. Here, Plaintiff's complaint has alleged ample evidence that indicates that as CEO and CFO, Defendants knew that PGE was engaged in non-retail energy trading, and knowingly made public statements to the contrary.

27 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

WL 3772675, at *30 (D.N.J. Aug. 8, 2018) (holding that the resignation of a member of senior management in the midst of an internal investigation can be indicative of scienter); *Southeastern Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-cv-00993, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) (same).[16]

### 3.    Confidential Witness Allegations Support an Inference of Scienter

The Complaint sets forth allegations from four confidential witnesses that support an inference of scienter.  In particular, CW2 explained that during her tenure, the Company was assuming increasing risks in its energy trades, and that traders were encouraged to meet annual revenue goals.  CW2 attributed much of these changes to Pope's new position as CEO.  ¶77.  CW2 further explained that PGE's risk management controls were flawed, and that traders were required to get approval for exceeding certain limits but did not always do so.  ¶78.  CW3 corroborated these allegations, describing intense pressure to generate profits.  In particular, a directive from senior management, whom CW3 believes is Pope, was issued to use "more creative means" and to "monetize the trading floor" to generate profit.  ¶79.

Defendants argue that the confidential witness allegations in the amended complaint do not "establish" scienter.  Def. Br. at 28-31.  In particular, Defendants claim that none of the confidential witnesses had "personal knowledge" of the alleged misconduct and that they made only conclusory assertions.  None of these arguments defeats the confidential witness allegations.

To begin, the allegations from the confidential witnesses do not need to "establish" scienter.  They simply need to lend support to the holistic analysis that, taken with other

---

[16] Cases Defendants rely on to the contrary are inapposite.  In *Zucco Partners*, 552 F.3d at 1001, the resignations were of lower-level employees.  In *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1139 (S.D. Cal. 2012), the CFO resigned after the company announced that it would not meet its revenue guidance, not in the midst of an internal investigation.

allegations, allows the Court to draw an inference that Pope and Lobdell were, at a minimum, reckless as to the fact that non-retail trading was occurring at PGE.

Further, Defendants are incorrect that the Complaint does not allege that the confidential witnesses have "personal knowledge" of the information they divulged. Under Ninth Circuit law, a "confidential witness must be 'described with sufficient particularity to establish [his or her] reliability and personal knowledge,'" that is, "'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014). Thus, the *Mulligan* court held that describing the witnesses' job and responsibilities constitutes a "large degree of specificity," especially where the witnesses' exact title is used. *Id.* The Complaint satisfies this standard. *See* ¶¶23 (CW1 was a "principal strategy integrator" who reported to the Vice President of strategy, regulation and energy supply, who reported to Pope); 24 (CW2 was a senior financial analyst who worked in the Power Operations Group and reported to the group's General Manager of Risk Management, Jim Barnes, who reported to Lobdell); 25 (CW3 was a principal analyst in the Company's strategic planning department who was two reporting levels away from Pope); 26 (CW 4 was a senior financial analyst and contract manager).

Defendants also argue that the four CWs listed in Complaint did not possess personal knowledge of the trading activity at issue in this case because they were not energy traders and did not have specific information regarding the trading losses at issue, because they worked in areas unrelated to the relevant department. Def Br. at 36-37. But this oversimplifies and misconstrues the allegations. The CWs did in fact allege personal knowledge related to the alleged fraud, because they had direct knowledge of how the trading floor operated, the inadequate risk controls at the Company, and the increasing pressure at PGE to find more creative ways to generate

29 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

revenue.  ¶79.  Moreover, the CWs did not work in "irrelevant departments" as all of the CWs' jobs involved some interaction with the trading desk or revenue generation.  ¶¶23-26.

Defendants' argument that the confidential witnesses made only "conclusory assertions of scienter" also fails.  Def. Br. at 29-30.  For example, Defendants fault CW2 – who observed increasingly risky trades made over time – for not communicating that opinion to anyone.  Def. Br. at 29.  But they do not explain why such communication is necessary for this fact to support scienter.  Defendants also mischaracterize the allegations as "vague observations."  Def. Br. at 30.

Finally, Defendants argue that CW4's statement that Pope was a "hands on manager" does not contribute to an inference of scienter.  Def. Br. at 24.  However, similar allegations have supported an inference of scienter.  *See In re VeriFone Sec. Litig.*, 704 F.3d at 710 (finding persuasive allegations that defendants were "hands-on managers").[17]

### 4. Pope's and Lobdell's SOX Certifications Support an Inference of Scienter

The Complaint alleges that Pope and Lobdell signed SOX certifications in which they attested that they "evaluated the effectiveness of [PGE's] disclosure controls and procedures." ¶¶142, 147.  Courts routinely find that these allegations support an inference of scienter.  *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 (N.D. Cal. 2020) (holding that SOX certifications, combined with other allegation of a lack of internal corporate controls contributed to an inference of scienter); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602,

---

[17] Cases Defendants cite are distinguishable.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1056 (9th Cir. 2014) (witnesses lacked "direct access" to senior executives, unlike CW1, who had "regular in-person meetings with Pope" and who explained that Pope was focused on how PGE's "business was being conducted" ¶142); *Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) (referring to "general allegations" about hands-on management style and not specific allegations coming from confidential witnesses).

617 (S.D.N.Y. 2015) (holding that SOX certifications, combined with additional allegations of knowledge, supported inference of scienter).

### 5.    The Complaint Alleges That Pope and Lobdell Had Motive and Opportunity to Commit Fraud

Although not required, the Complaint alleges that Pope and Lobdell had motive and opportunity to commit fraud because PGE was under increasing pressure to continue the trend of quarter over quarter profit increases.  ¶¶47-80.  *Fresno Cty. Employees' Ret. Ass'n. v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017) (holding that desire to meet market expectations provided motive); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 598 (D.N.J. 2001) ("Plaintiffs assert that Campbell's new management was determined to continue the Company's growth and meet Wall Street's expectations, and have identified statements to support this.  These allegations clearly give rise to a strong inference that the Company acted with scienter in failing to disclose material aspects of its operations and performance.").

Defendants argue that these allegations do not allege motive and opportunity because "every executive seeks to maximize revenue and grow profits."  Def. Br. at 32.  But the case they cite is distinguishable.  *In re Rigel Pharm, Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) concerned a stock offering, which the court characterized as a "routine corporate objective."  Here, in contrast, consistently beating earnings quarter after quarter is not "routine."[18]

---

[18] Defendants also argue that motive and scienter cannot be pled where there are no suspicious stock sales.  Def. Br. at 32.  But courts have held otherwise.  *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (scienter can be established even if the officers who made the misleading statements did not sell stock during the class period); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) (same); *In re Metawave Communications Corp. Sec. Litig.*, 298 F.Supp.2d 1056, 1071 (W.D. Wash. 2003) ("Scienter can be established even if there were no sales of stock by officers during the class period, if there were other motives for fraud, such as receiving benefits tied to the company's financial performance.")

**6.    An Inference of Scienter Is the Most Compelling Inference**

To determine if scienter is properly alleged, "courts must consider the complaint in its entirety" and determine if the Complaint alleged facts demonstrating a "strong" inference. *Tellabs,* 551 U.S. at 325. Courts are instructed to weigh potential competing inferences of non-culpability, but "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences." *Id.* at 324. Thus, "the tie goes to the Plaintiff." *Amgen Inc.*, 2014 WL 12585809, at *8.

Taken holistically, a strong inference can be drawn that Pope and Lobdell knew about, or at a minimum were reckless with regard to, the Company's use of non-retail energy trading to boost its profits and revenues. Pope had a background overseeing PGE's energy portfolio, and was charged with ultimate responsibility for PGE's risk management. ¶138, 140. It is not reasonable to infer that she was blind to PGE's trading practices, particularly since she was especially motivated to ensure that PGE continued its string of beating prior quarters' results. ¶141. Confidential witnesses back this up with their testimonials concerning an increasingly competitive environment among the traders aiming to please Pope, ¶77, and flouting the Company's official policies, ¶78. Directives to use "creative means" and to "monetize the trading floor," ¶79, further support a strong inference of scienter. The inference of scienter is further by the Compensation Committee's decision to deprive Pope and Lobdell of *any* incentive compensation for 2020 ***based on the "ill-conceived" trades alone***, ¶¶139, 145, and the Special Committee's choice to strip Pope of oversight of PGE's risk management following the Special Committee's review, ¶139. Viewed holistically, alongside Pope's and Lobdell's positions as CEO and CFO, ¶¶143, 146, and the fact that they verified that the Company's disclosure controls were adequate, ¶¶142, 147, the inference of scienter is stronger than any competing inference.

Defendants point to their disclosure of the trading losses and subsequent Special Committee investigation to support their argument that the Court cannot draw an inference of scienter. Def. Br. at 33. However, courts have found that an internal investigation does not negate an inference of scienter. *Henning v. Orient Paper, Inc.*, No. CV 10–5887–VBF (AJWx), 2011 WL 2909322, at *5 (C.D. Cal. July 20, 2011) (holding that an internal investigation does not negate inference of scienter).[19] And their decision to disclose was required once the outsized losses made it impossible to continue concealing the non-retail trading activity.

### C. The Amended Complaint Alleges Loss Causation

Loss causation is satisfied upon a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by investors. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). The Complaint meets this standard because PGE's stock price dropped soon after investors learned that PGE had been engaging in trading for non-retail purposes. ¶¶ 91-93. Thus, the Class's economic loss was directly related to PGE's misrepresentation that it did not engage in retail trading activity and the failure to disclose that the price volatility risk associated with deriving revenue from non-retail trading activity. This satisfies

---

[19] The cases Defendants cite are distinguishable. In *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010), the Court found defendants' investigation negated scienter because the Company commenced the investigation after learning new information about the risks associated with high-yield CDOs. Here, PGE's investigation was not prompted by the Company learning new information about the risks associated with non-retail trades, but because well-known risks associated with those trades had materialized due to poor risk management controls. Similarly, in *In re Seadrill Ltd. Sec. Litig.,* No. 14 CIV. 9642 (LGS), 2016 WL 3461311, at *12 (S.D.N.Y. June 20, 2016), the Court found that there was a more compelling inference of non-culpability on the part of the defendants because they could not have known the level of risk posed to the company by newly imposed international sanctions, because the effects of those sanctions were uncertain. Here, Defendants were well aware of the risks that were posed by non-retail trading long before the trading losses were announced. The holding in *In re Sanofi Sec. Litig.,* 155 F. Supp. 3d 386, 406 (S.D.N.Y. 2016), is inapposite, because the court held that an inference of scienter was negated where the company did not commission the internal investigation.

the "materialization of the risk theory." *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (holding that materialization of the risk recognizes that, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.")

Defendants incorrectly argue that PGE's August 24, 2020 announcement does not qualify as a corrective disclosure because it does not specifically state that the trades were done for non-retail purposes. Def. Br. at 35. Defendants rely on *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014), for the proposition that the mere announcement of an investigation is not sufficient to allege a corrective disclosure. However, the Complaint alleges that PGE disclosed not only the internal investigation, but also the fact that it was necessitated by $127 million in trading losses. Furthermore, a corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency. *See Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008). Thus, the August 24, 2020 announcement suffices for loss causation.[20]

Defendants' argument that the press release did not qualify as a corrective disclosure because the risks were already known to the market is also incorrect. Def. Br. at 35. Analysts expressed surprise when learning of this news, noting in particular that the Company's decision

---

[20] Defendants' reliance on *Loos* is misguided because it predates *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016), in which the Ninth Circuit held that loss causation is satisfied where the announcement of an investigation causes stock price to fall, and subsequent disclosures are made. "Indeed, any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false." *Id.*

34 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

not to apply for a PCAM adjustment was unusual and undermined the Company's "internal controls and incentives." ¶¶94-97.

### D. The Complaint Alleges Control Person Liability Under Section 20(a)

The Complaint also alleges control person liability under Section 20(a) of the Exchange Act. To allege control person liability under section 20(a), a plaintiff must allege with particularity a primary violation of the federal securities laws and control. *See In re Galena Biopharma,* 117 F. Supp. 3d at 1199–1200; *Kyung Cho v. UCBH Hldgs., Inc.*, 890 F.Supp.2d 1190, 1205 (N.D. Cal. 2012). The Complaint alleges both.

The individual Defendants qualify as control persons for the purposes of establishing liability under section 20(a), as the Complaint alleges that both Pope and Lobdell held the highest corporate positions at the Company as CEO and CFO respectively, ¶¶16-17, signed PGE's SEC Filings that contained materially false and misleading statements, ¶¶103-104, and had supervisory responsibility over PGE's day to day operations, ¶¶140,144,146,148. *See In re Montage Tech. Grp. Ltd. Sec. Litig.,* 78 F.Supp.3d. 1215, 1228 (N.D. Cal. Jan. 29, 2015) *(*control person liability was sufficiently alleged where plaintiffs alleged that the individual defendants were CEO, CFO, and President and that the individual defendants signed the SEC filings forming the basis of the action). Since the Complaint alleges a primary violation of Section 10(b) of the Exchange Act, it also states a claim for the violation of Section 20 (a).

## IV.    CONCLUSION

For the foregoing reasons, the Court should dismiss Defendants' Motion in its entirety. However, if the Court grants the Motion, Plaintiff respectfully requests that it be afforded an opportunity to replead its claims. "As a general rule, [d]ismissal without leave to amend is improper unless it is clear ... that the complaint could not be saved by any amendment.") *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1258 (D. Nev. 2019).

Dated this 11th day of May, 2021.

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**


By: s/ Keil M. Mueller
    **Keith S. Dubanevich,** OSB No. 975200
    **Keil M. Mueller**, OSB No. 085535

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840
Email: Kdubanevich@stollberne.com
        kmueller@stollberne.com

*Liaison Counsel for the putative class*


and

**GRANT & EISENHOFER P.A.**
Daniel L. Berger (admitted pro hac vice)
Barbara Hart (admitted pro hac vice)
Caitlin M. Moyna (admitted pro hac vice)
485 Lexington Avenue
New York, NY 10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501
Email: dberger@gelaw.com
        bhart@gelaw.com
        cmoyna@gelaw.com

*Lead Counsel for the putative class*

36 – MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS